UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNIVERSITAS EDUCATION, LLC,

        Petitioner,

   -v-                          Nos.    11CV1590-LTS-HBP
                                             and
                                   11CV8726-LTS-HBP

NOVA GROUP, INC., as trustee, sponsor and
fiduciary of THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN,

        Respondent.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Following entry of judgment in its favor in the above captioned-actions,

Universitas Education, LLC ("Petitioner") seeks, pursuant to New York Civil Practice Law and

Rules ("C.P.L.R.") section 5225(b) and Federal Rule of Civil Procedure 69, the turnover of

assets by respondent Daniel E. Carpenter and his affiliated entities Grist Mill Capital, LLC, Grist

Mill Holdings, LLC, the Grist Mill Trust Welfare Benefit Plan, Avon Capital, LLC, Hanover

Trust Company, Carpenter Financial Group and Phoenix Capital Management, LLC (with

Carpenter, the "Turnover Respondents"), as well as permanent injunctive relief barring the

transfer by the Turnover Respondents of money and assets, including certain specified insurance

policies, until Petitioner's judgment against Nova Group, Inc., has been satisfied.  (Docket entry

no. 308.)[1]

---

[1]     Docket entry numbers in this Memorandum Opinion and Order refer exclusively to those in case number 11 Civ. 1590.

Case 1:14-fj-00005-LFS   Document 133-1   Filed 12/10/18   Page 2 of 24

The Court has jurisdiction of these proceedings pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), 1441 and 1367.

Petitioner filed this motion for turnover against the Turnover Respondents on October 21, 2013.  The Court held an evidentiary hearing on November 22, 2013.  The Court heard oral argument regarding Petitioner's request for permanent injunctive relief on June 18, 2014.  Post-hearing submissions were completed on July 11, 2014.

On January 13, 2014, the Court granted Petitioner's related motion for a preliminary injunction barring Mr. Carpenter, his controlled entities, his entities' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them, pending resolution of Petitioner's turnover motion, from directly or indirectly causing, making, permitting or suffering any sale, assignment or transfer of, or any interference with, any asset or property of Mr. Carpenter, and any asset or property of any company, corporation or other entity (including any trusts) in which Mr. Carpenter has a direct or indirect interest or control; provided that Mr. Carpenter is permitted to expend or transfer up to an aggregate amount of $20,000.00 per month solely for ordinary expenses of himself and all of the entities that are subject to the preliminary injunction.[2]  (Docket entry no. 366 (the "January Order").)

The Court has considered carefully all of the submissions and arguments of the parties, the documentary evidence, including transcripts of deposition testimony, and the courtroom testimony.  In accordance with Federal Rule of Civil Procedure 52(a), this Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.  To the

---

[2]     Mr. Carpenter and certain third parties have moved to modify this temporary injunction to allow transactions between themselves and certain of the Turnover Respondents.  (See docket entry nos. 409, 412, and 448.)

extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa. For the following reasons, Petitioner's motion is granted in part.

FINDINGS OF FACT

This proceeding is the second turnover motion in the extensive litigation over the disposition of proceeds of two insurance policies on the life of the late Sash A. Spencer, who was the Chief Executive Officer of Holding Capital Group, Inc. The Court's Memorandum Opinion and Order resolving Petitioner's first turnover motion (docket entry no. 341, the "November Order") discusses the underlying facts in this case in detail, familiarity with which is presumed.

Mr. Spencer named Petitioner the sole, irrevocable beneficiary of a Charter Oak Trust death benefit comprising the proceeds payable under the two life insurance policies, whose face values totaled more than $30 million (the "Insurance Proceeds"). Under the confirmed arbitration award upon which judgment against Nova (in its capacity as trustee of the Charter Oak Trust) has been entered, all but $4.02 million of the Insurance Proceeds are owed to Petitioner. The Insurance Proceeds were paid to Charter Oak Trust and then removed from the Charter Oak Trust through a series of fourteen fraudulent transfers to other entities controlled, at all relevant times, by Mr. Carpenter. (See November Order at 6.)

Control of the Turnover Respondent Entities

In the November Order, the Court found that Mr. Carpenter controlled, during the periods relevant to the transactions discussed therein (May 2009 to October 2010), Nova Group, Inc. ("Nova"), Charter Oak Trust ("Charter Oak"), Grist Mill Capital, LLC ("Grist Mill"), Grist Mill Trust Welfare Benefit Plan ("GM Trust"), Grist Mill Holdings, LLC ("GM Holdings"), Phoenix Capital Management, LLC ("Phoenix"), and Caroline Financial Group, Inc. ("Caroline

Financial"), as well as hundreds of other related entities. The Court found that Mr. Carpenter had used these shell entities to hide assets from Petitioner, Nova's judgment creditor. Among other things, the Court found that Wayne Bursey, who was President of Nova and Trustee of the Charter Oak Trust, was Mr. Carpenter's confederate in the fraudulent transfers found in the November Order. The Court noted that, "[d]espite the fact that Mr. Bursey had earlier acknowledged a fiduciary duty to pay Petitioner the trust funds, he proceeded to transfer the entire amount of the Insurance Proceeds to Grist Mill over a period of six months while wrongly denying Petitioner's claims." (November Order at 18.) The Court further found that this transfer was designed to fraudulently benefit Mr. Carpenter.

