UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNIVERSITAS EDUCATION, LLC,

                        Judgment Creditor,

: Case No.: 11 CV 1590-LTS-HBP and
: 11-8726-LTS

                -against-

NOVA GROUP, INC., as Trustee, Sponsor
and Named Fiduciary of the CHARTER OAK
TRUST WELFARE BENEFIT PLAN,

**AFFIDAVIT**

                        Judgment Debtor.

                -and-

Daniel E. Carpenter, Charter Oak Trust Welfare Benefit
Plan, Grist Mill Capital, LLC, Grist Mill Holdings, LLC
The Grist Mill Trust Welfare Benefit Plan, Avon Capital
LLC, Hanover Trust Company, Carpenter Financial
Group and Phoenix Capital Management, LLC

                        Respondents.
------------------------------------------------------------------------X

STATE OF CONNECTICUT    )
                                       )ss:
COUNTY OF HARTFORD       )

        DANIEL E. CARPENTER, being duly sworn, deposes as states:

        1.       I am the Chairman of the Hanover Trust Company, Carpenter Financial Group, Inc., and Caroline Financial Group, Inc. ("CFG"). CFG is the Managing Member of the following Respondents: Grist Mill Capital, LLC ("GMC"), Avon Capital, LLC ("Avon"), Grist Mill Holdings, LLC and Phoenix Capital Management, LLC. I submit this affidavit in opposition to Universitas Education, LLC's ("Universitas") motion for a turnover order as well as a permanent injunction against GMC, Avon, myself, Carpenter

Financial Group and several other Respondents. I have personal knowledge of the facts and circumstances set forth herein.

2. At all relevant times I have been, and continue to be, the Chairman of the Managing Member of Grist Mill Capital, LLC – Delaware, which owns and controls GMC, which provided all of the funding through a Split-Dollar Arrangement for all of the life insurance policies purchased by the Charter Oak Trust, including the two policies on the life of Sash Spencer that were the subject of the underlying arbitration.

3. None of these Respondents are judgment debtors in this case. They have simply been added as new caption headings in an attempt to place a debt collection action within the confines of this proceeding.

4. None of these Respondents were parties in the arbitration or parties to the Universitas litigation.

5. Neither Grist Mill Capital (Delaware or Connecticut) nor any of the other Respondents participated in the Universitas arbitration.[1] **In fact, both GMC and I were specifically dismissed from that arbitration, prior to its commencement.** GMC was dismissed prior to the arbitration beginning. See Ex. A.

6. Thus, Grist Mill, Avon, and the other Respondents were not heard from at the arbitration.

7. I was dismissed after the arbitration was over, which dismissal was therefore effectively with prejudice. See Ex. B.

---

[1] In that regard, contrary to the assertions made by Counsel for Universitas in its Reply Memorandum in Support of its Motion for a Preliminary Injunction against me personally (Docket Number 326), I was not significantly involved in the arbitration, and contrary to Counsel's mischaracterizations, my attorney's bills at the time (Docket Number 327-1) do not demonstrate otherwise. For example, the November 11, 2010 conference call entry was on a separate matter, and the November 24, 2010 entry was for a call between me and Mr. Order regarding other business, and not between me and Kevin McEleny, who to the best of my knowledge I have never spoken with.

2

8. Universitas seeks to recover, via the instant turnover motion, in excess of $30 million from Grist Mill, Avon, and the other Respondents. That sum, Universitas claims constitutes transfers of monies to which it is entitled to from the proceeds of Sash Spencer's two insurance policies. As set forth below all of the transactions about which Universitas claims were bona fide transactions involving legitimate antecedent debts.

9. At its core, this claim by Universitas against Respondents concerns three major transactions of $8,677,276.75 and $2,186,566 in May 2009 and an $19.8 million foreclosure distribution paid from the Charter Oak Welfare Benefit Plan ("Charter Oak Trust" or "COT") to GMC in October 2009. The May transactions and the October transaction are all extensively documented and were *bona fide* payments based on the contractual and financial arrangements between COT and GMC. The Court need not look any further than these transactions to see that this present action by Universitas is ill-founded and unjustifiable.

