## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC,     ) | |
|         ) | |
|     Petitioner/Judgment Creditor,   ) | |
|         ) | |
| v.         ) | |
|         ) | |
| AVON CAPITAL, LLC,         ) | |
|         ) | |
|     Respondent/Judgment Debtor,   ) | |
|         ) | |
| ASSET SERVICING GROUP, LLC,   ) | Case No. 14-FJ-05-HE |
|         ) | |
|     Respondent/Garnishee,     ) | |
|         ) | |
| SDM HOLDINGS, LLC,        ) | |
|         ) | |
|     Respondent/Garnishee,     ) | |
|         ) | |
| and         ) | |
|         ) | |
| AVON CAPITAL, LLC, a Wyoming   ) | |
| Limited Liability Company,     ) | |
|         ) | |
|     Intervenor.       ) | |

## <u>REPORT AND RECOMMENDATION</u>

# Table of Contents

I.    INTRODUCTION. ........................................................................ 1

II.    BACKGROUND. ........................................................................ 4

    A. Universitas was the sole beneficiary to certain life insurance proceeds. ...................................................... 4

    B. Universitas did not receive those proceeds. ........................................ 5

    C. The creation of the three Avon Capital, LLC entities. ...................... 8

    D. The trail of Avon proceeds. ................................................ 11

    E. Avon-CT's transactions. .................................................. 13

        1. The Ridgewood credit facility agreement. .............................. 13

        2. The Ridgewood facility's funding of Charter Oak Trust policies and their resale. .................................................. 16

    F. Avon-WY's transactions. .................................................. 20

        1. The SDM purchase. .................................................. 20

        2. Andrew Terrell consults for Avon-WY. ................................ 25

        3. Avon-WY's 2010 "unloading" of Avon-CT's life insurance policies. .......................................................... 26

III.    THIS COURT HAS SUBJECT MATTER JURISDICTION. ................... 29

IV.    THE EFFECT OF THE REGISTRATION OF THE JUDGMENT. ........... 33

V.    THE COURT DENIES THE MOTIONS TO STRIKE THE CHERNOW DECLARATIONS. ..................................................... 34

VI.    THE COURT CONSIDERS UNIVERSITAS'S AND AVON-WY'S MOTIONS FOR SUMMARY JUDGMENT. ........................................ 36

    A. Standard of review. ...................................................... 36

B. The Court grants Universitas's motion for summary judgment: Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor. ................................................................ 38

  1. Fraud confirms this. ....................................................... 42

      a. Lack or inadequacy of consideration. ........................... 43

      b. Close familial relationship or friendship among the parties. .................................................................. 44

      c. Retention of possession or benefit of the property transferred. ............................................................... 46

      d. Change in financial condition of transferor in relation to the transfer. ...................................................... 47

      e. Chronology of events surrounding the transfer. ........... 47

      f. Transfer takes place during the pendency or threat of litigation. ............................................................. 50

      g. Hurried or secret transactions. ................................. 51

      h. Conclusion. ........................................................... 53

  2. Undercapitalization confirms this. ................................. 54

  3. Intermingling confirms this. ......................................... 56

  4. Injustice confirms this. ................................................ 60

  5. Conclusion. ............................................................... 61

C. The Court denies Avon-WY's motion for summary judgment. ......... 62

VII. THE COURT DENIES SDM'S MOTION TO QUASH THE GARNISHMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT. ............................................. 65

VIII. THE COURT DENIES UNIVERSITAS'S MOTION TO STRIKE SDM'S MOTION TO QUASH AND ITS REQUEST FOR SANCTIONS AGAINST SDM. ...................... 67

IX. CONCLUSION. .................................................................... 68

X. RECOMMENDATIONS AND NOTICE OF RIGHT TO OBJECT. ..................... 69

iii

## I.    INTRODUCTION.

Petitioner Universitas Education, LLC seeks enforcement of a $6,710,065.92 judgment entered in its favor on August 12, 2014 by the United States District Court for the Southern District of New York ("*Nova SDNY Litig*[*ation*]."). *See* Doc. 1.[1]  The Judgment was against Daniel E. Carpenter and his various entities, including "Avon Capital, LLC." *Id.*  United States District Judge Joe Heaton referred all post-judgment collection matters to the undersigned Magistrate Judge consistent with 28 U.S.C. § 636(b)(3).  Doc. 8.

In November 2014, the Southern District of New York permitted Universitas to register the $6,710,065.92 judgment in this district.  Doc. 1, Att. 2.  After doing so, Universitas sought an examination hearing regarding Judgment Debtor Avon Capital's potential ownership interests in Garnishee SDM Holdings, LLC (SDM).  Intervenor Avon Capital, LLC, a Wyoming LLC (Avon-WY), sought a permanent injunction to prohibit Universitas from enforcing the judgment against SDM or any of Avon-WY's other assets.  Doc. 73.  This Court denied that injunction.  Doc. 92.  Instead, the Court allowed limited discovery "to locate and identify Avon Capital, LLC's assets," to "determine the relationship between three allegedly distinct Avon Capital,

---

[1]    Citations to a court document are to its electronic case filing designation and pagination.  Deposition testimony deviates from this practice by instead using the deposition page number.  Except for capitalization, quotations are verbatim unless otherwise indicated.

1

LLC entities," and SDM, "in aid of execution" of the judgment.  Doc. 158, at 2 (affirming Doc. 150).

Before the Court, now, are:

(1) Avon-WY's motions to strike two declarations, Docs. 193, 213, and SDM's motion to join Avon-WY's first motion to strike, Doc. 196;

(2) Universitas's motion for summary judgment to impose alter-ego liability on Avon-WY for the full amount of the judgment against Avon Capital LLC, Doc. 186;

(3) Avon-WY's motion for summary judgment dismissing Universitas's claims seeking to pierce the corporate veil, Doc. 194;

(4) SDM's motions to quash garnishment and for partial summary judgment, Docs. 191, 192; and

(5) Universitas's motion to strike SDM's motion to quash, Doc. 208.

In its first motion, Universitas argues that Avon-WY is an alter ego of the two other Avon Capital, LLC entities, and that all three "were operated as a singular Avon Capital, LLC," which is a named judgment debtor.  Doc. 187, at 18.  Universitas asserts Avon-WY's alter-ego status should compel the Court to pierce the corporate veil and reach Avon-WY's assets (namely, SDM) to satisfy the judgment.  *Id.* at 24.  Universitas asks this Court to transfer Avon-WY's ownership of SDM to Universitas to satisfy the judgment, *id.* at 32, and,

if the Court declines to do so, to "enjoin Avon-WY from transferring ownership of SDM elsewhere."  Doc. 201, at 10.

Avon-WY argues it is not a judgment debtor and that Universitas lacks evidence to establish that Avon-WY is "an alter ego of any judgment debtor." Docs. 195, 204.  In support of that contention, Avon-WY filed motions to strike two declarations by Benjamin Chernow, which Universitas included in its Motion for Summary Judgment, Doc. 187, Att. 1, and its Response to Avon-WY's Motion for Summary Judgment, Doc. 205, Att. 1.  *See* Docs. 193, 213.

SDM, in turn, seeks partial summary judgment.  Doc. 192.  It argues that SDM was "never properly served with the garnishment summons," that no claims remain against SDM, and that SDM is neither indebted to nor holds assets of the judgment debtor.  *Id.* at 5-10.  SDM seeks to join Avon-WY's motion to strike the first Chernow declaration, Doc. 196, and moves to quash the garnishment summons.  Doc. 191.  In response, Universitas has moved to strike SDM's motion to quash—in addition to seeking sanctions against SDM, accusing SDM of "improper motion practice."  Doc. 208, at 1.  Specifically, Universitas alleges that SDM's purpose in "filing the same argument three times [is] . . . 'to harass, delay, or increase the cost of litigation.'"  *Id.* at 2.

Having reviewed the parties' extensive submissions, the undersigned recommends the Court (1) DENY Avon-WY's motions to strike, (2) GRANT SDM's motion to join, (3) GRANT Universitas's motion for summary judgment

3

and find that Avon-WY is the alter ego of the two other Avon Capital, LLC entities involved here, (4) DENY Avon-WY's motion for summary judgment, (5) DENY SDM's motions to quash and (6) for partial summary judgment, and (7) DENY Universitas's motion to quash and its request for sanctions against SDM. The undersigned recommends the Court (8) ENJOIN Avon-WY from transferring, alienating, and/or concealing or encumbering its ownership of any interest in SDM; and (9) ENJOIN Avon-WY, Avon-CT, and Avon-NV from transferring, alienating, and/or concealing or encumbering any non-exempt property.

## II.    BACKGROUND.

### A. Universitas was the sole beneficiary to certain life insurance proceeds.

Judge Heaton has provided helpful background in this matter:

> Universitas was the sole beneficiary of several life insurance policies totaling $30 million in proceeds. *Universitas Educ., LLC v. Nova Grp., Inc.*, 784 F.3d 99, 100-01 (2d Cir. 2015). When the death benefits came due, however, Universitas's claim to those benefits was denied. *Id.* Universitas participated in binding arbitration with the trustee of the benefit plan, and obtained a favorable award. *Id.* The plan trustee sought to vacate the award in the U.S. District Court for the Southern District of New York, but the award was confirmed and judgment was entered for $30,181,880.30. *Id.*

Doc. 92, at 2.

**B. Universitas did not receive those proceeds.**

The Southern District of New York turnover proceeding, referenced above, found that Daniel Carpenter fraudulently transferred $30 million of life insurance policy proceeds from the Charter Oak Trust, of which Universitas was the sole beneficiary.[2]  *See Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at *2 (S.D.N.Y. Aug. 7, 2014) [hereinafter *Aug. 2014 Nova*].

---

[2]    A court may "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001). The Court will not consider these documents for the truth of the matters asserted in them. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (noting that judicially noticed "documents may only be considered to show their contents, not to prove the truth of matters asserted therein").

Under Rule 201, a court may take judicial notice of adjudicative facts not subject to reasonable dispute at any point in the proceedings. An adjudicative fact is a fact "concerning the immediate parties-who did what, where, when, how, and with what motive or intent." Fed. R. Evid. 201 advisory committee's note (quoting 2 Kenneth C. Davis, *Administrative Law Treatise* at 353 (1958)). Adjudicative facts must, by definition, be relevant. 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5104 at 483-84 (1977).

The Court takes judicial notice from this proceeding and from two cases intertwined with the current action. First, the Court relies on the turnover action (*Nova SDNY Litig.*) between Universitas and judgment-debtor Nova Group, Inc. *See Universitas Educ., LLC v. Nova Grp., Inc.*, No. CIV-11-1590-LTS-HBP, 2012 WL 2045942 (S.D.N.Y. Jun. 5, 2012). Second, the Court cites the criminal action against Carpenter, which the Second Circuit affirmed. *See United States v. Carpenter*, 190 F. Supp. 3d 260 (D. Conn. 2016), *aff'd sub nom., United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020). Both offer adjudicative facts involving the immediate parties and who did what, when, where, how, and with what motive or intent. Universitas and Avon-WY have also relied on courts' findings, depositions, and other materials from these proceedings. *See e.g.*, Doc. 195, at 4 n.1 & Att. 5; Doc. 187, Att. 21.

These "fraudulent transfers" were made to a number of shell entities that were under Carpenter's control at all relevant times. *Id.* In fact, Carpenter controlled "hundreds of . . . entities" that he used "to hide assets from [Universitas]." *Id.* From May 2009 to October 2010, some of those entities were: Nova Group, Inc. (Nova); Charter Oak Trust; Grist Mill Capital, LLC (Grist Mill Capital); Grist Mill Trust Welfare Benefit Plan (Grist Mill Trust); Grist Mills Holdings, LLC (Grist Mill Holdings); Phoenix Capital Management, LLC (Phoenix); Caroline Financial Group, Inc. (Caroline Financial); Avon Capital, LLC; and Carpenter Financial Group (Carpenter Financial). *Id.* at *2. Of these, Nova, Grist Mill Capital, Grist Mill Trust, Grist Mill Holdings, Phoenix, Avon, and Carpenter Financial[3] are all either judgment debtors or alter egos of judgment debtors. Doc. 147, Att. 29, at 2-3.

The *August 2014 Nova* court also identified Wayne Bursey (President of Nova and Trustee of Charter Oak Trust) as "Mr. Carpenter's confederate in the fraudulent transfers." 2014 WL 3883371, at *2. And Bursey "was the only signatory on the Charter Oak Trust accounts." *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 6123104, at *2 (S.D.N.Y. Nov. 20, 2013) [hereinafter *Nov. 2013 Nova*].