Mr. Bursey is also affiliated with GM Trust. In a submission in opposition to the instant motion practice, GM Trust asserts that it was not controlled by Mr. Carpenter during the relevant period, proffering testimony by one Kathy Kehoe. Ms. Kehoe, a member of the Trust Department of Benistar Admin Services, Inc., which was the third-party administrator of GM Trust, testified that Wayne H. Bursey is signatory trustee of Nova Benefit Plans, LLC, which is the trustee and plan sponsor of GM Trust. GM Trust argues that "the familial relationship between Wayne H. Bursey and Dan Carpenter, standing alone, is not itself determinative of fraud." (Docket entry no. 337, pg. 23.) The Court has reconsidered de novo the question of control of GM Trust in light of the augmented record and concludes that GM Trust was under Mr. Carpenter's control at all relevant times, notwithstanding Mr. Bursey's titular authority. The record as a whole, including but not limited to the nature and timing of Mr. Bursey's actions in his various capacities, Mr. Carpenter's failure to offer credible justifications for the transfers, and Mr. Bursey's failure to proffer any explanations at all, proves by a preponderance of the evidence that GM Trust was under Mr. Carpenter's control at the time of the challenged transfers

of Insurance Proceeds. Ms. Kehoe's testimony, which presents no facts inconsistent with actual control by Mr. Carpenter, is insufficient to overcome Petitioner's proof.

The credible evidence of record also proves that the remaining Turnover Respondents, Avon Capital, LLC ("Avon") and Carpenter Financial Group ("CFG"), were also under Mr. Carpenter's control during the relevant transactions. Mr. Carpenter controlled CFG, serving as Chairman and Secretary during the relevant period. (Docket entry no. 338, pg. 9.) Avon was controlled by its managing member, Grist Mill, which is wholly owned by its members Grist Mill Holdings and Caroline Financial Group, Inc., both of which were wholly owned by Mr. Carpenter. (See May 9, 2013 Tr. at 25:2-4; Docket entry no. 223 at Ex. 22 at 47:15-18 ("[GM Holdings] is my alter ego for collecting commissions.").)

None of the entities controlled by Mr. Carpenter are New York entities. Each Turnover Respondent has waived the service requirements under Federal Rule of Civil Procedure 4 and accepted service of the motion for turnover via e-mail. (See docket entry no. 466.)

Fraudulent Conveyances to Mr. Carpenter's Entities

In May 2009, the insurer paid Charter Oak Trust $30.67 million in Insurance Proceeds, including interest, and Wayne H. Bursey signed for the deposit as trustee. (November Order at 3.) In its November Order, the Court further found that Mr. Carpenter had fraudulently transferred $8,677,276.75 and $2,186,566 (a total of $10.8 million) from Charter Oak Trust to Grist Mill in May 2009 for his own benefit. The Court found that, of these funds, $3.79 million was then transferred from Grist Mill to GM Trust, $2.7 million was transferred from GM Trust to Phoenix, $2.5 million was then transferred from GM Trust back to Grist Mill, $2.2 million

was transferred to GM Holdings, and that GM Holdings then transferred $1.2 million to

Hanover.  The Court held that each of these transfers was fraudulent under New York law.  The

Court has reconsidered de novo its findings with respect to these fraudulent transfers in light of

the record presented, and the additional arguments and evidence proffered by the Turnover

Respondents, and finds that Petitioner has proven by clear and convincing evidence that each of

these transfers was fraudulent.

       Petitioner has also proven that the following additional transfers were fraudulent.

On October 27, 2009, Mr. Carpenter caused $19.8 million to be transferred from the Charter Oak

Trust to Grist Mill's account.  (Nov. 22, 2013 Tr. at 27:8-24; Barnett Decl. Oct. 21, 2013 ¶ 56,

Ex. 31.)  Mr. Carpenter then caused $19 million to be transferred from Grist Mill to GM

Holdings the next day, on October 28, 2009.  (Barnett Decl. Oct. 21, 2013 ¶ 59, Ex. 35; Nov. 22,

2013 Tr. at 70:10-17.)  Grist Mill also transferred $6,710,065.92 to Avon on November 11,

2009, at the direction of Mr. Carpenter.  (Barnett Decl. Oct. 21, 2013 ¶ 59, Ex. 35.)  On

November 12, 2009, Mr. Carpenter caused GM Holdings to transfer $4,140,000 to CFG.