10. As a participant in the Charter Oak Trust, Sash Spencer was the named insured on two life insurance policies owned by COT, which policies have face value amounts totaling $30 million.

11. The premiums for the Spencer policies – *as well as nearly 85 other policies in the Charter Oak Trust--* **were paid by Charter Oak Trust with funds advanced from Grist Mill Capital using a split dollar arrangement.** See Ex. C hereto.

12. GMC, in turn, had a financing agreement with Ridgewood Finance, Inc. ("Ridgewood") whereby Ridgewood advanced funds to GMC, which GMC then used to

3

make Split-Dollar loans for the funding of premiums for the policies held by the Charter Oak Trust. See Grid Note attached as Ex. C, *supra*.

13. Ridgewood was a secured creditor of GMC.

14. The funding agreement between Grist Mill Capital and Charter Oak Trust with respect to the Spencer life insurance policies (as well as other life insurance policies) contained a provision whereby Grist Mill Capital (the "Funder") was given:

> A first priority lien and a first priority security interest in and to all properties, assets and rights of the trust, wherever located, whether now owned or hereafter acquired or arising, including, without limitation the Policy (including all proceeds thereof, such proceeds to encompass, among other things, any premium refunds, cash value, death proceeds or other payment by the insurer with respect to such Policy or any proceeds from the sale thereof...

See Ex. D.

15. On December 27, 2006, GMC recorded a UCC 1 Financing Statement against all assets of the Charter Oak Trust, and all proceeds thereof and including after acquired assets. See Ex. E hereto for a copy of the UCC-1 Document.

16. The funding arrangement for the Spencer policies was part of the insurance agreement entered into by Mr. Spencer in December 2006 and March 2007. Grist Mill Capital was specifically listed as the primary beneficiary of the Beneficiary Designation Forms signed by Mr. Spencer. See Ex. F.

17. When Mr. Spencer enrolled in the Charter Oak Trust, he executed a Disclosure, Acknowledgment & Certification Agreement which contained the following provision:

> 9. [Spencer] and Agent both understand and agree that the following remittances, fees and expenses

4

>shall be due and payable to the Funder upon the maturation, disposition, termination, or change in beneficiary of the Policy:
>(a) repayment of all premiums and related costs regarding the Policy;
>(b) an Origination Fee of twenty percent (20%) of the total premiums funded and paid for the Policy in consideration of the funding Arrangement heaving been implemented;
>(c) a premium Funding Fee of three percent (3%) of the face amount of the Policy in consideration for the funding of such premiums;
>(d) a Termination Fee of one percent (1%) of the face amount of the Policy in consideration other termination of the Funding Arrangement.

See Ex. G.

18. Sash Spencer died on June 10, 2008.

19. The Charter Oak Trust received the proceeds of the Spencer policies from Lincoln Life Insurance Company ("Lincoln") only after COT sued Lincoln, a case which COT finally dismissed the case against Lincoln in December 2009. See Ex. H.

20. The two payments made to GMC by the Charter Oak Trust in May 2009 equaling just under $11 million included the payments that Sash Spencer had agreed to in a signed agreement with GMC, including the repayment of the premiums paid plus an Origination Fee of 20% of the premiums paid plus a Placement Fee or Premium Funding Fee of 3% and a Termination Fee of 1%. See Ex. G, *supra*.

21. In addition, the Charter Oak Trust document provided that only 80% of the benefit would be paid out under Article 6.01. See Ex. I.

22. Before the May 2009 disbursement of approximately $11 million to GMC, Charter Oak Trust has borrowed well in excess of $50 million from GMC. See Ex. C, *supra*.

5

23. These various fees were spelled out in detail in a letter sent to Universitas shortly after Mr. Spencer's death. See Ex. J.