---

[3]     Carpenter Financial Group, LLC is also an alter ego of a judgment debtor. Doc. 147, Att. 29, at 2.

The *August 2014 Nova* court stated that "Avon was controlled by its managing member, Grist Mill [Capital], which is wholly owned by its members Grist Mill Holdings and Caroline Financial [ ]both of which were wholly owned by Mr. Carpenter." 2014 WL 3883371, at *3. Carpenter is Chairman of Caroline Financial. *Id.* Caroline Financial served as a member of both Grist Mill Capital and Grist Mill Holdings.[4] Doc. 205, Att. 2, ¶¶ 1, 25. And, as noted, Grist Mill Holdings also was a member of Grist Mill Capital. *August 2014 Nova*, 2014 WL 3883371, at *3. In his testimony, Carpenter admitted Grist Mill Holdings is his "alter ego for collecting commissions." *Id.*

During Carpenter's criminal trial, the trial court stated "[t]he evidence establishe[d] beyond a reasonable doubt that [Carpenter] conspired with . . . Don Trudeau, among others" to commit life insurance fraud.[5] *Carpenter*, 190 F. Supp. 3d at 299.

---

[4]    The *Nov. 2013 Nova* court stated Grist Mill Capital's members were Caroline Financial Group, and Grist Mills Holdings, and that Bursey was a manager. 2013 WL 6123104, at *3. Grist Mill Capital's Articles of Organization list Jack Robinson and Bursey as its managers. Doc. 147, Att. 13. Robinson is an attorney and manager of Grist Mill Capital, and is affiliated with several of Carpenter's entities and served as general counsel of Benistar Admin Services (Benistar or BASI) "for a period of time." Doc. 187, Att. 6, at 42; *id.* Att. 12; *see also* Doc. 147, Att. 31. Robinson is also Nova's former attorney. *Nov. 2013 Nova*, 2013 WL 6123104, at *2.
     BASI is one of the entities the *Carpenter* court found Carpenter controlled. 190 F. Supp. 3d. at 273. BASI provided administrative services to other Carpenter-controlled entities, and their employees "received their paychecks from BASI." *Id.*
[5]    Trudeau is one of Carpenter's affiliates and served in different roles in

### C. The creation of the three Avon Capital, LLC entities.

On June 6, 2006, Avon Capital, LLC filed articles of organization with the Nevada Secretary of State, forming a Nevada limited liability company (Avon-NV).  Doc. 57, Att. 1, at 3-4.  Avon-NV's managing member was Grist Mill Capital.  *Id.* at 3.  Trudeau testified he did not have "any involvement" with Avon-NV.  Doc. 187, Att. 6, at 23, ln. 19.

On November 21, 2006, Bursey, as the organizer, filed articles of organization on behalf of Avon Capital, LLC with the Connecticut Secretary of State, forming a Connecticut limited liability company (Avon-CT).  Doc. 57, Att. 2, at 1.  At the time of incorporation, Bursey and Robinson were listed as its managers.  Doc. 147, Att. 17; Doc. 195, Att. 2.  Trudeau testified that he, Bursey, and Robinson served as managers of Avon-CT around November 2006.  Doc. 187, Att. 6, at 41, lns. 14-21.

On May 18, 2007, Avon Capital, LLC filed articles of organization with the Wyoming Secretary of State, forming a Wyoming limited liability company (Avon-WY).  Doc. 147, Att. 6.  Avon-WY was administratively dissolved in June 2009 for failure to maintain a registered agent, and Trudeau, acting as principal, applied to reinstate it on November 15, 2010.  *See id.* Att. 9; Doc. 57,

---

Carpenter's enterprises.  *See, e.g.*, Doc. 147, Att. 31 (listing him as director of BASI).  "Don Trudeau was the President of BASI, and [Carpenter]'s wife, Molly Carpenter, was its Chairman."  *Carpenter*, 190 F. Supp. 3d at 273.

Att. 6, at 3.  Avon-WY was again administratively dissolved in July 10, 2011 for tax reasons, and Trudeau reinstated it on November 28, 2011.  Doc. 57, Att. 6, at 2-3.

At the time of incorporation in 2007, and after its reinstatements, Caroline Financial was Avon-WY's manager.[6]  Doc. 147, Att. 6; Doc. 57, Att. 6. Counsel for Avon-WY has stated that Trudeau served as a member and officer of Avon-WY before its 2010 reinstatement.  Doc. 187, Att. 11; *see also* Doc. 171, Att. 4, at 2, lns. 2-3; Doc. 58.  Trudeau testified he was "the managing member" after reinstating Avon-WY.  Doc. 187, Att. 6, at 17-18.  Caroline Financial also continued to serve as managing member after Avon-WY's reinstatement.  *Id.* Att. 11; Doc. 147, Att. 8.  Trudeau was the only authorized signatory for Avon-WY.  Doc. 187, Att. 10, at 232, lns. 22-24.

Avon-WY was ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial.  Doc. 171, Att. 4, at 2, lns. 17-25. Avon-CT was also ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial.  Doc. 187, Att. 4, at 2, lns. 18-28.  In 2010, Avon-NV was also ninety-nine percent owned by Carpenter Financial and one percent owned by Caroline Financial.  *Id.* Att. 5.  Avon-WY, Avon-CT, and Avon-NV each had its principal address at 100 Grist Mill Road, Simsbury, CT

---

[6]     Trudeau also stated that Caroline Financial was Avon-WY's managing member in July, 2010.  Doc. 171, Att. 4, at 2, ln. 23.

06070.  *See* Doc. 92, at 5; Doc. 147, Atts. 6, 13; Doc. 57, Att. 1.[7]  Carpenter controlled both Caroline Financial and Carpenter Financial.  *August 2014 Nova*, *Aug. 2014 Nova*, 2014 WL 3883371, at *3.  Bursey listed the same Grist Mill address as his business and residential address.  Doc. 147, Att. 17.  Grist Mill Capital (managing member of Avon-NV), Grist Mill Trust, and Grist Mill Holdings also have the same address.  Doc. 92, at 5 n.4.  Trudeau testified Benistar has its offices at the same address.  Doc. 195, Att. 5, at 14, lns. 9-11.

In November 2013, Carpenter averred he served as chairman of Caroline Financial, which in turn served as the managing member of Avon-WY.  Doc. 147, Att. 8; Doc. 205, Att. 2, ¶ 1.  The *Nova* courts identified Caroline Financial as one of Carpenter's wholly owned and controlled "shell companies," one of the shell entities he used to hide assets from Universitas.  *Nov. 2013 Nova*, 2013 WL 6123104, at *5, *8; *Aug. 2014 Nova*, 2014 WL 3883371, at *2, *5, *8.

Carpenter testified he was "privy" to each of the three Avon Capital entities.  Doc. 147, Att. 5, at 144, lns. 12-16.  He "definitely knew about [Avon-CT]."  *Id.* lns. 15-16.  According to Carpenter, unlike Avon-WY, Avon-NV did not engage in any life settlement transactions.  *Id.* at 146, lns. 3-6.  He also asserted it never had any employees or office space.  *Id.* lns. 10-16.

---

[7]    On November 28, 2011, Avon-WY updated its principal address to 300 1st Stamford Place, Suite 201, Stamford, CT 06902, but retained its mailing address in Simsbury.  Doc. 57, Att. 6, at 2.

Carpenter testified because Wyoming had few prohibitions or regulations for life settlement transactions, he thought "it would be best" to have a Wyoming LLC as opposed to a Nevada or Delaware LLC for those transactions. *Id.* at 147, lns. 2-16.  Trudeau similarly testified.  Doc. 187, Att. 6, at 18-20.  "Carpenter is listed as the signatory on both of Avon Capital's bank accounts." *Carpenter*, 190 F. Supp. 3d at 273.



### D. The trail of Avon proceeds.

Among the fraudulent transfers the *August 2014 Nova* court identified, was a November 11, 2009 $6,710,065.92 transfer from Grist Mill Capital to Avon Capital, LLC.  2014 WL 3883371, at *3.  The Avon Capital, LLC account

was held at TD Bank, with an account number ending in 4689 (Avon-NV TD bank account).[8]  Doc. 56, at 4; Doc. 57, Att. 1, at 1.

That transfer, like the others the *August 2014 Nova* court outlined, "were without documentation or consideration, a clear sign of fraud."  2014 WL 3883371, at *3.  "Nova and Mr. Carpenter resisted all discovery efforts to determine the whereabouts of [proceeds] after the transfers, and such secrecy further indicates a fraudulent intent."[9]  *Id.*  The court assessed a judgment of that same amount ($6,710,065.92) against Avon Capital, LLC.  *Id.* at *13.

During the month of December 2009, the Avon-NV TD bank account had large-sum withdrawals and deposits to and from bank accounts also controlled by Carpenter.  *See* Doc. 147, Att. 22.   After the November 11, 2009

---

[8]     Carpenter opened that bank account (one of the two "Avon Capital, LLC" accounts maintained in 2009-2010) on May 20, 2009.  Doc. 147, Att. 13; *Carpenter*, 190 F. Supp. 3d. at 273 ("Mr. Carpenter is listed as the signatory on both of Avon Capital's bank accounts.").  Carpenter opened this not long after an unsuccessful attempt to open a Charter Oak Trust account at Bank of America.  *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 2, at 64 (S.D.N.Y. Oct. 21, 2013) (May 14, 2009 email from Carpenter to Jeffrey Roman at U.S. Trust, Bank of America, complaining "that I was not allowed to do wires any more at [Bank of America] on Avon Capital which is a Company that I created and which has control over millions of dollars of assets in several trust accounts").

[9]     The SDNY sanctioned Nova for its "dilatory conduct during the course of post-judgment discovery," "efforts to frustrate Universitas' enforcement of the judgment," noting the Second Circuit encouraged a sanction aimed at deterring Nova's "persistent and abusive litigation conduct."  *Universitas Educ., LLC v. Nova Grp., Inc.*, No. CIV-11-1590-LTS-HBP, 2016 WL 2944646, at *3-5 (S.D.N.Y. Mar. 31, 2016), *adopted*, Doc. 598 (S.D.N.Y. May 16, 2016).

$6,710,065.92 deposit from Grist Mill Capital, the Avon-NV TD bank account had a November 30, 2009 balance of $6,745,794.16. *Id.* at 1. On December 30, 2009, the balance was $938,454.59; and on December 31, 2009, the balance was $160,683.29. *Id.* at 1, 3. Some of the transfers in the month included a December 3, 2009 $6.5 million transfer to a TD bank account ending in 7136 (Grist Mill Holdings TD bank account),[10] two deposits late in the month (totaling $1,292,469.36) from a bank account ending in 4697 (Carpenter Financial TD bank account), and wire transfers to H. Thomas Moran. *Id.* at 1, 3; *see also Carpenter*, No. CR-13-226-RNC, Doc. 207, at 22 (Government Exhibit List) (identifying Grist Mill Holdings and Carpenter Financial TD bank accounts).

### E. Avon-CT's transactions.

#### 1. The Ridgewood credit facility agreement.

Trudeau testified Avon-CT was "originally formed with specific capitalization and transaction structures in mind." Doc. 187, Att. 6, at 10, lns. 4-6. "[I]t was part of a joint facility with Grist Mill Capital, a $35 million facility." *Id.* lns. 13-14. He testified he thought "Ridgewood[11] was the actual

---

[10]   Doc. 171, Att. 8 (Grist Mill Holdings' TD bank account statement for November 2009 showing the last four digits of 7136 as the account number); *Carpenter*, 190 F. Supp. 3d at 295 (identifying TD bank account ending in 7136 as belonging to Grist Mill Holdings).

[11]   "Ridgewood [Finance Inc.] was a portfolio company" that was "set up as a speciality finance lender. In this capacity, Ridgewood made loans to other

issuing entity." *Id.* lns. 20-21. "And so all of the assets and activities basically that were conducted in [Avon-CT] were subject to that pledge and credit agreement." *Id.* at 10-11; *see Carpenter*, 190 F Supp. 3d at 279 (outlining Ridgewood credit facility agreement). That agreement, signed by Carpenter as "Chairman of [the] Managing Member" of Avon-Capital LLC, stated the financing was "for the purpose of funding AVON CAPITAL LLC's underlying loan to AVON INSURANCE TRUST on financing premium of a Life Insurance Policy." Doc. 187, Att. 9, at 3, 1; *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 3328746, at *2 (S.D.N.Y. July 2, 2013) ("Grist Mill [Capital], Avon Capital, Charter Oak Trust and Avon Insurance Trust are entities that are closely related to Nova Group. As collateral for this loan, Ridgewood Finance, Inc. took a security interest in the life insurance policies held by Charter Oak Trust and Avon Insurance Trust.").