(Barnett Decl. Oct. 21, 2013 ¶ 60, Ex. 37; Nov. 22 Tr. 70:10-17.)  GM Holdings transferred an

additional $7 million to CFG on December 3, 2009.  (Barnett Decl. Oct. 21, 2013  ¶ 62, Ex. 40.)

On December 3, 2009, CFG transferred $5 million to Phoenix at the direction of Mr. Carpenter.

(Barnett Decl. Oct. 21, 2013 ¶ 62, Ex. 40.)  That same day, Grist Mill made two transfers to GM

Trust, in the amounts of $510,000 and $178,125.  (Barnett Decl. ¶¶ 63 and 64, Ex. 43.)  These

transfers were without documentation or consideration, a clear sign of fraud.  The haste and

rapid succession of the transfers is also indicative of fraudulent intent by the Turnover

Respondents.  Furthermore, Nova and Mr. Carpenter resisted all discovery efforts to determine

the whereabouts of the Insurance Proceeds after the transfers, and such secrecy further indicates a fraudulent intent.  The Court finds that Petitioner has demonstrated by clear and convincing evidence that these transfers among Mr. Carpenter's entities were fraudulent.

No credible explanation for these transfers has been offered by the Turnover Respondents.  The Turnover Respondents offered Mr. Carpenter's testimony to explain the purpose of the series of transfers.  Mr. Carpenter's testimony largely mirrored the testimony that the Court had rejected as incredible in the November Order.  At the November 22, 2013, hearing in connection with the preliminary injunction and turnover motion practice, Mr. Carpenter again testified that certain pre-existing debts and security interests allowed Grist Mill to retain the benefit of the Spencer life insurance policies.  Mr. Carpenter testified, among other things, that Charter Oak Trust owed Grist Mill $60 million before the transfers of money it received in May and October 2009.  Carpenter's testimony in this regard was neither consistent with the documents of record nor credible.  Mr. Carpenter also testified incredibly that the transfer of $19.8 million from Charter Oak to Grist Mill was legal because of a "confidential settlement indemnity agreement" that, he alleged, allowed Grist Mill to retain the remaining proceeds of the Spencer policies.  (Nov. 22 Tr. 23:20-24.)  In the underlying arbitration proceeding in which Nova's liability to Petitioner for the Insurance Proceeds was initially determined, the arbitrator had rejected similar contentions advanced by Nova, and held, in the confirmed arbitration award, that the total amount payable to Grist Mill from the Insurance Proceeds was only $4.02 million, and that the remainder of the Insurance Proceeds, plus interest, were payable to Petitioner.

Mr. Carpenter asserted that the subsequent transfers, after Grist Mill received the Insurance Proceeds, among his other entities were made because the funds were required to pay

life insurance premiums on policies held by Avon and GM Trust, and to ensure "tax-free receipt" of the Insurance Proceeds. While there is no doubt that some of the funds eventually were applied in this fashion, neither the "tax free receipt" of the funds, nor the need to pay life insurance premiums, provides a justification for Mr. Carpenter's usurpation of the Insurance Proceeds. These explanations, furthermore, do not demonstrate that the Insurance Proceeds were properly in possession of any of his entities other than the Charter Oak Trust, which was obligated to pay them to Petitioner.

Mr. Carpenter also asserted that the two transfers made from Grist Mill to GM Trust on December 3, 2009, totaling $688,125, were repayments of an antecedent debt, specifically stating that GM Trust had made certain payments to the IRS for a client of Grist Mill. (Carpenter Aff. ¶ 39.) The Court found in the January Order that these assertions were not credible. GM Trust submitted the affidavit of Kathy Kehoe in support of the existence of these antecedent debts. Ms. Kehoe's affidavit does not attempt to explain all of the transfers of GM Trust, as it does not explain the $2.7 million loan allegedly made from GM Trust to Phoenix in June 2009. Nor does the affidavit demonstrate that Ms. Kehoe has personal knowledge of any facts regarding the transfers. The affidavit appears to be based on the assertions of Mr. Carpenter and his wife. At her deposition on January 7, 2014, Ms. Kehoe admitted that she was unaware of any loans made by Grist Mill Trust to anyone until six weeks prior to her deposition. (Docket entry no. 371, Ex. 65, at 109:5-7.) Ms. Kehoe further testified that she asked certain questions of Ms. Carpenter in preparation of her affidavit. (Docket entry no. 371, Ex. 65, at 23:1-22.) Wayne Bursey appointed Ms. Kehoe to sign the affidavit on behalf of GM Trust and

to serve as its deposition designee.  Ms. Kehoe's testimony lacks foundation, as she has not demonstrated personal knowledge of the transfers.