24. Inasmuch as the payments in the amount of approximately $11 million to GMC represented amounts owed to GMC contractually as well as a partial repayment on loans to Charter Oak Trust, what GMC did with the monies after that is of no legal consequence. However, after GMC received approximately $11 million, it then paid various creditors, <u>for loans made prior to the death of Mr. Spencer</u>. For instance, on June 9, 2009, GMC paid the Grist Mill Trust the total sum of $3,798,882.81. Grist Mill Trust was a creditor of Grist Mill Capital. See Ex. K hereto showing monies owed to Grist Mill Trust by GMC.

25. On or about May 22, 2009, GMC transferred $2.1 million to Grist Mill Holdings to repay some of the money owed by GMC to Grist Mill Holdings. Grist Mill Holdings owns 99% of GMC. Grist Mill Holdings LLC is a Delaware Limited Liability Company. I am the Chairman of the Managing Member of both LLCs. That transfer was a repayment of money that Grist Mill Holdings had advanced to GMC. See Ex. L.

26. On July 13, 2009, Grist Mill Capital transferred $2.2 million to Grist Mill Holdings. This transfer was made because GMC owed substantial sums to Grist Mill Holdings. See Ex. L, *supra*, showing $4.3 million had been advanced to GMC by Grist Mill Holdings.

27. On July 13, 2009, Phoenix Capital Management disbursed $2.5 million to Grist Mill Capital. Phoenix Capital Management Group, LLC is a Delaware Limited Liability Company. I am the Chairman of the Managing Member of the LLC. This

6

disbursement was made because Phoenix is the lending arm of Carpenter Financial Group, Inc.

28. Two days later, on or about July 15, 2009, Grist Mill Holdings transferred $1.2 million to Hanover Trust Company. Hanover Trust Company is a Delaware Trust company and is a trust organized under the laws of the State of Delaware. This transfer was made to facilitate a loan to Moonstone Partners LLC. Universitas is incorrect that this $1.2 million originated with the Charter Oak Trust. This $1.2 million originated from Phoenix Management.

29. On July 15, 2009, Hanover Trust Company disbursed $1,100,000.00 to Moonstone Partners LLC for the purchase of a home in South Kingstown, Rhode Island. This loan is backed by a mortgage note secured by the property. See Ex. M.

30. On or about October 28, 2009, Charter Oak disbursed to GMC the sum of $19,800.000, the payment of which represented only a portion of the more than $50,000,000 owed by COT to GMC, as payment on a collateral assignment extant in 2009. See Ex. C, *supra.*

31. In October 2009, GMC was effectively calling in its debt. See Ex. N hereto for the Confidential Settlement and Indemnity Agreement at page 3.

32. GMC had a secured collateral assignment on each and every policy in the Charter Oak Trust, at all times, including the Sash Spencer policies. See Ex. O.

33. GMC was also the designated unconditional Power of Attorney for each and every policy in the Charter Oak Trust, including the Sash Spencer policies via the signed Funding Agreement attached to every policy before it was funded. See Ex. D, *supra.*

7

34. The only funds remaining in the Charter Oak Trust from October 2009 to June 2010 when the Charter Oak Trust account was closed were the $1.8 million that Grist Mill Capital had offered to Mr. Spencer (and then to Universitas to resolve the insurance contracts dispute).

35. After the above described transfers of funds from the Charter Oak Trust to GMC in May and October 2009, all of the money transfers after that between GMC and its various affiliates and lenders are all bona fide transactions among non-judgment debtors. All of these transactions were between non-judgment debtors outside of New York.