"The parties agreed that Christiana Corporate Services, Inc. . . . would act as the [document custodian] and insurance trustee." *Carpenter*, 190 F. Supp. 3d. at 279. "If Ridgewood decided to fund the policy, it would issue a commitment letter to Bursey, who acted as the trustee of [Charter Oak Trust] and Kathy Kehoe, a Benistar employee."[12] *Id.* If Ridgewood authorized the

---

finance companies, often at high rates of interest." *Carpenter*, 190 F. Supp. 3d at 278-79.

[12] Kathy Kehoe served as the Manager of the Trust Department of Benistar, since 2003. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 337,

funding, it "would then direct Christiana to transfer the funds to an account in [Charter Oak Trust]'s name at PNC Bank . . . ." *Id.* at 280.

Trudeau testified that one of the Ridgewood facility's insureds was Rella Waldman, and that Trudeau was involved in that transaction. *See* Doc. 187, Att. 3, at 56; Att. 9. Trudeau further testified he was aware Avon-CT provided support services for Avon Insurance Trust. *Id.* Att. 3, at 57, lns. 14-16.

In a December 2006 letter from Robinson as Grist Mill Capital manager to Christiana, Robinson requested the creation of a custody account for Avon Capital, LLC. *Id.* Att. 12. Even though Avon-CT was the entity involved with the Christiana and Ridgewood transactions, Robinson used Avon-NV's tax identification number which ends in 6827, when opening the bank account. *Id.*; Doc. 57, Att. 1.[13]

The Avon-NV TD bank account records also show wire transfers toward the Waldman life insurance policy. *See* Doc. 187, Att. 13, at 1, 7-8 (reflecting a $44,150.00 outgoing wire to PNC Bank and fee for Waldman policy on Aug. 19, 2009); *id.* at 4, 9 (reflecting a $44,150.00 outgoing wire (including the wire transfer fee) to PNC Bank for the Waldman policy on Oct. 5, 2009).[14]

---

Att. 3, at 1 (S.D.N.Y. Nov. 20, 2013). She was also Assistant Secretary of Nova. *Id.* She currently serves as SDM's manager. Doc. 192, Att. 1, at 3; *see also* Doc. 187, Att. 19, at 64, lns. 7-9.

[13] In its motion for summary judgment, Avon-WY erroneously states this tax identification number belongs to Avon-CT. Doc. 195, at 4, ¶ 2.

[14] What Universitas identifies as Avon-NV's general ledger also reflects

### 2. The Ridgewood facility's funding of Charter Oak Trust policies and their resale.

As noted above, this action hinges on the fraudulent transfer from the Charter Oak Trust policies. These policies were stranger-oriented life insurances (STOLI) policies. The *Carpenter* court explained the nature of STOLI policies, life insurance providers' opposition to these policies, and Carpenter's creation of the Charter Oak Trust to serve "as a vehicle for obtaining [these] policies." 190 F. Supp. 3d at 273. Charter Oak Trust planned to "[re]sell life insurance policies on the secondary market, after [the lapse of] a contestability period."[15]  *Id.* at 276.

---

holding investment accounts for "R. Waldman" (Account IDs. 1320 and 1322) in the amounts of $1,002,475.00 and $626,300.00. Doc. 187, Att. 14, at 1, 8-9. Although the Avon Capital, LLC general ledger does not specifically state that it is Avon-NV's, the Court can reasonably infer so from the fact that the transactions listed on it reflect transactions that match those from Avon-NV's two bank accounts. *Compare* Doc. 187, Att. 14, at 2-4, *with* Doc. 147, Att. 22 (Avon-NV's TD bank account), at 4-6, *and id.* Atts. 15-16 (Avon-NV's People's bank account, *see infra* § II.G.). Avon-WY and SDM dispute the admissibility of this document, as it has not been authenticated and amounts to hearsay. Doc. 193, at 5-6; Doc. 197, at 15-17. The Court determines the ledger to be supplemental only for purposes of its findings herein.

[15]

> To induce people to participate in [Charter Oak Trust] as straw insureds, the agents used a sales pitch learned from discussions at the 100 Grist Mill Road offices. The prospective insureds were promised free life insurance for two years. They were told that if they died during the two-year period, the policy proceeds would be disbursed to their beneficiaries. After two years, the policy would be sold and the insured could potentially profit from the sale. No effort was made to attract people with an interest in buying long-term life insurance coverage then or later.

16

Insured Sash Spencer obtained two policies totaling $30 million, the first two policies ever to be placed in Charter Oak Trust. *Id.* at 292. Ridgewood funded both policies. *Id.* at 293. Spencer died in June 2008, within the contestability period. *Id.* Although the insurance provider investigated, the provider "was unable to determine that the two policies were procured for sale on the secondary market" and issued two checks to Charter Oak totaling $30,677,276.75 (the policies' proceeds plus interest), at Bursey's behest. *Id.* ("Mr. Bursey had admonished [the provider] that the trust had a 'fiduciary duty to pay death benefits to the Participant's designated beneficiary.'"). When Bursey told Carpenter about the checks, Carpenter wrote "Big day for all of us . . . check mail and speak only to me . . . only to me. . . . May you be in heaven before the Devil knows you're dead." *Id.*

The *Carpenter* court reviewed a "complex web of corporate entities, bank accounts, and numerous money transfers" to "determin[e] how the defendant and his co-conspirators used the $30 million in policy proceeds." *Id.* at 295. For example, on May 18, 2009, Bursey deposited the two checks from the insurance provider into a TD account in Charter Oak Trust's name, the "account ending in 4548" (Charter Oak TD bank account). *Id.* This account

---

*Carpenter*, 190 F. Supp. 3d at 280-81. "[Charter Oak Trust] was not widely marketed in order to reduce the risk that the true nature of the trust would be revealed." *Id.* at 280.

"had been set up by Mr. Bursey six days earlier." *Id.* Then, on May 21, 2009, Bursey transferred $8,677,276.75 from the Charter Oak TD bank account to a TD account belonging to Grist Mill Capital, the "account ending in 4712" (Grist Mill Capital TD bank account). *Id.* "Prior to this transfer, the [Grist Mill Capital TD bank account] was empty." *Id.* Then, on May 26, 2009, Bursey transferred another $2,186,566 from the Charter Oak TD bank account to the Grist Mill Capital TD bank account. *Id.* "After these two transfers, which were the only ones into the [Grist Mill Capital TD bank account] at the relevant time, the [Charter Oak TD bank account] contained just over $19.8 million." *Id.*

At the same time, the "$19.8 million remaining from the proceeds of the Spencer policies was kept in the [Charter Oak TD bank account], where the entire death benefit had originally been deposited." *Id.* at 296. On October 2, 2009, Bursey denied Universitas's claim to the proceeds. *Id.* at 294. On October 27, 2009, Bursey transferred $19,800,000 from the [Charter Oak TD bank account] to the [Grist Mill Capital TD bank account]." *Id.* Then, just "one day later, $19,000,000 was transferred to the Grist Mill Holdings account ending in 7136." *Id.*

Grist Mill Capital's appointed agent, Peter A. Goldman, testified he had been retained to try to "determine what happened to the $30 million." *Nov. 2013 Nova*, 2013 WL 6123104, at *7. He confirmed there had been $31 million

18

transferred from the Charter Oak Trust, but he could not explain why any transfers had been made to Grist Mill Capital. *Id.* He also reported Grist Mill Capital's general ledger recorded the $19.8 million as an "unknown deposit." *Id.*

Less than a month later, on November 11, 2009, Avon-NV managing member Grist Mill Capital transferred $6,710,065.92 to "Avon Capital, LLC,"[16] which was deposited to the Avon-NV TD bank account. *See* Doc. 56, at 4; Doc. 92, at 5. The *Carpenter* court also detailed a variety of transactions involving the balance of the Spencer policies, including the funding of additional life insurance policy premiums and the purchasing of real estate in Rhode Island. 190 F. Supp. 3d at 295-96.

---

[16]     "Grist Mill Capital . . . and Avon Capital were financing companies that loaned money to other" Carpenter controlled entities, including "Benistar Admin Services, TPG Group, Grist Mill Trust, Grist Mill Capital, Avon Capital, and the Charter Oak Trust." *Carpenter*, 190 F. Supp. 3d at 273. "Mr. Carpenter acknowledged at trial that he controlled [Grist Mill Capital], and documents admitted into evidence show that he signed on its behalf as 'Chairman of Managing Member.' The structure of Avon Capital is less clear. Many of the documents bear Mr. Trudeau's signature.    However, Mr. Carpenter is listed as the signatory on both of Avon Capital's bank accounts." *Id.*

### Spencer Policies Money Flow



## F. Avon-WY's transactions.

Much transpired between the first time Avon-WY was administratively dissolved, on June 17, 2009, and when Trudeau applied to reinstate it on November 15, 2010. *See* Doc. 147, Att. 9; Doc. 57, Att. 6, at 3.

### 1. The SDM purchase.

On December 30, 2009—while administratively inactive—Avon-WY closed on the acquisition of one hundred percent of the membership interest in SDM. Doc. 147, Atts. 20-21. The total purchase price was $4,395,502.60. *Id.* Att. 19, at 2. The assignors were Jane M. Moran and H. Thomas Moran, II. *Id.* Att. 21. Trudeau served as the authorized signatory for Avon-WY on the Assignment of Membership Interest document and on the Membership Purchase Agreement. *See id.* Atts. 20-21. Trudeau testified that Carpenter "authorized [him] to enter the transaction . . . and make this investment on

behalf of Avon Capital, LLC." *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 280, lns. 11-16 (S.D.N.Y. Sept. 25, 2014).

The purchase agreement required payment of $2,197,751.30 by December 30, 2009, and the balance by January 30, 2010. Doc. 147, Att. 20, at 1, ¶ 1(a)-(b). It also required Avon-WY to pay a pre-existing debt Thomas Moran owed to Kirkpatrick Bank. *Id.* at 2, ¶ 2; *id.* at 4, ¶ 5.6(b). The agreement bound Avon-WY to a pre-existing servicing contract with Asset Servicing Group (ASG). *Id.* at 3, ¶ 4.5; *id.* at 14, ¶ 8.2.2. And, it identified Heritage Group Agency, Inc. and ASG as Thomas Moran's affiliates.[17] *Id.* at 4, ¶ 5.6; *id.* at 14, ¶ 8.2.2(d).

Although Avon-WY was the signatory to the purchase agreement, a series of payments to Moran came from the Avon-NV TD bank account. *See also* Doc. 147, Att. 22, at 3-4. Carpenter and Amanda Rossi[18] served as the authorized signatories on the Avon-NV TD bank account. *Id.* Att. 14.

---

[17]     Carpenter testified Avon-WY was involved in acquiring "a block of business known as SDM." Doc. 147, Att. 5, at 148, lns. 7-9. According to Carpenter, Trudeau introduced him to Thomas Moran, who was the signatory for the purchase agreement on behalf of SDM. *Id.* lns. 20-21; *Id.* Att. 20, at 25. And Trudeau testified he signed the agreement at Carpenter's behest. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 280, lns. 11-16 (S.D.N.Y. Sept. 25, 2014).

[18]     Amanda Rossi is Secretary of Nova.   Doc. 147, Att. 14; *see also Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 57892, at *6 (S.D.N.Y Jan. 4, 2013). Also, the *Carpenter* court identified Ms. Rossi as a Benistar employee. 190 F. Supp. 3d at 294.

Related payments from the Avon-NV TD bank account include:

- Two December 31, 2009 payments of $777,741.30 and $514,469.36 to Thomas Moran, Doc. 147, Att. 22, at 3 (A March 30, 2010 email identifies the $514,469.36 as "received" by Kirkpatrick Bank, *id.* Att. 23 (per SDM Purchase Agreement, *id.* Att. 20, ¶¶ 2, 5.6));

- A January 4, 2010 payment of $25,000.00 to The Heritage Group, *id.* Att. 22, at 4;

- A January 5, 2010 payment of $175,334.85 to ASG, *id.*;

- A January 5, 2010 payment of $332,766.30 to "Hme, Llc," *id.* (A March 30, 2010 email from an ASG address to Trudeau and

---

[Ms.] Rossi [was] listed as a "Trustee" of Charter Oak Trust in a TD Bank account statement from December 2009 . . . [She was also] listed as a signatory . . . on several bank accounts to which Universitas alleges that Nova Group improperly transferred the insurance proceeds at issue here. It appears, however, that Mr. Bursey—not Ms. Rossi—authorized the deposits to these accounts. At her deposition, Ms. Rossi testified that she was employed only by Benistar . . . , Carpenter Financial [ ,] USB Group, Inc. She further testified that she performed office-manager work for these three entities, and that she worked as an executive assistant to Mr. and Mrs. Carpenter.

*Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 3487350, at *5 (S.D.N.Y. July 12, 2013) (citations omitted), *subsequently vacated on other grounds*, 784 F.3d 99 (2d Cir. 2015). In part because Bursey signed the deposit slips and endorsed the checks that Nova improperly deposited, the S.D.N.Y. determined Rossi was not "a controlling officer of Nova" because "she did not actually participate in one of the central transactions at issue." *Id.* at *10.

Andrew Terrell, cc'ing Thomas Moran, identifies this as a portion of the purchase price, *id.* Att. 23); and

- A January 7, 2010 payment of $373,033.83 to Thomas Moran, *id.* Att. 22, at 4.

On June 9, 2010, the Avon-NV TD bank account was closed and its balance of $953,238.84, minus the twenty-five dollar wire transfer fee, was deposited into the only other Avon Capital, LLC bank account of record at this time: a People's United Bank account ending in 3286 (Avon-NV People's bank account). Doc. 147, Atts. 15-16. People's United Bank sent that account's statements to Daniel Carpenter at the Grist Mill address; and Carpenter signed a check to ASG from this account at least once. *Id.* Atts. 15-16; *id.* Att. 27, at 17.

Litigation ensued over the balance due under the Purchase Agreement, and the parties settled. *See* Doc. 187, Att. 19, at 63, lns. 4-6; Doc. 147, Att. 19; *Moran v. Avon Capital, LLC*, No. CIV-10-393-HE, Doc. 58 (W.D. Okla. Feb. 17, 2011) (Stipulation of Dismissal). Payments to Moran, presumably in satisfaction of the SDM Purchase Agreement, continued to come from the Avon-NV People's bank account, of which Carpenter was the signatory. Doc. 147, Att. 25 (including the $75,000.00 Nov. 30, 2010 payment to Thomas Moran and near-monthly $100,000.00 payments thereafter until July 2011).

23



Avon-NV payments (on behalf of Avon-WY) for SDM Purchase

ASG sent Avon-WY monthly invoices.  *See* Doc. 147, Att. 27, at 1, 5-6, 10-11, 18-19.  ASG sent these invoices to Avon Capital, LLC, at 2187 Atlantic Street, Stamford, CT.  *Id.*  This is the address Avon-WY listed in the Purchase Agreement.  *Id.* Att. 20, at 20, ¶ 10.1.  No other Avon Capital, LLC entity used this address for its mailing or principal address.  And at least one invoice identified Don Trudeau as the contact.  *Id.* Att. 27, at 15.

Regular payments to ASG came from the Avon-NV TD bank account until its closure.  *Id.* at 7, 14.  After the closure of the Avon-NV TD bank account, payments continued, coming instead from the Avon-NV People's bank account.  *See, e.g., id.* at 20-21.  Carpenter signed a check dated December 9, 2010 from "Avon Capital, LLC" to ASG.  *Id.* at 17.

Most of the above transactions occurred while Avon-WY was "Inactive-Administratively Dissolved." *Id*. Att. 8. And these transactions continued after Trudeau reinstated Avon-WY in November 2010. *See, e.g.*, *id*. Att. 27, at 15-17.

### 2. Andrew Terrell consults for Avon-WY.

Trudeau also testified that Andrew Terrell, principal of Clermont Capital, provided consulting services for Avon-WY. Doc. 187, Att. 19, at 41, lns. 15-22; *id*. at 42, ln. 2.[19] Trudeau did not know how Terrell received compensation for his services but he did not think the compensation came from Avon-WY. *Id*. Att. 19, at 42, lns. 21-23. Terrell testified that in 2010 he had a consulting contract with Avon, "but sometimes [he] was paid by a different entity." *Id*. Att. 18, Ex. 17, at 11, lns. 5-8 (sealed). Avon-NV's bank records shows Avon-NV made several payments to Terrell during the time he consulted for Avon-WY, and to Clermont Capital. *See, e.g.*, *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 610, Att. 9, at 13, 17 (S.D.N.Y. Nov. 18, 2016) (showing two $15,000.00 wires on March 18, 2010 and May 28, 2010 to "Andrew G. and Maria G. Terrell").[20]

---

[19]   *See also* Doc. 187, Att. 14, at 1, lns. 14-15 (Avon-NV's general ledger showing $359,270.00 owed to Clermont Capital).

[20]   *See also* Doc. 187, Att. 14, at 2, 4-5, 23 (showing Avon-NV's general ledger, which includes three $15,000.00 payments for "Consulting Fees" to Andrew Terrell from the TD bank account in February, March, and May of 2010, and from the Avon-NV People's bank account in June 2010); *id*. at 2-3,

### 3.  Avon-WY's 2010 "unloading" of Avon-CT's life insurance policies.

The *Carpenter* court outlined other transactions involving Avon-CT and Avon-WY.  After the 2008 financial crisis, the market for selling Charter Oak Trust policies dried up.  *Carpenter*, 190 F. Supp. 3d at 289.  Trudeau had served as the point person in selling these policies on the secondary market.  *Id.* at 290.  After an unsuccessful year of trying to find buyers, on March 16, 2010, Trudeau wrote Carpenter asking whether he wanted to "unload" two of Charter Oak Trust insureds' policies.  *Id.* at 291.  Carpenter replied, "we want to unload everything" and followed up ten days later, telling Trudeau to "please figure out if we have buyers or not."  *Id.*

Ultimately, Carpenter and his associates devised a way to sell some of the Charter Oak Trust policies to an entity called Life Insurance Fund Elite (Life Elite).  *Id.*  The transactions were accomplished in the following way.  First, Charter Oak Trust "transferred ownership of the policy to an entity known as Yates Worldwide Holdings Ltd."  *Id.*  Bursey signed these agreements on behalf of Charter Oak Trust, while Trudeau signed on behalf of Yates Worldwide.[21]  "Next, Yates Worldwide transferred the policy to Tranen

---

14-15 (showing in Avon-NV's general ledger a credit to Clermont Capital for $100,000.00 in July 2010, $50,000.00 in November 2010, and a total of $100,100.00 in December 2010).

[21]     Yates was registered in the British Virgin Islands, and Avon Capital, LLC owned 50,000 shares.  Doc. 187, Att. 24.

Capital Alternative Investment Fund, Ltd. [and] Mr. Trudeau signed these agreements on behalf of Yates Worldwide, [while] Ken Landgaard[22] signed on behalf of Tranen." *Id.*; Doc. 187, at 15.  Then Tranen transferred the policy to Avon-WY. *Carpenter*, 190 F. Supp. 3d at 291; Doc. 187, at 15.  Landgaard signed these agreements on behalf of Tranen, while Trudeau signed on behalf of Avon-WY. *Carpenter*, 190 F. Supp. 3d at 291; Doc. 187, at 15.  "Finally, the policies were transferred from Avon[-WY] to Life [Elite]." *Carpenter*, 190 F. Supp. 3d at 291.  The *Carpenter* court did not find Carpenter's testimony attempting "to distance himself" from these transactions credible, finding "[i]t is apparent that [Carpenter] knew of and was involved in the transfer of policies to Life [Elite]." *Id.* at 292.

The Government's Exhibit List from the *Carpenter* criminal action shows the Tranen-to-Avon purchase and sale agreements were dated November 12, 2010.  *Carpenter*, No. CR-13-226-RNC, Doc. 207, at 20 (listed as "Life Insurance Purchase and Sale Agreement . . . from Tranen to Avon" for each of the eleven policies).  At least nine Charter Oak Trust-to-Yates-to-Tranen transactions took place on November 12, 2010.  *See id.* at 20-21 (listing "Life Insurance Purchase and Sale Agreement[s]" between Charter Oak Trust

---

22    Ken Landgaard, who operated Tranen Capital Alternative Investment Fund, served as one of several straw insureds recruited to participate in Charter Oak Trust.  *Carpenter*, 190 F. Supp. 3d at 280.

(listed as COT) and Yates, Yates and Tranen, and Tranen and Avon).  Trudeau

transferred the policies to Life Elite on November 15, 2010—the very day he

first sought to reinstate Avon-WY.  *Carpenter*, 190 F. Supp. 3d at 291; *see id.*

Doc. 207, at 20 (listing Transfer Agreement and Life Settlements Purchase &

Sales Agreements between Avon Capital and Life Elite); Doc. 147, Att. 9; Doc.

187, at 14-15.



That same day, Trudeau also emailed Carpenter "describing the

structure of a sale" to Life Elite.  *Carpenter*, 190 F. Supp. 3d at 291.  And less

than an hour later, he emailed Carpenter a flow chart describing the entities

involved in the transaction.  *Id.*  The *Carpenter* court noted Carpenter

requested the "ELITe [sic] portfolio ASAP" in response to Trudeau's email

regarding the sale of policies to Life Elite on January 11, 2011; Carpenter knew

of the transfer of these policies; and that these transfers involved the

Ridgewood facility, except for two policies that never belonged to Ridgewood.

*Id.* at 292.  In fact, Carpenter was "more than just a willing participant in this conspiracy; he oversaw its development and execution."  *Id.* at 299.  The evidence established that Carpenter "intend[ed] to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies." *Id.*  In doing so, he relied upon Avon-CT's Ridgewood facility,[23] and used Avon-WY as a conduit.  *Id.* at 291-92.  Carpenter did not challenge the district court's findings as to these transactions on appeal.  *See Bursey*, 801 F. App'x 1.

## III.  THIS COURT HAS SUBJECT MATTER JURISDICTION.

"[A] federal court must, sua sponte, satisfy itself of its power to adjudicate in every case and at every stage of the proceeding."  *State Farm Mut. Auto. Ins. Co. v. Narvaez,* 149 F.3d 1269, 1270-71 (10th Cir. 1998) (quotation omitted); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95 (1998) (holding that a federal court must always satisfy itself first that it does in fact have subject matter jurisdiction before proceeding in any case, and that there is no such thing as "hypothetical jurisdiction"); *Gold v. Local 7 United Food & Comm'l Workers Union,* 159 F.3d 1307, 1309-10 (10th Cir. 1998) ("*Steel* requires that a federal court satisfy itself of subject matter jurisdiction before proceeding to the merits of a claim—even when the question of the merits is the easier one . . . ."), *abrogation on other grounds recognized*

---

[23]     "[I]t appears that Ridgewood did not know about [Charter Oak Trust]'s transfer of the policies."  *Carpenter*, 190 F. Supp. 3d at 292.

*by Styskal v. Weld Cty. Comm'rs*, 365 F.3d 855 (10th Cir. 2004). Further, "the burden of proving jurisdiction is on the party asserting it . . . ." *State Farm Mut. Auto. Ins. Co.*, 149 F.3d at 1271 (internal citation and quotation marks omitted).

The doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994). Federal courts typically exercise ancillary jurisdiction

> for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.

*Id.* (internal citations omitted).

This case arguably "involves the second, less common purpose— ancillary jurisdiction over collateral proceedings." *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 966 (9th Cir. 2014). Ancillary jurisdiction is reserved to "subsequent proceedings for the exercise of a federal court's inherent power to enforce its judgments." *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("[W]e have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection

30

and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances.").

Ancillary jurisdiction's reach does not extend "beyond attempts to execute, or to guarantee eventual executability of, a federal judgment." *Id.* at 357. And *Peacock* "cautioned against the exercise of jurisdiction over proceedings that are 'entirely new and original' . . . or where 'the relief sought is of a different kind or on a different principle' than that of the prior decree." *Id.* at 358 (internal citations omitted).

*Peacock* involved new allegations of fraudulent transfer that the plaintiff attempted to raise under ERISA. *Id.* at 358-59. The alleged wrongdoing occurred after the entry of the ERISA judgment. *Id.* The Court held that the district court lacked jurisdiction of this "new action based on theories of relief that did not exist, and could not have existed, at the time the court entered judgment in the ERISA case." *Id.* at 359.

"[W]hen postjudgment proceedings seek to hold nonparties liable for a judgment on a theory that requires proof on facts and theories significantly different from those underlying the judgment, an independent basis for federal jurisdiction must exist." *Sandlin v. Corp. Interiors Inc.,* 972 F.2d 1212, 1217 (10th Cir. 1992). Here, Universitas asserts an alter-ego theory. "The cause of action based upon the alter ego theory is a closer case because in theory the court is merely trying to identify the true debtor on the judgment." *Id.* "Alter

31

ego in its accurate sense involves sometimes complex factual findings of gross undercapitalization or of owners' failure to observe separate corporate existence." *Id.*

"[A]n attempt to hold directors liable for a corporate judgment 'already obtained' is not within the ancillary jurisdiction of the court." *Id.* at 1218 (quoting *H. C. Cook Co. v. Beecher*, 217 U.S. 497, 498-99 (1910)). To be sure, this Court recognizes Universitas is "attempt[ing] to execute, or to guarantee eventual executability of, a federal judgment." *Peacock*, 516 U.S. at 357. And the Court acknowledges the facts underlying Universitas's contentions are not significantly different from those underlying the *Nova SDNY Litigation*, and the relief sought is not of a different kind than in that turnover action. But this Court recognizes the limitation on ancillary jurisdiction that *Sandlin* and *Peacock* set forth.