As the Court noted in the November Order, Grist Mill appointed Peter A. Goldman, Esq., as its agent to review documents and testify on its behalf in this case.  Mr. Goldman testified in May 2013 that he had been retained in an attempt to "determine what happened to $30 million." (May 9 Tr. at 120:20-22.)  Mr. Goldman further testified that he had reviewed certain records of Grist Mill, and that he had confirmed that there had been transfers totaling about $31 million from the Charter Oak Trust. (May 9, 2013 Tr. at 115:14-24.)  He reported that he could not explain why the Charter Oak Trust had made any of the three transfers to Grist Mill. (May 9, 2013 Tr. at 114:5-25, 115:21-25, 116:1-17.)  As to the $19.8 million that was transferred from Charter Oak Trust to Grist Mill in October 2009, Mr. Goldman reported that it was recorded in the Grist Mill's general ledger as an "unknown deposit." (May 9 Tr. at 118:19-20.)

Based upon its careful review of the entirety of the Record, the Court finds that Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the Insurance Proceeds, to which Petitioner is entitled, to and through entities that he controlled, either directly or indirectly, all for the personal benefit of Mr. Carpenter and his affiliates and without consideration.

The testimony proffered by the Turnover Respondents fails to credibly refute Petitioner's demonstration of their fraudulent intent in engaging in the series of transfers of the Insurance Proceeds.

<u>CONCLUSIONS OF LAW</u>

        For the following reasons, the Court concludes that it has jurisdiction over each

Turnover Respondent and that each Turnover Respondent is liable, jointly and severally with

each other Turnover Respondent, for a sum of money equal to the portion of the Insurance

Proceeds of which it was a transferee.

<u>Personal Jurisdiction and Service of Process</u>

        The Turnover Respondents, other than Mr. Carpenter,[3] argue that the Court does

not have personal jurisdiction over them because they are not New York domiciliaries and the

New York long-arm statute is insufficient to render them subject to the Court's specific

jurisdiction or, alternatively, that such exercise of jurisdiction would violate their Due Process

rights.  The Turnover Respondents also argue that they were not served in accordance with

Federal Rules of Civil Procedure.

        In New York, courts undertake a two part analysis to determine whether the

exercise of personal jurisdiction of a defendant is proper: 1) the court must determine whether

N.Y. C.P.L.R. sections 301 or 302 provide a basis for personal jurisdiction, and 2) if they do, the

court must determine whether the exercise of personal jurisdiction over the defendant would

offend the constitutional right to due process under the principles enunciated in <u>International</u>

<u>Shoe Company v. Washington</u>, 326 U.S. 310 (1945), and its progeny.  <u>See</u> <u>A.I. Trade Finance,</u>

<u>Inc. v. Petra Bank</u>, 989 F.2d 76, 82 (2d Cir. 1993).

        Specific jurisdiction may be exercised over non-domiciliaries who engage certain

acts, including the commission of torts outside of New York which cause injury within the state,

---

        [3]        Mr. Carpenter has not challenged the Court's personal jurisdiction over him.

so long as the tortfeasor regularly does business within New York or should reasonably expect that the tortious conduct will cause consequences within the New York and the tortfeasor "derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. § 302(a)(3).

With respect to the applicability of the N.Y. C.P.L.R. section 302(a)(3) long-arm provision, the Turnover Respondents have only contested whether injury was caused within the state of New York and whether the Turnover Respondents should reasonably have expected their acts to have consequences in New York.

A fraudulent conveyance is a species of tort.  See Bank of Commc'ns v. Ocean Dev. Am., Inc., 07 Civ. 4628, 2010 WL 768881 (S.D.N.Y. Mar. 8, 2010).  Rendering a creditor unable to recover on a defaulted debt in New York through a fraudulent conveyance constitutes injury in New York that is reasonably foreseeable.  See Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F. Supp. 765, 771 (E.D.N.Y. 1995) ("[J]urisdiction under section 302(a)(3)(ii) is appropriate, because [defendant's] actions regarding the sale of [debtor's] assets and the subsequent transfer of the proceeds to [defendant] could reasonably have been expected to have had consequences in New York with respect to [plaintiff's] ability to" recover a debt.).