36. For instance, on October 28, 2009, GMC transferred the sum of $19 million to Grist Mill Holdings. This transfer was made to Grist Mill Holdings to preserve the tax free nature of the death benefit received by Grist Mill Capital from the Charter Oak Trust. As is clear from the Sash Spencer Beneficiary Designation Form, GMC was the primary beneficiary of the death proceeds to be paid from the Charter Oak Trust. In the event that the tax free nature of these proceeds was challenged, GMC wanted to upstream the $19 million in death proceeds to preserve its tax free status because all of the owners of Grist Mill Holdings are tax exempt entities themselves. In this manner, GMC would be certain that the $19 million would retain its tax free status for the purpose of GMC's other financial transactions.

37. The Barnett declaration at Paragraph 59 is incorrect when it states that "on or about November 12, 2009, [i] transferred $6,710,065.92 from … [GMC] … to … Avon." This is untrue. On November 12, 2009, Grist Mill Holdings transferred 6,710,065.92 to GMC. This transfer was made because GMC was funding the payment of premiums for

8

policies owned by **Charter Oak Trust 2009**, as will be shown, a separate and distinct entity from the judgment debtor Charter Oak Trust.

38. On November 12, 2009, Grist Mill Holdings transferred the sum of $4,140,000.00 to Carpenter Financial Group, Inc. Carpenter Financial Group Inc. (CFG), is a Delaware corporation. I am the Chairman and Secretary of CFG. CFG is 100% owned by its employees through the CFG Employee Stock Ownership Plan (ESOP), which owns 100% of Carpenter Financial Group, Inc. This transfer was done because CFG is one of the owners of Grist Mill Holdings.

39. On December 3, 2009, two transfers were made to the Grist Mill Trust from the Grist Mill Capital account in the total sum of $688,125.00. That transfer was made to repay Grist Mill Trust for having made a payment to the IRS for a client of Grist Mill Capital, having nothing to do with the Charter Oak Trust.

40. Until recently, I mistakenly believed that there was a Nova Group, Inc. – Delaware and a Nova Group, Inc. - Connecticut. As it turns out, the filing for Nova Group, Inc. in Connecticut was merely a Certificate of Authority to do business in Connecticut. Despite my mistaken belief on this subject, it is clear from the filings in Connecticut that from January 2007 and on, I was not an officer of Nova Group, Inc. in Delaware or Connecticut, contrary to whatever statements counsel for Universitas may make. See Ex. P.

41. The purported basis upon which Universitas seeks a turnover order and a permanent injunction against, among others, Grist Mill Capital and the other Respondents, is that neither Grist Mill Capital nor any other Respondent has provided any consideration or value in return for the monies it has received from Nova/Charter

9

Oak Trust. This allegation is incorrect—as shown above, these were repayments of antecedent debts.

42. For example, with respect to allegations in the Barnett Declaration at Paragraph 78 that I arranged for monies allegedly belonging to the COT to bypass the COT in June 2011 by "arranging" for a settlement check arising out of a lawsuit between Penn Mutual and the COT be made out to Grist Mill Capital, this too is incorrect and a blatant attempt to mislead the Court into thinking that either I or Grist Mill Capital did something wrong or improper. The truth is that COT did not have a bank account at that time (Nova Group and COT bank accounts were closed in June 2010 – a fact well known to Universitas) and Grist Mill Capital had already foreclosed on COT in October 2009. GMC, therefore, owned all policies and money from that time on. Moreover, the reason that Penn Mutual settled the case at all and **paid** Grist Mill Capital was presumably because it understood that Grist Mill Capital was the funder of the policies and had a legitimate collateral interest in the policies, and had done nothing wrong or improper.

43. Mr. Barnett's declaration at paragraphs 17-19 attempts to demonstrate that the judgment debtor just this year tried to transfer ownership of certain insurance policies. His efforts in this regard are misleading as well.