Avon-WY argues *Peacock* precludes this Court's exercise of ancillary jurisdiction. Doc. 204, at 19. Universitas argues "in any judgment-enforcement action otherwise governed by *Peacock* there may in fact be an independent basis for federal jurisdiction." *Shaw v. AAA Eng'g & Drafting Inc.*, 138 F. App'x 62, 68 (10th Cir. 2005) (quoting *Ellis v. All Steel Const., Inc.*, 389 F.3d 1031, 1033-34 (10th Cir. 2004)); *see* Doc. 201, at 7-8. And here, that independent basis for subject matter jurisdiction over Universitas's alter-ego claim is diversity of citizenship. Doc. 201, at 8 ("This is a dispute

between parties from different states with a matter in controversy exceeding $6 million, and thus this Court has subject matter jurisdiction over this proceeding."); *see also United States v. Vitek Supply Corp.*, 151 F.3d 580, 585-86 (7th Cir. 1998) (rejecting judgment debtor's argument that "federal courts cannot collect debts by piercing the corporate veils of judgment debtors" where an independent basis for jurisdiction exists); *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 133 (4th Cir. 2002) ("[The *Peacock*] Court held only that federal jurisdiction over claims leading to an underlying judgment provides no *ancillary* federal jurisdiction over a subsequent, post-judgment alter ego claim.") (citation omitted).   Even assuming without deciding this Court cannot proceed exercising ancillary jurisdiction, this Court agrees—and Avon-WY does not argue otherwise—that diversity of citizenship provides an independent basis for this Court's jurisdiction.   *See also* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3523 at 89 (2d ed. 1984) (stating that ancillary jurisdiction "include[s] those acts that the federal court must take in order properly to carry out its judgment on a matter as to which it has jurisdiction").

## IV.   THE EFFECT OF THE REGISTRATION OF THE JUDGMENT.

Under 28 U.S.C. § 1963, a judgment creditor may register one district court's judgment in an action for money damages by filing a certified copy of the judgment in any other district court, thereby giving the registered

judgment "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." 28 U.S.C. § 1963. The act of registration serves not merely as a procedural device for the collection of the foreign judgment—registration creates an altogether "new judgment" to be given the same effect as any other judgment entered by the registering court. *Condaire, Inc. v. Allied Piping, Inc.,* 286 F.3d 353, 357 (6th Cir. 2002) (citing *Stanford v. Utley*, 341 F.2d 265, 270 (8th Cir. 1965)). Section 1963 grants by implication "inherent powers to the registering court to enforce those judgments." *Id.*; *see also Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 235 n.8 (1998) ("Congress has provided for the interdistrict registration of federal-court judgments for the recovery of money or property.").

## V. THE COURT DENIES THE MOTIONS TO STRIKE THE CHERNOW DECLARATIONS.

The Court addresses Avon-WY's challenges (the first, sought to be joined by SDM) to Chernow's declarations. Docs. 193, 196, 213. Universitas submitted these declarations in support of its motion for summary judgment, and in support of its response to Avon-WY's motion for summary judgment. *See* Doc. 187, Att. 1; Doc. 205, Att. 1.

Avon-WY argues that the Chernow declarations are not based on Chernow's personal knowledge. Doc. 193, at 2-4; Doc. 213, at 3-4. A "declaration used to support or oppose a motion" for summary judgment "must

34

be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

Universitas responds that Chernow demonstrated his first-hand knowledge based on his review of the documents he introduces in the declarations.  Doc. 209, at 7; Doc. 205, Att. 1, at 1-2 (averring "personal knowledge").  It is not unusual for an attorney to make such declarations, and such declarations should come as no surprise to Avon-WY.  Indeed, Chernow submitted similar declarations in this matter in April and October of 2019.  Doc. 147, Att. 1; Doc. 171, Att. 1.  As Judge Heaton observed, neither Avon-WY nor SDM disputed Universitas's April 2019 allegations, which relied on Chernow's similar declarations.  Doc. 150, at 9 (citing Doc. 149).  And neither objected to Chernow's October 2019 declaration on this basis.

Should the Court agree with Avon-WY that the Chernow declarations contain "speculation," this Court is prepared to disregard its analysis of certain parts of those declarations, without needing to strike entire declarations.  *See United States v. TDC Mgmt. Corp., Inc.*, 827 F.3d 1127, 1134 (D.C. Cir. 2016) (deferring to the district court's evaluation of the admissibility of portions of a declaration, upon which it relied for "some factual analyses" and disregarded "legal conclusions and other deficiencies") (internal quotation marks omitted); *Servaas Inc. v. Republic of Iraq*, 686 F. Supp.2d 346, 353 (S.D.N.Y. 2010) ( "[A

court] need not 'conduct a line-by-line analysis' [of a declaration] and, instead, may 'simply disregard any material that does not comply with' the Federal Rules of Civil Procedure and/or Federal Rules of Evidence." (citation omitted)), *aff'd,* 653 F. App'x 22 (2d Cir. 2011), *as amended* (Feb. 16, 2011); *see, e.g.*, Doc. 193, at 7 (claiming the "declaration is wrought with speculation").

Avon-WY further argues that the declarations contain impermissible hearsay and conclusory statements.  Doc. 193, at 4-6; Doc. 213, at 2-5.  The Court will make its own conclusions based on the admissible evidence presented.  *See Servaas*, 686 F. Supp. 2d at 353 ("[T]he Court will not make the suggested inferences simply because [Declarant] has suggested them," instead, the court will look at the evidence and "draw its own conclusions based on that evidence." (citations omitted)).

## VI.   THE COURT CONSIDERS UNIVERSITAS'S AND AVON-WY'S MOTIONS FOR SUMMARY JUDGMENT.

### A. Standard of review.

Parties may seek summary judgment in post-judgment proceedings.  *See Env't Cleanup, Inc. v. Ruiz Transp., LLC*, 2017 WL 2080270 (W.D. Okla. May 12, 2017) (ruling on cross motions for summary judgment filed in post-judgment garnishment proceeding).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Evans v. Sandy*

*City*, 944 F.3d 847, 852 (10th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015) (internal quotation marks and citation omitted).

The Court views "facts in the light most favorable to the non-moving party and "draw[s] all reasonable inferences in [its] favor."  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (citations and alternations omitted).  "Even so, the non-movant . . . must marshal sufficient evidence requiring submission to the jury to avoid summary judgment."  *Id.* (brackets and internal quotation marks omitted).

The Court treats cross-motions for summary judgment "separately[—]the denial of one does not require the grant of another."  *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).  In evaluating the parties' cross-motions for summary judgment the Court looks beyond the pleadings and assesses the proof to determine whether there is a genuine need for trial.  *See Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

Universitas argues that Avon-WY is an alter ego of Avon-CT and Avon-NV, and that this Court should pierce the corporate veil of all three Avon Capital, LLC entities to satisfy the judgment. Doc. 187, at 17-32. Universitas asks for an alter-ego determination based on Avon Capital's fraudulent conduct, inadequate capitalization of both Avon-WY and Avon-CT, intermingling among all three Avon Capital entities, and the three entities' failure to keep corporate formalities. *Id.*

Avon-WY also seeks summary judgment, arguing that Avon-WY is not a judgment debtor named in the *Nova SDNY Litigation* judgment, that Universitas lacks admissible evidence to prove its alter-ego claim, and that Avon-WY is not an alter ego of any judgment debtor. *See* Doc. 195.

For the reasons stated in the following alter-ego determination, the Court grants Universitas's motion for summary judgment and denies Avon-WY's motion for summary judgment.

## B. The Court grants Universitas's motion for summary judgment: Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor.

Universitas argues that Avon-WY is the alter ego of Avon-CT and Avon-NV. Because Avon-WY is an LLC formed in Wyoming, Wyoming law applies. *See Clemmer v. D.C. Grp.*, 2014 WL 1509274, *3 (W.D. Okla. Apr. 16,

2014) ("[T]he Oklahoma Supreme Court would most likely . . . look to the Restatement (Second) of Conflicts of Law to decide what substantive law to apply" to resolve the veil-piercing issue, which "provides that [t]he local law of the state of incorporation will be applied . . . .") (internal quotation marks and citations omitted).

Wyoming law requires the presence of certain "exceptional circumstances" to pierce an LLC's corporate veil.  *See GreenHunter Energy, Inc. v. W. Ecosystems Tech., Inc.*, 337 P.3d 454, 462 (Wyo. 2014) (reaffirming the "essence" of the Wyoming Supreme Court's veil-piercing analysis).  Wyoming law, in determining "whether the limited liability company has been operated as a separate entity, or whether the member has instead misused the entity in an inequitable manner to injure the plaintiff," applies a "fact-driven and flexible" two-prong test.  *Id.* at 463.

This two-prong test pierces the corporate veil:

> (1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity.

*Mantle v. N. Star Energy & Constr. LLC*, 437 P.3d 758, 799 (Wyo. 2019) (quoting *GreenHunter*, 337 P.3d at 462); *see also id.* at 800 ("[V]eil-piercing is

39

a fact-intensive inquiry generally not suited for summary judgment.") (quoting *Atlas Constr. Co. v. Slater*, 746 P.2d 352, 355 (Wyo. 1987) (citation omitted)).

"[T]he existence of one or more elements tending to support a showing of legitimacy[, however,] does not always preclude summary judgment." *Terrapin Leasing, Ltd. v. United States*, 1981 WL 15490, at *3 (10th Cir. Apr. 6, 1981) (affirming a veil-piercing summary judgment when "as a whole and in context, the undisputed facts about the operation of this corporation show that it was such a sham that a jury would not be permitted to find it a legitimate shelter against tax claims against its owner and manipulator"); *Oren v. United States*, 1992 WL 79110, at *2 (W.D. Mich. Jan. 7, 1992) ("Taking the facts as a whole in the light most favorable to the plaintiff," the court granted summary judgment to the defendant finding that "[a]lthough some individual facts do favor plaintiff's position, the facts taken as a whole are overwhelming and leave no question of material fact for a jury that the corporation was the [plaintiff's] alter ego.").

In applying the *GreenHunter* test, the Court considers:

1. the existence of fraud,

2. the adequacy of capitalization,

3. "the degree to which the business and finances of the company and the member are intermingled," *Mantle*, 437 P.3d at 799, and

4. whether there has been an "injustice or unfairness." *GreenHunter*, 337 P.3d at 464.

The Wyoming Supreme Court has further enumerated a litany of factors relevant to "justifying a disregard of the corporate entity." *Daniels v. Kerr McGee,* 841 F. Supp. 1133, 1136 (D. Wyo. 1993) (citing *AMFAC Mech. Supply Co. v. Federer,* 645 P.2d 73, 77-78 (Wyo. 1982) (citation omitted), *abrogated on other grounds by Texas West Oil & Gas Corp. v. First Interstate Bank of Casper,* 743 P.2d 857, 859 (Wyo.1987)).  These factors include:  whether a corporation is truly a separate entity; commingling of funds and other assets; failure to segregate funds of the separate entities; failure to adequately capitalize a corporation; the absence of corporate assets and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; and the use of the corporate entity to procure labor, services or merchandise for another person or entity.  *Kloefkorn-Ballard v. N. Big Horn Hosp. Dist.,* 683 P.2d 656, 661 (Wyo. 1984).  And if the party making an alter-ego claim is "the victim of some basically unfair device" where the separate existence of the entity is "used to achieve an inequitable result," a court will also disregard that entity under Wyoming law.  *AMFAC,* 645 P.2d at 81 (listing, as an example, paying "off a

41

controlling shareholder" with the assets of an insolvent corporation "in preference to a general creditor").

### 1. Fraud confirms this.

Fraud is the only *GreenHunter* factor that by itself can justify piercing the veil. 337 P.3d at 463. Fraud can be actual or constructive. *Id.* Constructive fraud "consist[s] of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another . . . ." *Id.* The party seeking to pierce the veil, however, must prove fraudulent intent. *Mantle*, 437 P.3d at 800. As Avon-WY argues, "[a]ctual fraud must be proven by clear and convincing evidence" while "[c]onstructive fraud must be proven by a preponderance of the evidence." Doc. 204, at 30 (citing *Mantle*, 437 P.3d at 786-89). "Clear and convincing evidence is 'proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Mantle*, 437 P.3d at 784 (citations omitted).