Here, the situs of the injury is New York, because the fraudulent conveyances impeded Petitioner's ability to enforce its New York judgment.  During the time period in which the conveyances at issue occurred, Mr. Carpenter both controlled the Turnover Respondents and acted as their principal or agent in accomplishing the transfers.  As the Court found in the November Order, the conveyances were accomplished at a time when Mr. Carpenter knew that Petitioner was asserting a right to the proceeds of the insurance policies and was considering

litigation.  (See November Order at 20.)  Mr. Carpenter was also aware that Petitioner would be

required to arbitrate any claims arising from a dispute over the Insurance Proceeds in New York,

and that any confirmed award would result in a New York judgment.  The conveyances were

thus actions taken on behalf of the Turnover Respondents by Mr. Carpenter and designed

fraudulently to render the prospective New York judgment unrecoverable, despite the fact that

the actions may have been performed in Connecticut.  Therefore, the Turnover Respondents

should reasonably have expected their actions to create an injury in New York.  See Bank of

Commc'ns, 2010 WL 768881, at * 3 (exercising personal jurisdiction over defendant, in

fraudulent conveyance action, that purchased without fair consideration California warehouse

from debtor during pendency of New York litigation); Sunrise Indus., 873 F. Supp. at 771.

        To comply with the Due Process Clause of the Constitution, a court must only

exercise personal jurisdiction over a defendant whose "conduct and connection with the forum

State are such that he should reasonably anticipate being haled into court there."  Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 (1985) (quoting World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 297 (1980)).  The conduct of tortious activity targeted at a New York

entity and a New York judgment suffices to demonstrate that the Turnover Respondents should

reasonably have anticipated being haled into court here.

        The Court must go on to consider whether the assertion of jurisdiction "comports

with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable

under the circumstances of a particular case."  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84

F.3d 560, 568 (2d Cir. 1996) (quoting International Shoe, 326 U.S. at 316).  "[I]n assessing

whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative

strengths and weaknesses of each requirement—that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." Metro. Life, 84 F.3d at 568.

Five reasonableness factors are relevant to this inquiry: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metro. Life, 84 F.3d at 568 (citing Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty., 480 U.S. 102, 113 (1987)).

First, the burden on the Turnover Respondents is light. The Turnover Respondents are entities formed in Delaware and Connecticut, with offices in Simsbury, Connecticut, and can easily be represented in New York. Second, New York has a strong interest in protecting people within its borders from fraud and protecting the legitimacy of its court judgments. The third factor is neutral, because Petitioner could have sought relief in nearby Connecticut. Fourth, if the Court were to find that a fraudulent conveyance tortfeasor could be haled into court only where the actions took place, rather than where the harm was focused, a tortfeasor would have ultimate control over where suit might be brought, and might spread suits among a variety of jurisdictions. Fifth, the states have a shared interest in preventing fraudulent conveyances. See 7-Eleven, Inc. v. Upadhyaya, 926 F. Supp. 2d 614, 631 (E.D. Pa. 2013) (holding that fraud prevention is in the public interest). The factors, thus, weigh

in favor of the reasonableness of the Court's exercise of jurisdiction over the Turnover Respondents.

The Turnover Respondents' final objection to the exercise of jurisdiction – insufficiency of process – is meritless. Petitioner filed a certification verifying that each of the Turnover Respondents agreed to accept, and accepted, service by e-mail. The Turnover Respondents do not contest the veracity of this certification.

The Court thus has personal jurisdiction over the Turnover Respondents pursuant to C.P.L.R. section 302(a)(3), and this exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the Constitution.

<u>Necessity of a Special Proceeding</u>

Under New York law, which is made applicable in this Court by Federal Rule of Civil Procedure 69, a judgment creditor may seek the turnover of property not in possession of the judgment debtor, in which the judgment debtor has an interest, through a special proceeding. <u>See</u> N.Y. C.P.L.R. 5225(b) (McKinney 2012). The Turnover Respondents raise a further procedural objection to Petitioner's instant motion practice against them, arguing that Petitioner was required to commence a separate special proceeding against them, since they were not parties to the underlying litigation, and could not properly initiate this C.P.L.R. 5225(b) turnover proceeding as post-judgment motion practice in the above-captioned actions.

The Court has already held in this case that a judgment debtor in federal court may initiate a turnover proceeding by motion, rather than by initiating a new proceeding. <u>See</u> November Order, at 13-14. The Turnover Respondents raise no arguments that the Court has not previously considered. Furthermore, courts in this Circuit have consistently held that, because

Case 1:14-cv-00005-LTS-HBP   Document 123-9   Filed 12/18/14   Page 15 of 24

there is no provision for a "special proceeding" under the Federal Rules of Civil Procedure, it is appropriate to seek a turnover order against a third-party through motion practice.  See, e.g., N. Mariana Islands v. Millard, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012) (noting that "[n]early every court in this Circuit to consider the issue has held that parties can bring a motion under FRCP 69(a), rather than instituting a special proceeding under New York state law.").  Turnover Respondents' objection to the use of the motion procedure is therefore meritless.