44. The Wisda policy and other policies discussed in the Barnett Declaration were owned by a separate entity, the Charter Oak Trust 2009 which had a separate existence and a separate Tax ID from the original Charter Oak Trust which is the judgment debtor. See Ex. Q. Judgment Debtor Charter Oak Trust did not own these policies and did not violate any restraining notice as is alleged. **Without this one single**

10

**incident, there is nothing that has occurred in recent years that would mandate the drastic relief that Universitas now seeks against the Respondents.**

45.     Contrary to what Universitas suggests in its reply brief, Split-Dollar Arrangements are not just between an employer and employee and, in fact, can be between a funder of the policy (GMC) and the owner and beneficiary of the policy, which in this case was the Charter Oak Trust. As the IRC Regulations, Reg. 1.61-22, define Split-Dollar:

> The final regulations generally define a split-dollar life insurance arrangement as any arrangement between an owner of a life insurance contract and a non-owner of the contract under which either party to the arrangement pays all or part of the premiums, and one of the parties paying the premiums is entitled to recover (either conditionally or unconditionally) all or any portion of those premiums and such recovery is to be made from, or is secured by, the proceeds of the contract.

46.     Similarly, GMC was the funder for the policies held in the Charter Oak Trust regardless of whether a different company loaned GMC the funds or not, the amounts were still due to be paid back to GMC so that GMC could repay the entities that loaned money to GMC. To this date, GMC is owed more than $60 million. See Ex. R.

47.     Again, contrary to Universitas' assertions, the Spencer proceeds were no different than anyone else's proceeds that would be secured to pay back GMC for its loan. See the Confidential Settlement and Indemnity Agreement attached as Exhibit N, *supra*.

48.     All parties involved in this litigation have known since the beginning that GMC was the owner and primary beneficiary of the policies insuring Mr. Spencer, and that GMC held an irrevocable and unlimited Power of Attorney over all of the policies. See Paragraph 21 of Exhibit S, where Mr. Spencer acknowledged and granted an irrevocable Power of Attorney over the control of the policies to GMC.

11

49. Universitas makes the statement that GMC refused to submit to arbitration. This is an outright misrepresentation and another blatant attempt to mislead this Court, as the enclosed Disclosure, Acknowledgement and Certification Agreement signed by both Mr. Spencer and me shows that any dispute must be settled by arbitration. See Paragraph 22 of Exhibit S, *supra.*

50. The Funding Agreement for each policy gives GMC an unconditional Power of Attorney with full control over each policy, including the Sash Spencer policies. See Ex. D, *supra.*

51. The only document signed by myself and Sash Spencer is the Disclosure, Acknowledgement and Certification Form. See Ex. S, *supra.*

52. The Beneficiary Designation listed GMC as the Primary Beneficiary of every policy in the Charter Oak Trust, including the Sash Spencer policies. See Ex. F.

53. I have read the Declaration of Michael Barnett, dated October 9, 2013. None of the transactions recited by him in ¶¶ 48-66, occurred in New York. **All of the transactions described therein occurred in Connecticut or Rhode Island and were between non-judgment debtors.**

12

54. Moreover, as Counsel for Nova wrote and disclosed to the Court on October 4 and 18 of this year, Respondents GMC, Avon Capital, Carpenter Financial Group, Phoenix Capital wholly lack assets to turn over in any appreciable amount. Bank Statements from May through September 2013 were previously provided to the Court and counsel for Universitas----the amounts in each were negligible or non-existent with the exception of Carpenter Financial Group, which had approximately $15,000—again a miniscule sum compared to the amount of the judgment. Furthermore, Carpenter Financial Group never did business with Universitas or the Charter Oak Trust, and never did business in New York or owned any property in New York.

55. However, in sum, nothing has transpired since the confirmation of the arbitration award to justify or warrant the extreme remedy now sought by Universitas – this is an effort to vitiate transfers to bona fide transferees that had legitimate pre-existing obligations from the judgment debtor—and which no longer even have funds as Counsel for Universitas well knows remotely approaching the amount of the judgment.

_____
DANIEL E. CARPENTER

Sworn to before me this
20th day of November, 2013

_____
Notary Public
My commission expires:
(Notary seal/stamp)

JASON J. CONCATELLI
Notary Public, State of Connecticut
My Commission Expires March 31, 2017

13