Among the other "badges of fraud" the Court can rely on to establish fraudulent intent are:

    a.   "[L]ack or inadequacy of consideration";

    b.   "close familial relationship or friendship among the parties";

    c.   "retention of possession or benefit of the property transferred";

    d.   "the financial condition of the transferor both before and after the transfer";

e.    "the chronology of events surrounding the transfer";

f.    occurrence of transfer during "threat of litigation"; and

g.    "hurried or secret transactions."

*Mantle*, 437 P.3d at 789 (citation omitted).

Universitas argues that the Avon entities satisfy "every single badge of fraud." Doc. 187, at 24. It argues that "Avon Capital's actual fraud can be inferred through its fraudulent intent," which was already established from "the initial [fraudulent] transfers of insurance proceeds." *Id.* "[B]ecause of the virtual impossibility of proving actual fraudulent intent[,] . . . this court and [others] have come to rely on inferences and presumptions drawn from the surrounding circumstances." *Mantle*, 437 P.3d at 789 (internal quotation marks and citation omitted); *see also Universitas Educ., LLC v. Nova Grp., Inc.*, 2016 WL 1178773, at *3 (S.D.N.Y. Mar. 23, 2016) ("Judge Swain has noted that during discovery, [Nova and] Carpenter 'resisted all discovery efforts to determine the whereabouts of the Insurance Proceeds after the transfers, and such secrecy further indicates a fraudulent intent.'" (quoting *Aug. 2014 Nova*, 2014 WL 3883371, at *3)).

### a. Lack or inadequacy of consideration.

Universitas argues Carpenter "fraudulently transferred the insurance proceeds to Avon-NV" to then fund Avon-WY's SDM acquisition, so the payments were "a continuation of a fraudulent transfer." Doc. 187, at 22. The

*November 2013 Nova* court outlined the fraudulent conveyances that underlie Universitas's claim here.   2013 WL 6123104, at *8 ("[T]he evidence demonstrates that each entity that received Life Insurance Proceeds was controlled by Mr. Carpenter."). And these transactions stemmed from "a single purpose, to remove a portion of the Life Insurance Proceeds from the Charter Oak Trust . . . insulated from the reach of Mr. Carpenter's creditors (and of course, from [Universitas's] claim)." *Id.*

Avon-NV received no apparent consideration for its multiple payments on behalf of Avon-WY or Avon-CT.  Avon-WY did not have a bank account until Trudeau opened one in 2012.[24]  Avon-NV had no employees and appeared to receive no consideration for its payment of Avon-WY's obligations.  *See* Doc. 147, Att. 5, at 146, lns. 10-12.  This factor weighs in favor of a finding of fraud.

### b. Close familial relationship or friendship among the parties.

Universitas argues that the three Avon entities are part of the several Carpenter-operated entities whose business objectives furthered Carpenter's fraudulent scheme relating to insurance payments.  Doc. 187, at 23-26. Carpenter testified that Nova is a shell corporation.[25]  Counsel for Nova stated

---

[24]   Avon-WY maintains it has more than one bank account, but cites only to the one Trudeau opened in 2012.  Doc. 195, at 5 (citing *id.* Att. 3 and Doc. 187, Att. 8 (sealed exhibit 7)).

[25]   *See Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 47, dep. pg. 76, lns. 3-4.  Doc. 310, Att. 5, contains multiple depositions within

Universitas's money was transferred first to Grist Mill Capital, and then to Grist Mill Holdings, Avon Capital, Carpenter Financial Group, Phoenix Capital Management,[26] and then to Grist Mill Trust. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 90-92. Each of these is a judgment debtor. And the *August 2014 Nova* court found Carpenter also controlled Nova, Charter Oak Trust, Caroline Financial, and "hundreds of other related entities."[27] 2014 WL 3883371, at *2.

As to Bursey, who acted under Carpenter's "direction and on his behalf," the two "had a particularly close relationship . . . ." *Carpenter*, 190 F. Supp.3d at 299, 301. Regarding Grist Mill Trust, Carpenter, and Bursey served as trustees, and Carpenter's wife, Molly, as signer. *Nov. 2013 Nova*, 2013 WL 6123104, at *4. And the *August 2014 Nova* court found Carpenter also controlled Grist Mill Trust. 2014 WL 3883371, at *2. These familial, and otherwise close, relationships point toward fraudulent intent. *See Mantle*, 437 P.3d at 789 (citation omitted).

---

one attachment, so for clarity the Court will refer to both the ECF page number and the accompanying deposition page number.

[26] Carpenter testified he was Phoenix's sole officer and director. *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 42, dep. pg. 34, lns. 19-24.

[27] *See also Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 5, at 37, dep. pg. 16, lns. 15-23 (The number of entities for which Caroline is the managing member and tax matters partner was "too numerous to mention.").

Universitas also argues that "Carpenter owns all three Avon entities" and controls each of their respective managers.  Doc. 187, at 24.  Carpenter Financial, for which Carpenter serves as Chairman, owns 99% of each of the three Avon entities.  Carpenter's dominance over all of the entities involved also weighs in Universitas's favor as to a finding of fraud.[28]

### c. Retention of possession or benefit of the property transferred.

The October 2009 transfer of $19.8 million to Grist Mill Capital was classified as an "unknown deposit."  *Aug. 2014 Nova*, 2014 WL 3883371, at *5.  The subsequent transfers from the Avon-NV bank accounts also lack credible explanations.  *Id.* at *10.  After this flurry of transfers, Carpenter, through his control of Avon-WY's managing member Caroline Financial, retained the property (i.e. SDM).  And Carpenter controlled Avon-NV and served as a signatory on its two bank accounts.  This factor weighs in favor of a finding of fraud.

---

[28]   Also of note, through no fault of its own, the *August 2014 Nova* court misstated the identity of the Avon Capital entities, using them interchangeably.  2014 WL 3883371, at *3 ("Avon was controlled by its managing member, Grist Mill [Capital], which is wholly owned by its members Grist Mill Holdings and Caroline Financial Group, Inc., both of which were wholly owned by Mr. Carpenter.").  Of the three Avon entities, Grist Mill Capital managed only Avon-NV.  Doc. 57, Att. 1, at 3.

### d. Change in financial condition of transferor in relation to the transfer.

Carpenter controlled the financial affairs of his entities. *Id.* at *2. No one disputes that Carpenter opened the May 2009 Avon-NV TD bank account, which had a November 30, 2009 balance of $6,745,794.16, a December 30, 2009 balance of $938,454.59, and a December 31, 2009 balance of $160,683.29. He was a signatory on Avon-NV's two bank accounts. Those accounts received funds from the Charter Oak Trust bank account, and then were used to satisfy the obligations of Avon-WY and related Avon-CT/Ridgewood transactions. Avon-NV's change in its financial condition to satisfy Avon-WY's obligations weighs in favor of a finding of fraud.

### e. Chronology of events surrounding the transfer.

Avon-WY argues Universitas's position is "specious" because it cannot show a chain of custody linking Avon-WY to the judgment. Doc. 204, at 30-31. And because the fraud claim is based "on the actions of non-member and non-manager Carpenter." *Id.* at 30. As Judge Heaton noted, Avon-WY did not challenge Universitas's allegations that Avon-NV used Universitas's judgment funds to purchase SDM for Avon-WY. Doc. 150, at 9 (citing Doc. 149). The Avon-NV TD bank account received the funds in November 2009 from the Grist Mill Capital TD bank account, which had previously received the funds from

the Charter Oak Trust TD bank account.[29]  Charter Oak Trust held the Avon-

CT/Ridgewood life insurance policies.  *Universitas*, 2013 WL 3328746, at *2.

And Carpenter controlled each of these entities.  Despite others holding titular

authority, Carpenter made all significant corporate decisions; he "exercised

ultimate authority over" the Avon entities' operations.  *Carpenter*, 190 F. Supp.

3d at 286.  In fact, "the formal corporate structure of the various Benistar

Entities had little meaning for the people involved."  *Id.* at 274.

Less than two months after receiving the November 2009 deposit, the

Avon-NV TD bank account began a series of transfers of funds to Moran and

his related entities to satisfy the Avon-WY/SDM purchase agreement.  Doc.

147, Att. 22, at 3.  Also within weeks, monies from that account were

transferred to the Grist Mill Trust, a Carpenter-controlled entity.  *Id.*

Avon-WY's argument that Universitas must trace the entirety of the

purchase price to the Charter Oak Trust/Spencer funds "is illogical."  *Nov. 2013

Nova*, 2013 WL 6123104, at *12.  The *November 2013 Nova* court "decline[d] to

presume that fraudulently conveyed funds, mixed with potentially legitimate

funds, are traceable first to the legitimate funds."  *Id.*  This would "permit[ ]

Carpenter and his affiliates to perpetuate their evasion of the legal obligation

to pay the Life Insurance Proceeds to [Universitas] through manipulation of

---

[29]    *Carpenter*, 190 F. Supp. 3d at 296; *see also Nova SDNY Litig.,* No. CIV-11-1590-LTS-HBP, Doc. 310, Att. 4, at 21.

money transfers," resulting in inequity.  *Id.* (citing *United States v. Henshaw,* 388 F.3d 738, 741 (10th Cir. 2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them.")).

Avon-WY also misstates Trudeau's involvement:  it states "Trudeau had no involvement with Avon-WY prior to his reinstatement of it in 2011."  Doc. 205, at 18, ¶ 92.  However, before the 2011 reinstatement, Trudeau had reinstated Avon-WY in November 2010, and served as an officer and member of Avon-WY even before its reinstatement.  Avon-WY's counsel previously told this to the Court.  Doc. 187, Att. 11.  This unusual chronology of events, involving Avon-WY's SDM purchase, funded by Avon-NV, and Avon-WY's 2010 transactions related to unloading the Charter Oak Trust Avon-CT/Ridgewood policies, weighs in favor of a finding of fraud.

Avon-WY also argues Universitas never asserted any cause of action against it in the turnover action.  Doc. 204, at 24.  When the Southern District of New York granted Universitas's motion to register the judgment here, it noted no opposition was filed to Universitas's motion.  Doc. 1, Att. 2.  That court granted the motion "for substantially the reasons stated in Universitas' memorandum in support of its motion."  Doc. 1, Att. 2, at 1.  Universitas's motion in turn relied upon Trudeau's February 2013 deposition testimony, where he stated that Avon Capital, LLC had an "indirect interest" in the SDM

49

policies, and "own[s] a portion of the death benefits." *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP, Doc. 487, Att. 1, at 275, lns. 14-20 (S.D.N.Y. Sept. 25, 2014); *id.* at 276, lns. 19- 25; *id.* at 277, lns. 2-3.  Universitas cited the correct standard for registering a judgment in another district.  *Id.* Docs. 485-87.  As outlined above, Trudeau and Carpenter used the Avon entities near interchangeably.  Because of the intentionally opaque and interchangeable structure of Avon Capital, LLC, Universitas reasonably relied upon Trudeau's testimony that Avon Capital, LLC owned at least a portion of SDM's policies. *See also Carpenter*, 190 F. Supp. at 273 (noting in 2016, that "[t]he structure of Avon Capital [was] less clear").

Avon-WY again challenges the Chernow declarations, which the Court addressed above.  Doc. 204, at 5-6.  In making its findings, the Court has taken judicial notice of the turnover action, the criminal trial, and various documents from the Southern District of New York and the District of Connecticut actions. Similarly, the parties have relied upon various documents and testimony in arguing their positions.

### f.  Transfer takes place during the pendency or threat of litigation.

Universitas contends that "[e]very Avon Capital transaction occurred during the pendency of litigation," with Carpenter being "aware of pending litigation over the insurance proceeds when he initially fraudulently

transferred them from [Charter Oak Trust]." Doc. 187, at 25. "[Universitas] had made claim to the [life insurance] funds in June 2008, well before they were transferred out of the Charter Oak Trust account" and "Bursey, on behalf of Nova, acknowledged Nova's legal and fiduciary duty to pay to [Universitas] the [funds] prior to the arbitration." *Nov. 2013 Nova*, 2013 WL 6123104, at *11. The *November 2013 Nova* court found these facts indicated "that Nova knew of the possibility of a law suit to collect the Life Insurance Proceeds[ and] Nova must therefore have believed that it be unable to pay the benefit plan obligation to [Universitas] when it drained its bank account by transferring the Life Insurance Proceeds to Grist Mill [Capital]." *Id.* Additionally, "there was clearly a close association between the entities involved in this transfer, with Mr. Bursey moving the funds to an entity controlled by his brother-in-law, Mr. Carpenter." *Id.* The transfers occurred after Charter Oak Trust had wrongly denied Universitas's claim, and the awareness that it violated a legal and fiduciary duty, weigh in favor of a finding of fraud with respect to this factor.