Merits of Turnover Motion

Federal Rule of Civil Procedure 69 requires that a money judgment be enforced by a writ of execution and provides that "the procedure on execution . . . must accord with the procedure of the state where the court is located."  Under New York law, "[a] judgment creditor may use Section 5225(b) 'as the means to set aside a transfer made by a judgment debtor to defraud his creditors.'"  Leser v. U.S. Bank Nat. Ass'n, 09 Civ. 2362, 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013) (quoting Gelbard v. Esses, 96 A.D. 2d 573, 465 N.Y.S. 2d 264, 267 (N.Y. App. Div. 2d Dep't 1983)).  A judgment creditor may move for turnover of property not in possession of the judgment debtor, in which the judgment debtor has an interest, where "it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee."  N.Y. C.P.L.R. 5225(b) (McKinney 1997).

> [T]he rule provides for a two-step analysis in determining whether property belonging to a judgment-debtor that is in the possession of a third party, should be turned over to a judgment creditor.  First, it must be shown that the judgment debtor has an interest in the property the creditor seeks to reach.  Where this first step is satisfied, the court must then make one of two findings: either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party in

possession. Only after both steps of the analysis are demonstrated may the trial court order the transferee to turn over the property to the judgment creditor . . . .

Beauvais v. Allegiance Sec., Inc., 942 F.2d 838, 840-41 (2d Cir. 1991) (internal quotation marks omitted).

As explained infra, New York law permits a judgment creditor to obtain a money judgment in lieu of turnover of specific property where, as here, recipients of fraudulent conveyances have dissipated the transferred assets.

Applicable Fraudulent Conveyance Statute

Turnover Respondents contend that the Court should apply Connecticut's fraudulent transfer statute, rather than New York's, asserting that Connecticut's four-year statute of repose would bar Petitioner's claims, which arise from transfers that occurred beginning in May 2009 and were first asserted directly against most of the Turnover Respondents in October 2013. Connecticut's statute of repose provides in pertinent part that:

> [a] cause of action with respect to a fraudulent transfer or obligation . . . is extinguished unless action is brought . . . within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

Conn. Gen. Stat. Ann. § 52-552j. While the Connecticut statute generally imposes a four-year deadline on the commencement of actions for fraudulent conveyances, it includes a provision extending the time limit for one year after discovery, where the fraud has been concealed. The evidence in this case proves that Mr. Carpenter and his entities actively concealed the fraudulent conveyances by using shell entities to secretly move the Insurance Proceeds away from the Charter Oak Trust, and then vigorously resisting efforts to enforce Petitioner's judgment, and opposing all discovery efforts designed to determine the whereabouts of the Insurance Proceeds.

See, e.g., November Order at 4 ("Petitioner has engaged in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates."). Petitioner was not in a position to understand the nature of the transfers until November 30, 2012, when Petitioner first received a production of bank records related to the transfers. (See Barnett Decl. Jan. 24, 2014, Ex. 75.) This turnover proceeding was commenced within a year of that date and thus is timely even under the Connecticut statute.

Petitioner relies on New York fraudulent conveyance law. The Turnover Respondents raise no objection to the legal principles cited by Petitioner, other than their statute of limitations argument. For this reason, and because application of Connecticut law would make no material difference in the outcome, the Court applies New York fraudulent conveyance law in resolving the substantive issues presented by Petitioner's turnover motion.

Fraudulent Conveyances to and Among the Turnover Respondents

Under the New York Debtor and Creditor Law, a conveyance may be avoided as actually fraudulent or constructively fraudulent. See N.Y. Debt. & Cred. Law §§ 273, 275 (McKinney 2012).

A debtor's conveyance made with the "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 (McKinney 2012). Under section 276, "[t]he existence of actual intent to defraud is never presumed, and intent to defraud cannot be found 'based merely on suspicion, conjecture, or doubtful inference.'" Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004).

Therefore, "[a]ctual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction." HBE Leasing, 48 F.3d at 639.

Under section 276 of the New York Debtor and Creditor Law, courts have applied "an analysis of 'badges of fraud' associated with the transaction, which are 'circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent,' to hinder, delay, or defraud a present or future creditor." See Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., No 04 Civ. 4971, 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013) (internal quotation and citation omitted). These "badges of fraud" include: 1) inside transactions among related entities, 2) hasty transfers made outside of the ordinary course of business, 3) inadequate or absent consideration, 4) secret transfers, 5) retention of control by the transferor, and 6) creation of a shield of property from creditors. See Lippe, 249 F. Supp. 2d at 375; Lesser, 2013 WL 3788877, at *8. Absence of these indicators – "evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control" – suggests that no fraudulent intent was present. Lesser, 2013 WL 3788877, at *8.