### g. Hurried or secret transactions.

The transactions underlying the SDM purchase and the 2010 unloading of Charter Oak policies were both hurried and secreted. In its defense, Avon-WY first maintains it was "dormant" from June 17, 2009 to November 11, 2011.

Doc. 195, at 4-5, ¶¶ 4-5; Doc. 204, at 20, ¶¶ 4-5.[30]  Universitas argues "Trudeau reinstated Avon-WY the day before Avon-WY sold [the] fraudulently obtained" Charter Oak policies that required the Charter Oak Trust-Tranen-Yates transactions.  Doc. 187, at 32.

Avon-WY was *not* dormant after its administrative dissolution in June 2009.  Far from it.  Less than two months after receiving the fraudulent November 11, 2009 transfer, on December 30, 2009, Avon-WY executed the Purchase Agreement for SDM Holdings.  Doc. 195, Att. 3, at 3-6.  Trudeau, who served as Avon-WY's signatory to that agreement, did so at Carpenter's direction.  The use of the Avon-NV account, rather than one of a party to the transaction, suggests an intent to conceal or hide the source of funds.  And when Trudeau did reinstate Avon-WY in 2010, it was during a flurry of transactions related to unloading a series of Avon-CT/Charter Oak Trust-related policies in November 2010.

These hurried and concealed transactions also tip the scales toward fraudulent intent.  *See Mantle*, 437 P.3d at 789.

---

[30]    In its reply brief, Avon-WY acknowledges "that Avon Capital-WY incurred the obligation to purchase SDM <u>after</u> Avon Capital-WY was administratively dissolved" and that Trudeau was the only signatory for the purchase.  Doc. 214, at 12.

### h. Conclusion.

The Avon Capital, LLC trifecta (CT, NV, WY) earns *Mantle*'s badges of fraud, supported by clear and convincing evidence.  The close relationship of the involved parties, including both family (Bursey was Carpenter's brother-in-law[31]) and apparent friends is not in dispute.  Just as before, "[t]his was an inside transaction involving closely related entities."  *Nov. 2013 Nova*, 2013 WL 6123104, at *9.  Only Avon-NV held the purse strings for all of Avon-WY's transactions.

Avon-WY made the SDM purchase after a series of hurried and complex transactions revolving around Charter Oak Trust's October 2009 receipt of the Spencer insurance proceeds.  *See Mantle*, 437 P.3d at 789.  And Carpenter reaped the benefits of all the transactions.  The Avon-NV TD bank account received the fraudulent transfer in October 2009.  Less than two months later, the inactive Avon-WY signed the SDM deal.  The transactions "were hasty" and "not in the ordinary course of business." *Nov. 2013 Nova*, 2013 WL 6123104, at *10.  Carpenter used the Avon-NV TD bank account to satisfy Avon-WY's obligations, suggesting an intent to conceal the sources of funds.  The next year, Carpenter and Trudeau schemed to use Avon-WY to act on Avon-CT's behalf to unload various Charter Oak Trust policies, duping

---

[31]     *Carpenter*, 190 F. Supp. 3d at 273.

Ridgewood in the process. *Carpenter*, 190 F. Supp. 3d at 291-92. The Avon entities' actions, taken together, amount to fraud—and could alone support piercing the veil of the three entities and persuade a trier of fact that the truth of the contention is highly probable. *Mantle*, 437 P.3d at 784; *see GreenHunter*, 337 P.3d at 469.

### 2. Undercapitalization confirms this.

In analyzing undercapitalization, the Court considers "the degree of undercapitalization and the reason for it," such as whether the undercapitalization was by choice or a result of external forces. *Mantle*, 437 P.3d at 799. Inadequate capitalization is determined by "compar[ing] the amount of capital to the amount of business to be conducted and the obligations which must be satisfied." *GreenHunter,* 337 P.3d at 463 (citation omitted).

Universitas argues neither Avon-WY nor Avon-CT had "the capital necessary to fulfill its business obligations," each having "entered into transactions requiring" substantial payments without having bank accounts or assets. Doc. 187, at 27. Avon-WY rebuffs this argument by dismissing Universitas's focus on pre-2010 operations. Doc. 204, at 31-32. And Avon-WY later states that it was adequately capitalized when Trudeau reinstated it, and incorrectly states Universitas does not dispute this. Doc. 214, at 11. Avon-WY did not have a bank account upon reinstatement in 2010 and Avon-NV was

making Avon-WY's SDM payments under the purchase agreement at that time.

Avon-WY argues the Court should focus on "the time period following its reinstatement." Doc. 204, at 32. It contends that Universitas wrongly relies on relating to Avon-WY's operations prior to 2010 *before* it was "administratively restarted for an existence and purpose separate and distinct from prior operations." *Id.*

This is not so. Trudeau, an Avon-WY member in May 2010, reinstated Avon-WY in November 2010, in order to unload the Avon-CT/Charter Oak Trust policies. After reinstatement, Avon-WY still had the same financial obligations to SDM under the purchase agreement it entered into on December 2009, signed by Trudeau. Again, Avon-WY did not even have a bank account until Trudeau opened one in 2012. Yet, before that account was opened, Avon-WY satisfied a host of obligations through the two Avon-NV bank accounts, including the SDM-purchase payments to Moran and consulting fees to Terrell. And Avon-WY facilitated the unloading of the Charter Oak policies in 2010, which involved only Avon-CT and the Ridgewood facility. Neither Avon-WY nor Avon-CT have produced any bank account records for the 2009-2010 period. These factors also weigh in favor of piercing the corporate veil. *See also Kloefkorn-Ballard*, 683 P.2d at 661.

55

### 3.  Intermingling confirms this.

Intermingling looks at business operations, assets, and finances, and requires an analysis of various aspects of the LLC, including commingled assets (such as using the LLC's property as the member's personal property) and separate bank accounts and business records.  *GreenHunter,* 337 P.3d at 464; *see also Mantle*, 437 P.3d at 800 (relying on the following factors to support a finding of intermingling: using the same accounting department, having the same business addresses, having consolidated tax returns, lacking separate sources of revenue from the member, failing to have any independent employees from the member, and "the member manipulated the assets and liabilities such that the member reaped all benefits of the LLC's activities while the LLC was saddled with all losses and liabilities") (citation omitted).

Universitas argues "Avon Capital is a singular integrated entity."  Doc. 187, at 28.  Avon-WY calls this assertion "outlandish (and unsupported)."  Doc. 204, at 32.  It is not.  As this Court has already found, there is plentiful intermingling among the three entities, each of which Carpenter controlled. Doc. 92, at 5-6.[32]  In 2009-2010, all three entities listed the principal and/or

---

[32]     Trudeau testified that his "interest lied in the operating business."  Doc. 187, Att. 6, at 94, lns. 9-10.  By "operating business," he meant "Avon Capital in its entirety, whether it's [Avon-CT] or [Avon-WY] or whatever, dealt with the assets of the one part of that."  *Id.* lns. 13-15.  This suggests Trudeau also treated the Avon entities interchangeably for operational purposes.

mailing address as 100 Grist Mill Road in Simsbury, CT.   Maintaining the same addresses is "highly probative" evidence.   *See Nov. 2013 Nova*, 2013 WL 6123104, at *9 (noting, in addition, that Carpenter "admits to having established and controlled hundreds of entities" sharing this office).   In April 2016, Carpenter testified he was "privy" to each of the three entities.   Doc. 147, Att. 5, at 144, lns. 14-16.   He testified Avon-NV had no employees or office space.   *Id.* at 146, lns. 10-16.   The Southern District of New York has already adjudged Benistar to be an alter ego of the Judgment Debtors.   Doc. 147, Att. 29, at 2.   Avon-NV was set up by an individual who worked for Benistar.   *Id.* Att. 5, at 144, lns. 19-25.   Though that person was involved in the secondary market for life insurance, Avon-NV did not engage in any life-settlement transactions.   *Id.* at 146, lns. 1-6.

Carpenter testified Avon-WY was formed because "Wyoming has the best laws in the country for doing life settlement transactions."   *Id.* at 147, lns. 2-6.   Carpenter stated he was unaware of who the members of Avon-NV were and that he could not recall if any of his entities were members of Avon-WY. *Id.* at lns. 17-22.   He knew Avon-WY was involved in the acquisition of SDM, because Trudeau had introduced him to the previous owner of SDM, Moran. *Id.* at 148, lns. 4-23.   The Southern District of New York found Carpenter's testimony about his denial of having a relationship with Nova incredible, as well as most of his testimony for other matters in that case, including his

explanations for the purpose of the 2009-2010 transfers of the Charter Oak Trust insurance proceeds.  *See Nov. 2013 Nova*, 2013 WL 6123104, at *2-5; *Aug. 2014 Nova*, 2014 WL 3883371, at *3.  Carpenter, as the signatory on the Avon-NV People's bank account, also signed at least one check to ASG to satisfy a payment Avon-WY owed.

Although Avon-WY vehemently argues it is a separate and distinct entity from Avon-CT and Avon-NV, the facts do not support this contention. Carpenter and Trudeau undertook an elaborate and complex series of actions. They orchestrated transactions among the three Avon entities that ignored legal formalities, which suggests the confusion and overlap was by design, at least in part to continue to hide assets from Universitas.  For example, from 2009-2010, two bank accounts that Carpenter opened using Avon-NV, serviced all three entities.  And Carpenter used the Avon entities interchangeably to suit his needs:  Avon-CT was set up for transactions related to the Ridgewood facility and the Charter Oak Trust, Avon-WY for life settlements, and Avon-NV served as the account holder for each.  Carpenter manipulated the assets and liabilities of the only Avon LLC with an account, Avon-NV.

Carpenter also identified himself as "Chairman of [the] Managing Member of Avon Capital, LLC" in signing the Ridgewood facility agreement, which pertained to Avon-CT.  Doc. 187, Att. 9, at 3.  But Avon-CT's managers were Trudeau, Robinson, and Bursey, while Avon-WY's managing member was

Caroline Financial, for which Carpenter served as Chairman. The interchangeable use of the Avon entities caused confusion and deception.

This confusion caused the *August 2014 Nova* court to identify all the judgment debtors as Connecticut or Delaware entities in the turnover action involving Avon Capital, LLC. 2014 WL 3883371, at *7. But, in the same action, Carpenter referred to himself as serving as Chairman of Caroline Financial, which in turn served as the managing member of Avon Capital. Doc. 205, Att. 2, ¶ 1. And again, that is true for Avon-WY—but *not* for Avon-CT. Similarly, the *August 2014 Nova* court identified the judgment debtor's managing member as Grist Mill Capital. 2014 WL 3883371, at *3. And that is true for Avon-NV—*not* for Avon-CT.

Avon-WY argues that it "kept its bank accounts and financial records entirely separate from those of its members" so it is not intermingled with Judgment Debtors. Doc. 204, at 32. This is untrue, at least to the extent that funds from Avon-NV's bank accounts satisfied Avon-WY's payment obligations to Moran for the SDM purchase agreement and satisfied Avon-CT's obligations on the Charter Oak Trust Waldman policy, as Universitas argues. Doc. 187, at 23. And Avon-WY fails to point to any bank account it maintained before 2012.

Avon-CT, Avon-NV, and Avon-WY are "not only owned, influenced and governed by its members, but the required separateness has ceased to exist

due to misuse of the limited liability compan[ies]." *Mantle*, 437 P.3d at 799 (quotation omitted); *see also Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 390-91 (4th Cir. 2018) (finding three distinct LLCs that operated as a "single economic entity" with funds "transferred freely among the LLCs" without explanation, including payment of expenses of one LLC by another, were alter egos of a sole member who "utterly dominated and controlled" them); *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) ("The effect of applying the alter ego doctrine . . . is that the corporation and the person who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound . . . .") (quoting *Shamrock Oil & Gas Co. v. Ethridge*, 159 F. Supp. 693, 697 (D. Colo. 1958)).  When looking at the undisputed facts of the three Avon's operations, as a whole, no rational juror could find otherwise.  *See Terrapin*, 1981 WL 15490, at *3; *Oren*, 1992 WL 79110, at *2; *see also Kloefkorn-Ballard*, 683 P.2d at 661.