In the November Order, the Court held that:

Mr. Carpenter caused Nova, the Charter Oak Trust, and other affiliated entities, directly or indirectly, to transfer the . . . Insurance Proceeds to which Petitioner is entitled. Mr. Carpenter caused the . . . Insurance Proceeds to be transferred to and through entities that he controlled, either directly or indirectly, including Moonstone, for the personal benefit of Mr. Carpenter and his affiliates.

(November Order at 13.)  As explained above, the Court, having again considered the legitimacy of these transfers in light of the supplemented record, finds that the evidence is clear and convincing that they were without consideration or proper justification, and were undertaken in order to deprive Petitioner of rightful access to the Insurance Proceeds.

Petitioner has now identified additional transactions that were part of, or related to, the original series of fraudulent conveyances found in the November Order.  The newly identified transactions were conducted with the same intent to defraud as those identified in the November Order.  The additional transfers identified by Petitioner bear similar indicia of fraud, most importantly that the value was retained by Mr. Carpenter, as demonstrated through the transfers to and among the Turnover Respondent entities, each of which was controlled by Mr. Carpenter.  Tellingly, Grist Mill's agent, Mr. Goldman, could not explain the purpose of any of the transfers of the Insurance Proceeds from Charter Oak into Grist Mill.  Credible, legitimate explanations are also entirely lacking for the subsequent transfers to and among the Carpenter-controlled Turnover Respondent entities.  Furthermore, Mr. Carpenter and the Turnover Respondent entities fought to hide the evidence of these transfers well after judgment was entered in favor of Petitioner, as is noted in prior orders, rather than proffering their purported explanations of the transfers in a timely fashion.  (See, e.g., November Order at 2 ("Petitioner has engaged in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates.").)

The Court finds that Petitioner has demonstrated by clear and convincing evidence that each of the identified transfers to the Turnover Respondents was part of, or related to, the series of fraudulent conveyances identified in the November Order.

Relief – Money Judgments

The Turnover Respondents deny that they are still in possession of the fraudulently conveyed funds.  Courts in New York are authorized to enter money judgments in favor of a movant for turnover pursuant to N.Y. C.P.L.R. section 5225(b), where the assets have been dissipated.  See F.D.I.C. v. Conte, 204 A.D. 2d 845, 846 (N.Y. App. Div. Dep't 1994) ("[CPLR 5225(b)] furnishes a mechanism for obtaining a money judgment against the recipient of a fraudulent conveyance who has, in the interim, spent or dissipated the property conveyed.") Therefore, money judgments will be awarded to Petitioner against each of the Turnover Respondents in the following amounts, representing the amount of Insurance Proceeds that was fraudulently conveyed, directly or indirectly, to each:

Daniel E. Carpenter- $30,600,000.00;

Grist Mill Capital, LLC - $30,600,000.00[4];

Grist Mill Holdings, LLC - $21,000,000.00;

Carpenter Financial Group - $11,140,000.00;

Avon Capital, LLC - $6,710,065.92;

Phoenix Capital Management, LLC- $5,000,000.00;

Grist Mill Trust Welfare Benefit Plan, and any trustees and plan sponsors thereof insofar as they hold Grist Mill Trust assets - $4,487,007.81; and

---

[4]     Although Petitioner sought money judgments against Mr. Carpenter and Grist Mill Capital, LLC for $31,263,842.75 each, the record demonstrates that only $30,600,000.00 was fraudulently conveyed from the Charter Oak Trust to Grist Mill Capital, LLC for Mr. Carpenter's benefit.  A movant may only recover by turnover assets in which the judgment debtor has an interest.  See N.Y. C.P.L.R. 5225(b). Thus, the Court awards only the amount found to have been fraudulently conveyed, in which the judgment debtor has an interest.

Hanover Trust Company - $1,200,000.00.

Requests for Permanent Injunction and Other Equitable Relief

Petitioner also seeks equitable relief in the form of a permanent injunction barring transfers of assets by the Turnover Respondents,[5] an injunction barring the transfer of certain specific insurance policies, an order to "retitle" certain insurance policies that were allegedly transferred out of the Charter Oak Trust, and an order requiring the turnover of any future proceeds of a lawsuit to which one of the Turnover Respondents is a party. All of the requested relief would remain in place until the entire judgment against Nova has been satisfied. The injunctive measures Petitioner seeks combine to constitute, in effect, a perpetual, across-the-board limitation, on the Turnover Respondents' use of their general assets, with Petitioner playing a supervisory role with respect to all but the most minor of their business dealings.

Petitioner's motion was brought pursuant to Federal Rule of Civil Procedure 69(a), which provides that "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a). There is no applicable federal statute, so the Court looks to New York law to determine whether it provides authority for the extraordinary measures sought here. The New York Civil Practice

---

[5]     Petitioner's latest iteration of its asset restriction request is set forth in docket entry no. 470. Petitioner's proposed order would restrict transfers of money for most of the Turnover Respondents until Nova's judgment is satisfied. It would restrict transfers of insurance policies held by GM Trust except where in "strict compliance" with certain provisions of the GM Trust documents.

Law and Rules authorize the use of certain collection methods in aid of judgment execution.

Petitioner cites no statutory authority for the expansive injunctive relief it now seeks.

        The cases upon which Petitioner relies look to other bodies of law or general

powers of the court, and each is materially distinguishable from the instant judgment collection

action.  In Global NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 15 (1st Cir. 2013), the

First Circuit upheld an injunction barring judgment debtors from "interfering with [,] . . .

reducing the value of, or otherwise damaging" specific companies that the individual judgment

debtor owned, while a receiver was placing the companies up for sale to satisfy the judgment.  In

Yukos Capital S.A.R.L. v. OAO Samaraneftegaz, 10 Civ. 6147, 2014 WL 81563 (S.D.N.Y. Jan.

9, 2014), the court granted an injunction barring a judgment debtor from "paying dividends,

making loans, or otherwise making further payments to its shareholder or other corporate

affiliates, until [the judgment debtor] either satisfie[d] the Judgment or post[ed] a bond pending

appeal."  In NML Capital, Ltd. v. Republic of Argentina, 699 F.3d 246, 262 (2d Cir. 2012), cert.

denied, 134 S. Ct. 201 (U.S. 2013), the Second Circuit upheld an order directing specific

performance of payment priorities in a bond indenture, and thereby barring the judgment debtor,

the Republic of Argentina, from making payments to certain bondholders prior to paying others.

Finally, in Jones v. Dana, 06 Civ. 0159, 2006 WL 1153358 (S.D.N.Y. May 2, 2006), the court

declared a constructive trust and enjoined defendants who were found to have fraudulently taken

funds from the plaintiff, from removing or destroying records and accessing, expending, or

dispersing certain fraudulently "converted funds."  In each case, the court granted a very specific

injunction, affecting particular assets or entities, in aid of the preservation of the judgment

creditor's rights as against specific adverse claimants or actors within a specific temporal or

transactional context. Furthermore, in each case, the injunction was imposed on the original judgment debtor.

Here, by contrast, Petitioner seeks to impose an expansive and permanent restriction on the general financial activities of the Turnover Respondents, none of whom was originally a judgment debtor in this case. This type of injunction, which is tantamount to a general receivership by a judgment creditor over all assets and interests of a host of individuals and entities that are engaged in business relationships with still other entities and members of the public, is not contemplated by New York's judgment collection statutes, which focus on liens, garnishments, executions, turnovers, and receivership measures targeting specific identified assets. See generally N.Y. C.P.L.R. Article 52. Petitioner's request for permanent injunctive relief is denied.

Petitioner's requests for a retitling of insurance policies, prohibition on the transfer of specified insurance policies in which other individuals and entities appear to have interests, and future payment of contingent litigation proceeds are equally unfounded. Petitioner again points to no authority within the Court's judgment execution powers to grant such relief. These requests are denied, without prejudice to proceedings to execute upon particular assets and the use of other appropriate judgment collection procedures under the laws of relevant jurisdictions.

### CONCLUSION

For the foregoing reasons, Petitioner's turnover motion is granted. Petitioner is hereby granted money judgments as follows: against Daniel E. Carpenter in the amount of $30,600,000.00; against Grist Mill Capital, LLC, in the amount of $30,600,000.00; against Grist

Mill Holdings, LLC, in the amount of $21,000,000.00; against Carpenter Financial Group, in the

amount of $11,140,000.00; against Avon Capital, LLC, in the amount of $6,710,065.92; against

Phoenix Capital Management, LLC, in the amount of $5,000,000.00; against Grist Mill Trust

Welfare Benefit Plan, and any trustees and plan sponsors thereto insofar as they hold Grist Mill

Trust assets, in the amount of $4,487,007.81; and against Hanover Trust Company, in the

amount of $1,200,000.00.  The Clerk of the Court is requested to enter judgment against the

Turnover Respondents accordingly.  Liability under the judgments is joint and several.

Petitioner's requests for permanent injunctive and other equitable relief are

denied.

Each of the third-party motions to modify the preliminary injunction, docket entry

numbers 409, 412, and 448, are denied as moot, as the preliminary injunction is hereby

terminated pursuant to the provisions of the January Order, because Petitioner's motion for

turnover has been resolved.  (See January Order at 15.)

The Order resolves docket entry nos. 308, 409, 412, 419, 429, and 448.

SO ORDERED.

Dated: New York, New York
       August 7, 2014

                                      /S/ Laura Taylor Swain
                                     LAURA TAYLOR SWAIN
                                     United States District Judge