### 4.  Injustice confirms this.

Universitas argues that the Avon entities are "judgment-proof shells" that benefited from Carpenter's fraudulent transfers intended to hide money from Universitas, so affording them veil-piercing protection would result in injustice.  Doc. 187, at 21.  Before the *November 2013 Nova* court, and continuing through this and other related litigation, Universitas "has engaged

in wide-ranging discovery efforts in aid of execution of the Judgment, which have been met with vigorous opposition by Nova and its affiliates." 2013 WL 6123104, at *2. As to whether an injustice would result in this case if the Court did not apply the alter-ego doctrine, depriving Universitas of the fruits of its judgment against Avon would result in an injustice.  "When, as here, the corporation is a mere dummy and the alter ego of a judgment debtor with no real existence apart from [that judgment debtor], the fiction of the corporation as a separate legal entity [cannot] be used to defeat the rights of the judgment creditor." *Shamrock Oil & Gas Co.*, 159 F. Supp. at 698.  Undoubtedly, "the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity." *Mantle*, 437 P.3d at 799 (quotation omitted); *see also AMFAC*, 645 P.2d at 81(holding that when the party making an alter-ego claim is "the victim of some basically unfair device" where the separate existence of the entity is "used to achieve an inequitable result," a court will disregard that entity under Wyoming law); *Kloefkorn-Ballard*, 683 P.2d at 661.

### 5. Conclusion.

A reasonable jury viewing the evidence in the light most favorable to Avon-WY, and drawing all reasonable inferences in its favor, could not find Avon-WY, Avon-CT, and Avon-NV operated as anything but alter egos.  The

Court grants summary judgment in favor of Universitas.  *Dewitt*, 845 F.3d at 1306.

### C. The Court denies Avon-WY's motion for summary judgment.

Avon-WY's arguments against an alter-ego determination stress the separateness of the three Avon entities.  Doc. 195, at 14-18.  Avon-WY argues Universitas presents only "generalized claims" and fails to meet its burden to present "specific facts showing a genuine issue for trial."  *Id.* at 10-11; Doc. 214, at 8-14.  Avon-WY maintains Universitas presents no clear and convincing evidence supporting fraud, apart from relying on the bad acts of others.  Doc. 195, at 16-17; Doc. 214, at 5.

Avon-WY argues it must be treated as distinct from its previous iteration.[33]  Doc. 195, at 14.  Avon-WY argues that Carpenter's involvement with Avon-WY was before it became "dormant" when it was administratively dissolved in June 2009.  *Id.*  It argues its current active state was "restarted" by Trudeau for "an existence and purpose separate and distinct from any event . . . prior to 2009."  *Id.*  But, Avon-WY cannot discount the probative evidence

---

[33]    Avon-WY's use of the two reinstatement dates in its briefs only adds to the confusion.  Avon-WY sometimes argues it was dissolved in 2009 at which time it became dormant until being reinstated in 2011, leaving out the first reinstatement and second dissolution.  *See* Doc. 195, at 4-5; Doc. 204, at 20. And other times, Avon-WY uses the 2010 reinstatement as the point in time when its activities became "separate and distinct" from prior operations.  *See* Doc. 195, at 4-5, 14, 17, 18; Doc. 204, at 21.

of alter-ego liability, most notably the purchase of SDM with funds from the Avon-NV TD bank account.

Avon-WY offers as undisputed facts: Trudeau "had no involvement with [Avon-WY] prior to his reinstatement of it in 2011"; Avon-WY "had no liabilities when Don Trudeau administratively reinstated [it]"; and Trudeau reinstated it "for business operations with a purpose separate and distinct from the prior business operations that used the entity." *Id.* at 5 ¶¶ 6, 8-9; *id.* at 14. In making these allegations, Avon-WY cites Trudeau's 2013 testimony, which does not support these assertions. *See id.* Att. 5.

Next, in its reply brief, Avon-WY backtracks and acknowledges that Trudeau held ownership interests in Avon-WY after its first administrative dissolution in 2009, contrary to its prior insistence that he was not involved with Avon-WY before reinstatement. Doc. 214, at 11. Avon-WY also admits it "had an obligation to purchase SDM," and that Trudeau served as the signatory (seemingly admitting Avon-WY was not dormant after this dissolution and again conflicting with its previously stated undisputed facts). *Id.* at 12.

Avon-WY's arguments fail for the reasons outlined above. First, Universitas disputes the argument that Avon-WY became dormant in the period after its administrative dissolution and before it was reinstated by Trudeau for a "different purpose." *See* Doc. 205, at 21. As shown, Avon-WY

was in fact very active in the period between dissolution and reinstatement. The relevant period involves the transfers of $30 million of Avon-CT-related Charter Oak Trust life insurance proceeds to various entities, including to Avon-NV's bank account.   Also included is the December 2009 SDM acquisition, which Avon-NV funded on Avon-WY's behalf.  The Charter Oak Trust-Tranen-Yates transactions took place on November 12, 2010.   The transfer from Avon-WY to Life Elite were completed November 15, 2010, the day Trudeau applied to reinstate Avon-WY.

Try as it might, Avon-WY cannot refute Carpenter's control of each of the Avon entities; Trudeau's involvement with Avon-WY (beyond bold factual misstatements that he was not involved until either 2010 or 2011); Trudeau's signing the SDM deal on Avon-WY's behalf in 2009 after the receipt of the Charter Oak Trust monies; the rapid reinstatement of Avon-WY and transactions in the latter half of 2010 timed in tandem with the Charter Oak Trust transactions; Avon-NV's payment of various SDM/ASG-related fees and payments to the Morans and related entities; and Avon-NV's payments to Avon-WY's consultant Terrell.  Avon-NV also funded at least some of Avon-CT's activities, as the Avon-NV TD bank account shows.  *See* Doc. 187, Att. 13, at 1, 4, 7-9 (reflecting two $44,150.00 Waldman policy payments in August and October 2009).

Viewing the factual record and making all reasonable inferences in favor on Universitas, the Court denies Avon-WY's motion for summary judgment. The evidence not only weighs in Universitas's favor, but is so one-sided that only Universitas can prevail as a matter of law.  *See Anderson*, 477 U.S. at 252.

## VII.   THE COURT DENIES SDM'S MOTION TO QUASH THE GARNISHMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT.

Because SDM's motion for partial summary judgment contains substantially similar language to its motion to quash garnishment, the Court will address the motions together.  *See* Docs. 191-92.

SDM seeks to quash Universitas's writ of garnishment, arguing in part it "[d]oes not believe any further relief is sought against SDM."  Doc. 191, at 2. SDM also argues it "was not properly served with all of the required documents."  *Id.* at 5.  Universitas responds that SDM has previously "entered an appearance in this proceeding identifying itself as a 'Garnishee'" so even if it was improperly served, it is "properly before the Court as a garnishee."  Doc. 206, at 6.  Universitas also argues "voluntary appearance is equivalent to service" and it "can occur at any point in the proceeding . . . ."  *Id.* (citing *Wagoner v. Saunier*, 627 P.2d 428, 431 n.4 (Okla. 1981)).

SDM argues that its counsel's appearances were for *Respondent* SDM, primarily to respond to a motion for contempt and a motion to compel.  Doc. 211, at 2, 8; Doc. 212, at 4-5.  SDM waived service by its appearance, producing

documents, corresponding with Universitas's counsel, participating in a status conference, filing a joint status report, and winning relief in the form of sanctions.  *See, e.g.*, Docs. 113, 115, 134, 137, 142, 148; *Hopper v. Wyant*, 502 F. App'x 790, 792 (10th Cir. 2012) ("'[A]n individual may submit to the jurisdiction of the court by appearance,' and voluntary use of certain court procedures may constitute constructive consent to the personal jurisdiction of the court." (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703-04 (1982))).

In addition to the arguments regarding lack of relief sought and service included in the motion to quash, SDM alternatively argues in its motion for summary judgment that SDM is not liable as a garnishee because it is not indebted to and does not possess assets belonging to the Judgment Debtor. Doc. 192, at 9-10.  SDM makes "the claim of exception on the part of the judgment debtor(s) . . . [that SDM] is neither owned by nor indebted to the actual judgment debtor(s): [Avon-CT] and/or [Avon-NV]." *Id.* at 10 (quoting *id.* Att. 1).  In determining the Avon entities are alter egos, the Court finds they are one and the same for purposes of their liability to Universitas.  *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 143 (2d Cir. 1991) (stating that once alter-ego status is established, "the previous judgment is then . . . enforced against entities who were, in essence, parties to the underlying dispute[ and] the *alter egos* are treated as one entity").  Because

66

Avon-WY owns one hundred percent of the membership interests in SDM,[34] SDM possesses assets of a judgment debtor.  *Id.*  The undersigned finds Universitas does seek relief against SDM, as SDM serves as Avon-WY's "most notable asset."  Doc. 92, at 4 n.2.  Viewing the factual record and making all reasonable inferences in favor of the nonmovant, the Court denies SDM's motion for partial summary judgment.

## VIII. THE COURT DENIES UNIVERSITAS'S MOTION TO STRIKE SDM'S MOTION TO QUASH AND ITS REQUEST FOR SANCTIONS AGAINST SDM.

In seeking to strike SDM's motion, Universitas argues that every issue in the motion to quash is "also addressed in SDM's Motion for Summary Judgment and SDM's Opposition to Petitioner's Motion for Summary Judgment."  Doc. 208, at 1.  What else could SDM "hope to accomplish by filing the same argument three times, other than 'to harass, cause unnecessary delay, or increase the cost of litigation'"?  *Id.* at 2.  In fact, "Mr. Carpenter and his associates have a demonstrable history of filing motions solely to 'harass, cause unnecessary delay, or increase the cost of litigation.'"  *Id.* (citing *Nova SDNY Litig.*, No. CIV-11-1590-LTS-HBP; *Universitas Educ., LLC v. Nova Grp., Inc.,* 2013 U.S. Dist. LEXIS 142481, at *11 (S.D.N.Y. Sept. 30, 2013) (indicating that Nova's "re-filing of the motion to dismiss was in bad faith and

---

[34]     *See* Doc. 57, Att. 3, at 2, ¶ 7.

with a motive to delay, harass, or needlessly increase the cost of litigation")).

Finally, Universitas notes SDM is run by Kehoe, a Benistar employee. *Id.*

Despite the demonstrable history of filing motions to harass and delay on the part of a multitude of Carpenter-controlled entities, the Court notes SDM's counsel states it is acting in good faith and out of an abundance of caution. Doc. 191, at 1; Doc. 192, at 2. SDM's counsel was uninvolved in the turnover proceedings or any other apparent litigation in this matter. As such, the Court finds the denial of Universitas's motion to quash to be appropriate.

## IX.   CONCLUSION.

Avon-WY and Avon-NV are alter egos of Avon-CT. Given this, Universitas may enforce the judgment it registered here against any of the three Avon entities. 28 U.S.C. § 1963 (A judgment has "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner."); *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 143; *see also Condaire*, 286 F.3d at 357 (noting that registration under § 1963 equates to a "new judgment" and  recognizing § 1963's grant of "inherent powers . . . to enforce [such] judgments"); *Sys. Div., Inc. v. Teknek Elecs., Ltd.,* 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of [personal] jurisdiction over an alter ego is compatible with due process because a corporation and its alter ego are the *same entity* . . . ."); *Misik v. D'Arco*, 197 Cal. App. 4th 1065, 1072 (2011) ("[A]mending a judgment to add

68

an alter ego does not add a new defendant but instead inserts the correct name of the real defendant."). So, the Court may enjoin each of these entities from transferring, alienating, and/or concealing or encumbering any non-exempt property.

## X.   RECOMMENDATIONS AND NOTICE OF RIGHT TO OBJECT.

For the reasons discussed above, the undersigned recommends:

1. The Court DENY Avon-WY's motions to strike, Docs. 193, 213.

2. The Court GRANT SDM's motion to join Avon-WY's first motion to strike, Doc. 196.

3. The Court GRANT Universitas's motion for summary judgment and find that Avon-WY and Avon-NV are alter egos of Avon-CT, the named judgment debtor, Doc. 186.

4. The Court DENY Avon-WY's motion for summary judgment, Doc. 194.

5. The Court DENY SDM's motion to quash, Doc. 191.

6. The Court DENY SDM's motion for partial summary judgment, Doc. 192.

7. The Court DENY Universitas's motion to strike SDM's motion to quash, Doc. 208.

8. The Court ENJOIN Avon-WY from transferring, alienating, and/or concealing or encumbering its ownership of any interest in SDM.

69

9. The Court ENJOIN Avon-WY, Avon-CT, and Avon-NV from transferring, alienating, and/or concealing or encumbering any non-exempt property.

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court on or before November 3, 2020, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make a timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned in the captioned matter.

**ENTERED** this 20th day of October, 2020.


SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE