## SERVICING AGREEMENT
### (SDM/ASG)

This Servicing Agreement (this "Agreement") is dated and effective as of December 24, 2009 by and between SDM Holdings, LLC or it nominee, a_ *Oklahoma*_ limited liability company ("Owner"), and Asset Servicing Group, LLC, an Oklahoma limited liability company ("ASG"), as the servicer hereunder (in such capacity, the "Servicer").

### RECITALS

WHEREAS, Owner desires to appoint ASG to act as the Servicer with respect to the settlement, ongoing administration and servicing of certain life insurance policies that are from time to time owned (including as of the date hereof), or in the process of being acquired, directly or indirectly by Owner, and ASG desires to accept such appointment as the Servicer, all in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual benefits and promises herein described, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINED TERMS; CERTAIN RULES OF CONSTRUCTION

Section 1.1.    Defined Terms.    Each capitalized term used but not otherwise defined herein has the meaning given to such term in Annex 1 hereto.

Section 1.2.    Usage of Terms. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; article, section, subsection, exhibit and schedule references contained in this Agreement are references to articles, sections, subsections, exhibits and schedules in or to this Agreement unless otherwise specified; all references herein to "$" are to United States dollars unless otherwise stated; with respect to all terms in this Agreement, the singular includes the plural and the plural the singular; words importing any gender include the other gender; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; a reference herein to any agreement (including this Agreement) or other document is to such agreement or other document (together with the schedules, exhibits, annexes and other attachments thereto) as it may have been or may hereafter be amended, modified, supplemented, waived or restated from time to time in accordance with its terms (except to the extent prohibited by the terms of this Agreement); unless the context otherwise requires, a reference herein to any party to this Agreement or any other agreement or document includes such party's permitted successors and permitted assigns; a reference herein to any legislation or to any provision of any legislation includes any modification or re-enactment thereof (including prior to the date hereof), any legislative provision substituted therefor and all regulations and rules issued thereunder or pursuant thereto; and whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

EXHIBIT

1

ARTICLE II
APPOINTMENT; SERVICING STANDARD

Section 2.1.    Appointment.

(a)    Owner hereby appoints and engages ASG as Servicer hereunder to provide the services described on Annex 2 hereto (the "Services"), pursuant to, and in accordance with, the terms and provisions of this Agreement during the Servicing Term, and ASG hereby accepts such appointment on the terms and conditions set forth in this Agreement.  The Servicer will, as an independent contractor on behalf of Owner (and not as an agent thereof), perform the Services described on Annex 2 hereto during the Servicing Term in all cases subject to the Servicing Standard.

Section 2.2.    Servicing Standard.    In performing the Services, the Servicer shall exercise the same degree of skill and care used by other Persons of established reputation responsible for servicing life insurance policies (and in any event at least the same degree of skill and care as the Servicer exercises with respect to comparable assets held for its own account) and in compliance in all material respects with all applicable Laws, including with respect to licensing, dissemination of medical information, privacy, regulatory reporting and record keeping (the foregoing, the "Servicing Standard").  Subject to the specific requirements and prohibitions of this Agreement, (i) the Servicer shall perform the Services for the benefit of Owner, without regard to any relationship which the Servicer or any Affiliate thereof may otherwise have with any Insurer or Insured, and (ii) the Servicer shall at all times act in accordance with the provisions of each Portfolio Policy in all material respects and observe and comply with all applicable Laws in all material respects.

ARTICLE III
FEES AND EXPENSES

Section 3.1.    Out-of-Pocket Expenses.  The Servicer shall be entitled to be reimbursed by Owner for any actual and reasonably documented Out-of-Pocket Expense reasonably incurred by the Servicer in performing the Services to the extent either (i) such Out-of-Pocket Expense, together with all other Out-of-Pocket Expenses incurred by the Servicer during the same calendar month as such Out-of-Pocket Expense and for which the Servicer has been reimbursed by (or is seeking reimbursement from) Owner, does not exceed $5,000 or (ii) the incurrence of such Out-of-Pocket Expense has been consented to in writing by Owner (and such Out-of-Pocket Expense does not exceed the amount stated in such written consent of Owner).  Without limiting the immediately preceding sentence, Owner agrees that it shall not unreasonably withhold, condition or delay its consent to the incurrence by the Servicer of any Out-of-Pocket Expense reasonably incurred (or proposed to be incurred) by the Servicer in performing the Services, and the Servicer shall not be obligated to perform any Service hereunder to the extent such performance would necessitate the reasonable incurrence by the Servicer of an Out-of-Pocket Expense of which the Servicer is not entitled to reimbursement pursuant to the first sentence of this Section 3.1.

Section 3.2.    Fees.

(a)     Owner agrees to pay to the Servicer a one-time set-up fee in the amount of $0.00 in advance, in respect of each Insurance Policy that became a Portfolio Policy prior to the current calendar month (the "Set-Up Fee"). The Servicer shall provide Owner a written invoice for the Set-Up Fee within fifteen (15) days of the first day of each calendar month beginning in January , 2010, which sets forth any Set-Up Fees due prior to the current  calendar month and Owner shall remit the Set-Up Fee to the Servicer within fifteen (15) days of receiving such invoice.

(b)     As compensation to the Servicer for performing the Services hereunder (other than the Settlement Services and the Death Benefit Processing Services), Owner shall pay to the Servicer a monthly fee of $ 30.00 in advance or arrears, respectively in respect of each Insurance Policy with a death benefit amount of $500,000.00 or less, that constituted a Servicing Policy on at least one day during the immediately preceding calendar month (the aggregate amount of such fees for all of the Servicing Policies with respect to a calendar month is referred to herein as the "Monthly Servicing Fee"). The Servicer shall provide Owner with a written invoice for the Monthly Servicing Fee on a monthly basis within fifteen (15) days of the first day of each calendar month, beginning in January , 2010, which sets forth the Monthly Servicing Fee of the immediately preceding calendar month and Owner shall remit the Monthly Servicing Fee to the Servicer within fifteen (15) days of receiving such invoice.

(c)     As compensation to the Servicer for performing the Services hereunder (other than the Settlement Services and the Death Benefit Processing Services), Owner shall pay to the Servicer a monthly fee of $68.00 in advance or arrears, respectively in respect of each Insurance Policy with a death benefit amount of $500,00.01 or more, that constituted a Servicing Policy on at least one day during the immediately preceding calendar month (the aggregate amount of such fees for all of the Servicing Policies with respect to a calendar month is referred to herein as the "Monthly Servicing Fee"). The Servicer shall provide Owner with a written invoice for the Monthly Servicing Fee on a monthly basis within fifteen (15) days of the first day of each calendar month, beginning in January, 2010, which sets forth the Monthly Servicing Fee of the immediately preceding calendar month and Owner shall remit the Monthly Servicing Fee to the Servicer within fifteen (15) days of receiving such invoice.

(d)     Without limiting Section 3.3(a) hereof, Owner shall pay to the Servicer a fee in the amount of $550.00 per Insurance Policy that the Servicer performs the Settlement Services (the aggregate amount of such fees for all of the Insurance Policies with respect to which the Servicer has performed the Settlement Services in a calendar month is referred to herein as the "Monthly Settlement Service Fee"); provided, that, the parties acknowledge Owner may request the Servicer to perform the Settlement Services with respect to an Insurance Policy more than once (e.g., in connection with its acquisition and then in connection with its disposition), in which case such fee of $550.00 shall apply with respect to each such performance of the Settlement Services. In the event Owner requests that Servicer perform the Settlement Services with respect to an Insurance Policy, but after the Servicer has begun to perform such Settlement Services and prior to the completion of such Settlement Services, Owner elects not to acquire such Insurance Policy, Owner will nevertheless be obligated to pay the full Monthly Settlement Service Fee to Servicer, including the portion of such Monthly Settlement Service Fee with respect to any such Insurance Policy which Owner has elected to not acquire. The Servicer shall provide Owner with a written invoice for the Monthly Settlement Service Fee on a monthly

basis within fifteen (15) days of the first day of each calendar month, beginning in January , 2010, which sets forth the Monthly Settlement Service Fee of the immediately preceding calendar month and Owner shall remit the Monthly Settlement Service Fee to the Servicer within fifteen (15) days of receiving such invoice.

(e)     Upon the Servicer completing the Death Benefit Processing Services with respect to any Portfolio Policy, the Servicer shall be entitled to receive a fee from Owner in the amount of $525.00 in respect of such Portfolio Policy (the aggregate amount of such fees for all of the Portfolio Policies with respect to which the Servicer has completed the Settlement Services in a calendar month is referred to herein as the "Monthly Death Benefit Processing Fee").  The Servicer shall provide Owner with a written invoice for the Monthly Death Benefit Processing Fee on a monthly basis within fifteen (15) days of the first day of each calendar month, beginning in January, 2010, which sets forth the Monthly Death Benefit Processing Fee of the immediately preceding calendar month, and Owner shall remit the Monthly Death Benefit Processing Fee to the Servicer within fifteen (15) days of receiving such invoice.

(f)     Notwithstanding anything herein to the contrary, the initial base fees of $0.00, $30.00 or $68.00, $550.00 and $525.00 (the "Initial Base Fees") for the Set-Up Fee, the Monthly Servicing Fee (dependent on death benefit amount as stated in 3.2 (b) and (c)), the Monthly Settlement Service Fee and the Monthly Death Benefit Processing Fee, respectively, are subject to the cost of living adjustments described in Annex 4 attached hereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1.   Representations and Warranties of the Servicer.  The Servicer hereby represents and warrants to Owner on and as of the date hereof that:

(a)     Organization and Good Standing.  The Servicer is a limited liability company, duly organized, validly existing and in good standing under the laws of Oklahoma and has the limited liability company power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

(b)     Due Qualification.  The Servicer has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such licenses or approvals and where the failure to so obtain such licenses and approvals will have a material adverse effect on the ability of the Servicer to perform its obligations under this Agreement.

(c)     Power and Authority.  The Servicer has full limited liability company power, authority and right to execute and deliver this Agreement, and to perform its obligations hereunder, and has taken all necessary limited liability company action to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(d)     Binding Obligation.  This Agreement constitutes the legal, valid and binding obligations of the Servicer enforceable against the Servicer in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by

general principles of equity.

(e)    No Conflict.  Neither the execution or delivery of this Agreement by the Servicer nor the performance by the Servicer of its obligations hereunder will (i) conflict with, result in any breach of any of the terms or provisions of, or constitute (with or without notice or lapse of time) a default under, the Articles of Organization or the operating agreement of the Servicer, or (ii) conflict with or breach any of the material terms or provisions of, or constitute (with or without notice or lapse of time) a default under, any indenture, agreement or other instrument to which the Servicer is a party or by which it shall be bound.

(f)    No Proceedings.  There is no Action now pending, or to the Servicer's knowledge, threatened, against the Servicer (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (iii) seeking any determination or ruling that might materially and adversely effect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement.

(g)    No Consents.  Neither the execution or delivery of this Agreement by the Servicer nor the performance by the Servicer of its obligations hereunder requires to the Servicer's knowledge any consent, waiver, Permit, Order, designation or authorization of, notice to, or registration, filing, qualification or declaration with, any Governmental Authority or other Person, other than any such consent, waiver, Permit, Order, designation, authorization, notice, registration, filing, qualification or declaration (i) which has been, or will be no later than when required to be, duly made, obtained or delivered, as applicable, (ii) which the failure to make, obtain or deliver, as applicable, will not to the Servicer's knowledge, have a material adverse effect on (A) any Portfolio Policy or on Owner's right, title or interest in, to or under any Portfolio Policy, (B) the provision of the Services hereunder or (C) the ability of the Servicer to conduct its business or perform its obligations under this Agreement or on the earnings, business affairs or business prospects of the Servicer or (iii) which is applicable as a result of any act or omission by, or the status of any fact, event or circumstance pertaining to, Owner or any of its Affiliates and not by or to the Servicer or any of its Affiliates.

(h)    Compliance With Law.  The Servicer has not received any notice of any violation, or potential violation, of any such Law from any Governmental Authority or other Person and to the Servicer's knowledge, the Servicer conducts, and at all times has conducted, its business in compliance in all material respects with each Law applicable thereto in effect at all relevant times.

Section 4.2.    Representations and Warranties of Owner.  Owner hereby represents and warrants to the Servicer on and as of the date hereof that:

(a)    Organization and Good Standing.  Owner is a limited liability company, duly organized, validly existing and in good standing under the laws of _____ and has the power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

(b)    Due Qualification.  Owner has obtained all necessary licenses and

approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such licenses or approvals and where the failure to so obtain such licenses and approvals will have a material adverse effect on the ability of Owner to perform its obligations under this Agreement.

(c)     Power and Authority.  Owner has full power, authority and right to execute and deliver this Agreement, and to perform its obligations hereunder, and has taken all necessary statutory trust action to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(d)     Binding Obligation.  This Agreement constitutes the legal, valid and binding obligations of Owner enforceable against Owner in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general principles of equity.

(e)     No Conflict.  Neither the execution or delivery of this Agreement by Owner nor the performance by Owner of its obligations hereunder will (i) conflict with, result in any breach of any of the terms or provisions of, or constitute (with or without notice or lapse of time) a default under, the organizational documents of Owner, or (ii) conflict with or breach any of the material terms or provisions of, or constitute (with or without notice or lapse of time) a default under, any indenture, agreement or other instrument to which Owner is a party or by which it shall be bound.

(f)     No Proceedings.  There is no Action now pending, or to Owner's knowledge, threatened, against or affecting Owner (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or (iii) seeking any determination or ruling that might materially and adversely effect the performance by Owner of its obligations under, or the validity or enforceability of, this Agreement.

(g)     No Consents.  Neither the execution or delivery of this Agreement by Owner nor the performance by Owner of its obligations hereunder requires, to Owner's knowledge, any consent, waiver, Permit, Order, designation or authorization of, notice to, or registration, filing, qualification or declaration with, any Governmental Authority or other Person, other than any such consent, waiver, Permit, Order, designation, authorization, notice, registration, filing, qualification or declaration (i) which has been duly made, obtained or delivered, as applicable, (ii) which the failure to make, obtain or deliver, as applicable, will not, to Owners' knowledge, have a material adverse effect on (A) any Portfolio Policy or on Owner's right, title or interest in, to or under any Portfolio Policy, (B) the provision of Services hereunder or (C) the ability of Owner to conduct its business or perform its obligations under this Agreement or on the earnings, business affairs or business prospects of Owner or (iii) which is applicable as a result of any act or omission by, or the status of any fact, event or circumstance pertaining to, the Servicer or any of its Affiliates and not by or to Owner or any of its Affiliates.

(h)     Compliance With Law.  Owner has not received any notice of any violation, or potential violation, of any such Law from any Governmental Authority or other Person and to the Owner's knowledge, Owner conducts, and at all times has conducted, its

business in compliance in all material respects with each Law applicable thereto in effect at all relevant times.

Section 4.3.   Survival; Notice of Breach.  The representations and warranties set forth in Sections 4.1 and 4.2 hereof shall survive the termination of the Servicing Term for a period of one (1) year.  Upon the Servicer having knowledge of any breach of any representation or warranty set forth in Section 4.1 hereof, the Servicer shall provide Owner with prompt written notice thereof.  Upon Owner having knowledge of any breach of any representation or warranty set forth in Section 4.2 hereof, Owner shall provide the Servicer with prompt written notice thereof.

ARTICLE V
CERTAIN COVENANTS OF THE PARTIES

Section 5.1.   Compliance with Laws.   The Servicer shall in connection with its performance of the Services comply in all material respects with all applicable Laws.  Owner shall in connection with its acquisition, ownership and disposition of the Portfolio Policies comply in all material respects with all applicable Laws.

Section 5.2.   Insurance.   During the Servicing Term, the Servicer shall maintain insurance with respect to its operations and property and with respect to its obligations under this Agreement which is adequate, reasonable and customary in light of the Servicer's operations and consistent with the Servicing Standard.  The additional costs and expenses of any errors and omissions insurance policy (the "E&O Policy") with coverage in excess of Servicer's standard coverage of $1,000,000 shall be paid solely by the Owner within ten (10) days of receipt of a written invoice for such additional costs and expenses.

Section 5.3.   Relationship Between Servicer and Owner.   The parties hereto acknowledge and agree that the relationship between the Servicer and Owner is a contractual relationship of an independent contractor and, except as set forth in Section 6.1(b) hereof with respect to any money in the Premium Account (which the Servicer shall hold in trust for the exclusive benefit of Owner), the Servicer shall not have any fiduciary duty or other implied obligation or duty arising out of this Agreement to Owner.  Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership or of joint venture between the Servicer and its Affiliates, on the one hand, and Owner and its Affiliates, on the other hand, and, except to the extent set forth in Section 8.1 hereof, neither Owner nor any of its Affiliates shall be liable to any other Person (including, without limitation, the Servicer) for any obligation or liability of, or claim against, the Servicer of any kind whatsoever (whether or not arising out of or otherwise in connection with this Agreement).  Further, except to the extent set forth in Section 8.2 hereof, neither the Servicer nor any of its Affiliates shall be liable to any other Person (including, without limitation, Owner) for any obligation or liability of, or claim against, Owner of any kind whatsoever (whether or not arising out of or otherwise in connection with this Agreement).

Section 5.4.   Further Assurances.  Each party hereto shall use its reasonable, good faith efforts to take, or cause to be taken, all actions that are, and to do, or cause to be done, and to assist and cooperate with the other party hereto in doing, all things that are, necessary, proper or

otherwise advisable under all applicable Laws to more fully affect the purposes of this Agreement.

        Section 5.5.   Disclaimer By Servicer.  Owner acknowledges and agrees that:

        (a)    by entering into this Agreement, the Servicer makes no implied or actual determination, statement or approval as to (i) the viability or enforceability of any Insurance Policy or insurance document, (ii) the insurability of any individual or (ii) Owner's decision to (or to not) purchase or otherwise acquire, provide premium financing, finance or sell or otherwise dispose of any Insurance Policy;

        (b)    the Servicer shall not be responsible or liable for (i) any amount of expected or anticipated death benefits or other maturity proceeds under any Portfolio Policy in the event that the Insurer thereof denies such benefit or claim or (ii) the validity, perfection, priority, continuation or value of any death benefit or maturity proceeds of any Portfolio Policy, or of any security interest or the value or collectibility of the same; or (iii) any life expectancy reports or other reports which Servicer obtains from any third party for the benefit of Owner, including without limitation, any subcontracting of outside firms to provide any services beyond those identified herein which may be requested by Owner; and

        (c)    unless otherwise agreed in writing, (i) the Servicer will not undertake to verify or otherwise be responsible or liable for any errors, inaccuracies, omissions or shortfalls in any Premium Payment Schedule and (ii) the Servicer will not be liable or responsible for paying premiums with respect to any Portfolio Policy other than in accordance with the terms of the related Premium Payment Schedule and this Agreement.

        Section 5.6.   Investigative Services.  The Servicer shall not, nor is expected to, perform any investigative service in connection with the Tracking Services.  However, the Servicer and Owner may from time to time separately agree upon the performance by the Servicer of certain investigative services on a separate fee basis.  These services may include the sub-contracting of outside firms that specialize in investigative services.  Should the Servicer find or determine that the performance of any investigative service on an individual Insured is not possible or is unreasonably difficult, the Servicer, with the consent of Owner, shall be permitted to terminate such investigative service on that Insured with no penalty or fee attached thereto, other than the loss to the Servicer of a fee for investigation of that Insured.  If Owner unreasonably withholds its consent to terminate any such investigative service, the Servicer may do so in its sole discretion without penalty or fee.

### ARTICLE VI
### ESTABLISHMENT OF ACCOUNT

        Section 6.1.   Establishment of Premium Account.

        (a)    On the date hereof, the Servicer shall establish one commercial checking account at the Deposit Bank, (such account, the "Premium Account").

        (b)    The Servicer acknowledges and agrees that notwithstanding anything contained herein to the contrary, all amounts in the Premium Account at any time are being held

in trust for the exclusive benefit of Owner pursuant to, and in accordance with the terms of, this Agreement, and no such amount shall constitute an asset or property of the Servicer (or of ASG or any Affiliate thereof). Except to the extent required by applicable Law, the Servicer shall not subject the Premium Account (or any money therein) to, or cause the Premium Account (or any money therein) to be the subject of, any right of deduction, set-off, banker's lien, counterclaim, defense, recoupment or other lien or encumbrance of any kind in favor of the Servicer or any other Person. The Servicer shall not commingle amounts in the Premium Account with any other funds of the Servicer or any other Person.

Section 6.2.    Deposits and Withdrawals.

(a)    The Servicer shall deposit into the Premium Account any and all amounts that may from time to time be delivered to the Servicer by or on behalf of Owner for deposit into the Premium Account. The Servicer shall withdraw funds from the Premium Account from time to time as described in paragraph 2(c) of Annex 2 hereto.

(b)    If the Servicer receives any death benefits, proceeds and other amounts with respect of any Portfolio Policy (whether from an Insurer or otherwise), the Servicer shall promptly deposit such funds in the Premium Account.

(c)    Upon termination of the Servicing Term or upon written instruction provided to the Servicer by Owner from time to time, the Servicer shall, within two (2) Business Days of such termination or the Servicer's receipt of such instruction (or such later date specified in such instruction), withdraw all funds (or such other amount(s) specified in such instruction) from the Premium Account and transfer such funds to an account designated by Owner from time to time in immediately available funds.

(d)    The Servicer shall only withdraw or otherwise disburse amounts from the Premium Account in accordance with the terms of this Agreement.

Section 6.3.    Activity Report.  The Servicer shall provide Owner with online access to the daily balance of, each deposit to, and each withdrawal from, the Premium Account.

ARTICLE VII
CONFIDENTIALITY

Section 7.1.    General Duty.  The Servicer agrees that all documentation, materials and information provided by or on behalf of, or made available by or on behalf of, Owner for the performance of the Servicer's obligations hereunder shall be used solely for the purposes contemplated or permitted by this Agreement and that all such documentation, information and materials provided by or on behalf of Owner to the Servicer shall be deemed proprietary; all information and materials shall be received, utilized, and maintained in confidence. All of the Servicer's methods, information and documentation are proprietary to the Servicer and shall be maintained in confidence by Owner and its Affiliates.

Section 7.2.    Reasonable Precautions.    The Servicer shall take such reasonable precautions as may be reasonably necessary to protect such documentation, information and

materials from disclosure to others or from use by itself or others for any purpose inconsistent with this Agreement.

Section 7.3.    Dissemination of Certain Information.    The Servicer shall materially comply with all Laws affecting the Services, including but not limited to Laws regarding the privacy of any Insured and the maintenance of all information obtained by Owner and/or the Servicer in the performance of their duties in accordance with applicable Laws concerning the dissemination of such information; provided, that, the Servicer may disclose such information to competent judicial or regulatory authorities in response to a written request therefrom for such information; provided, however, that (a) the Servicer shall not disclose such information to such judicial, regulatory or other governmental authorities before the date set forth in such request therefor; and (b) the Servicer shall provide Owner with prompt notice of such request, providing a reasonable period of time for each party to seek judicial or other relief before such information is disclosed.

## ARTICLE VIII
## LIMITATION OF LIABILITY

Section 8.1.    In no event will Servicer, its directors, officers, shareholders, employees, attorneys, agents, assigns or successors-in-interest be liable to Owner for any indirect, special, incidental, punitive, exemplary or consequential damages of any kind whatsoever, arising out of or relating to this Agreement whether based on an action or claim in contract, restitution, equity, negligence, tort or otherwise.

Section 8.2.    The liability of Servicer, its directors, officers, shareholders, employees, attorneys, agents, assigns or successors-in-interest to Owner for any direct damages in any way arising out of or relating to this Agreement whether based on an action or claim in contract, restitution, equity, negligence, tort or otherwise, will not exceed, in the aggregate, an amount equal to the profits realized by Servicer under this Agreement during the twelve (12) month period prior to the filing date of such action or claim.

## ARTICLE IX
## REMOVAL AND RESIGNATION OF THE SERVICER

Section 9.1.    Term; Termination.    This Agreement:

(a)    will continue until sixty (60) months from the date of this Agreement, but shall be automatically renewed for consecutive one year terms thereafter unless either party is notified in writing by the other party to the contrary at least ninety (90) days prior to the next succeeding termination date of this Agreement; provided, however, that notwithstanding the foregoing, if the Servicer has notified Owner in writing that it has elected not to renew the contract, that the termination shall not be effective and this Agreement shall continue to be in force on the same terms and conditions as the immediately preceding term except that all fees during such extended period shall be twice the fees charged during the immediately preceding term until a replacement servicer has been engaged by Owner; provided, further, that if no replacement servicer has accepted appointment within forty-five (45) days following the

respective term of this Agreement, the Servicer may, at the sole cost of Owner, petition any court of competent jurisdiction for the appointment of a replacement servicer;

(b)     may be terminated by Owner or the Servicer by delivery of written notice to the other of a change in any applicable Law that causes it to be illegal for such party to continue performing under this Agreement; provided, however, if such change in Law only affects the performance with respect to one or more Portfolio Policies but not all of the Portfolio Policies, or one or more of the Services but not all of the Services, this Agreement shall continue to be in force with respect to each Portfolio Policy and/or Service as to which such performance is then still legal under all applicable Laws;

(c)     may be terminated by Owner effective immediately upon receipt of written notice by the Servicer if the Servicer fails to perform or observe any of the covenants, conditions or agreements to be performed or observed by it hereunder and such failure shall continue for a period in excess of thirty (30) calendar days after written notice thereof is given by Owner to the Servicer;

(d)     may be terminated by the Servicer effective immediately upon receipt of written notice by Owner, if any of the following occur:

(i) Owner fails to perform or observe any of the covenants, conditions or agreements to be performed or observed by it hereunder and such failure shall continue for a period in excess of thirty (30) calendar days after written notice thereof is given by the Servicer to Owner;

(ii) any insolvency event shall occur with respect to Owner; or

(iii) Owner fails to pay the Monthly Servicing Fee, the Monthly Settlement Service Fee, the Monthly Death Benefit Processing Fee or any other fees owing to the Servicer hereunder within ten (10) calendar days after the due date therefor; and

Section 9.2.     Cooperation.     In connection with any termination hereunder pursuant to Section 9.1 hereof, the Servicer shall, at no cost or material disruption to Servicer, reasonably cooperate with Owner and each successor servicer (if any) as reasonably requested from time to time by or on behalf of Owner in furtherance of such termination and the transition of the servicing of the related Portfolio Policies (or any Insurance Policy that was formerly a Portfolio Policy), including, without limitation, with respect to the transfer of any amounts in the Premium Account.  Without limiting the foregoing, following the termination of this Agreement, the Servicer shall at the Owner's sole cost and expense, transfer all files to Owner (or to a designee thereof) if so requested in writing or destroy all files and records retained by the Servicer in connection with the performance of its duties and obligations under this Agreement, unless otherwise required by Law.

ARTICLE X
MISCELLANEOUS

Section 10.1.  Entire Agreement.  This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof and is the complete and exclusive statement of the terms of such agreement and supersedes (and in entering into this Agreement, the parties expressly disclaim any reliance on) any and all prior negotiations, discussions, correspondence, communications, representations, understandings, proposals, drafts and agreements, written or oral, between the parties hereto relating to the subject matter hereof, all of which are merged into this Agreement.  No prior drafts of this Agreement and no words or phrases from any such prior drafts shall be admissible into evidence in any action or proceeding involving this Agreement.

Section 10.2.  Amendments; Waivers; Consents.  This Agreement may be amended, modified, supplemented or restated only by a written instrument executed by each of the parties hereto.  The terms of this Agreement may be waived only by a written instrument executed by the party waiving compliance.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent or other breach, whether or not similar, and no such waiver shall operate or be construed as a continuing waiver unless so provided.  No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

Section 10.3.  Successors and Assigns; No Third-Party Beneficiaries.  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns; provided, however, neither party hereto may assign any of its rights, or delegate any of its obligations, under this Agreement without the prior written consent of the other party hereto (which consent may not be unreasonably withheld, conditioned or delayed), and any such purported assignment or delegation without such consent shall be void.  Nothing in this Agreement shall confer upon any Person, other than a party to this Agreement or a party's permitted successor or permitted assign, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

Section 10.4.  Severability.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the fullest extent permitted by applicable Law, the parties hereby waive any provision of Law which may render any provision hereof prohibited or unenforceable in any respect.

Section 10.5.  Notices.  Any notice or other communication given, delivered or made hereunder shall be in writing and shall be given by (i) personal delivery, (ii) overnight courier service or certified or registered mail, in each case return receipt requested, (iii) facsimile or (iv) electronic mail, to the following addresses:

if to the Servicer, to:

>Asset Servicing Group, LLC
>521 West Wilshire
>2nd Floor
>Oklahoma City, Oklahoma 73116
>Attn:   H. Thomas Moran
>       Kimberly D. Hinkle
>Telephone: (405) 753-9100
>Facsimile No.: (405) 753-9397
>Email: tmoran@theasg.net
>       khinkle@theasg.net

with copy to:

>Phillips Murrah, P.C.
>Corporate Tower, 13th Floor
>101 N. Robinson
>Oklahoma City, OK  73102
>Attn:   Mel R. McVay
>       Sally A. Hasenfratz
>Telephone:  (405) 235-4100
>Facsimile:  (405) 235-4133
>Email:  mrmcvay@phillipsmurrah.com and
>       sahasenfratz@phillipsmurrah.com

or to such other persons or at such other addresses as the Servicer may have furnished to Owner in writing; and

if to Owner, to:

>SDM Holdings, LLC
>Attention: H. Thomas Moran, II
>       Don Trudeau
>Telephone:   _405 - 753 - 9100_
>Facsimile No.: _405 - 753 - 9397_
>Email:

or to such other persons or at such other addresses as Owner may have furnished to the Servicer in writing.

Any such notice or other communication shall be deemed to have been given, delivered or made as of the date received; provided, however, any notice of breach, service of process, notice of an indemnification claim or other similar communication shall not be deemed to have been given, delivered or made until the date such notice, service of process or other communication is

received by a means of delivery described in clause (i) or (ii) of the first sentence of this <u>Section 10.5</u>.

Section 10.6.   <u>Governing Law; Consent to Jurisdiction; Service of Process</u>.

(a)      This Agreement shall be governed by and construed under the Laws of the State of Oklahoma (without regard to any conflicts of laws rules that might apply the Laws of any other jurisdiction).

(b)      Each of the parties hereto hereby irrevocably consents and agrees that any action, suit or proceeding with respect to any matter arising under or relating to this Agreement or the subject matter hereof shall be brought in the United States District Court of the Western District of Oklahoma sitting in Oklahoma City (or if jurisdiction is not available in such Court, then in the State Court of Oklahoma sitting in Oklahoma City) and each of the parties hereby irrevocably accepts and submits, for itself and in respect of its properties, to the exclusive jurisdiction of such court *in personam*, generally and unconditionally, with respect to any such action, suit or proceeding. Each of the parties hereby irrevocably consents to the service of process in any such action, suit or proceeding by the mailing of a copy thereof by registered or certified mail, postage prepaid, to such party at the address specified in <u>Section 10.5</u> hereof for notices to such party. In addition to or in lieu of any such service, service of process may also be made in any other manner permitted by applicable Law. Each of the parties hereby irrevocable and unconditionally waives any objection or defense which it may now or hereafter have to the laying of venue to any such action, suit or proceeding in the United States District Court of the Western District of Oklahoma sitting in Oklahoma City (or if jurisdiction is not available in such court, then in the State Court of Oklahoma sitting in Oklahoma City) and hereby irrevocably and unconditionally waives and agrees not to plead or claim that such action, suit or proceeding has been brought in such Court has been brought in an inconvenient forum.

Section 10.7.   <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. EACH PARTY HERETO ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF SUCH PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MIGHT BE FILED IN ANY COURT AND THAT MAY RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING ALL COMMON LAW AND STATUTORY CLAIMS. EACH PARTY FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 10.8.   <u>Headings</u>. The headings preceding the text of the sections and subsections hereof are inserted solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect. Owner and the Servicer agree that any rule of law or any legal decisions that would require interpretation of any claimed

ambiguities in this Agreement against the party that drafted it has no application and is expressly waived.

Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement.

## SIGNATURE PAGE TO FOLLOW

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

OWNER:

SDM Holdings, LLC, ILC
An Oklahoma limited liability company

By: _____
    H. Thomas Moran, II, Manager


ASSET SERVICING GROUP, LLC
an Oklahoma limited liability company

By: _____
    Sheri Townsend, Manager

## ANNEX 1
## DEFINED TERMS

"Action" means any claim, action, suit, proceeding, arbitral action, governmental inquiry, criminal prosecution or other investigation, whether or not filed or commenced in any court or tribunal.

"Affiliate" of a specified Person means any other Person that (at the time when the determination is made) directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified Person.  As used in the foregoing sentence, the term "control" (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") means the power to direct the management and/or the policies of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning given to such term in the preamble hereto.

"ASG" has the meaning given to such term in the preamble hereto.

"Base Fees" means the Initial Base Fees as adjusted by the CPI from time to time.

"Business Day" means a day other than (i) a Saturday, (ii) a Sunday or (iii) a day on which commercial banks in the City of Oklahoma City, Oklahoma are authorized or required to be closed for business.

"CPI" the Consumer Price Index, United States, all Urban Consumer, all Items (1967-100) as published by the United States Department of Labor Bureau of Statistics.

"Death Benefit Processing Services" means, collectively, the Services described in paragraphs 4(a) through (c) of Annex 2 hereto.

"Deposit Bank" means Kirkpatrick Bank, in Oklahoma City, Oklahoma.

"E&O Policy" has the meaning given to such term in Section 5.2 hereof.

"Governmental Authority" means any local, state, federal or foreign government or any agency, bureau, board, commission, court, department, political subdivision, tribunal or other instrumentality of any such government.

"Hourly Rates" means the Initial Hourly Rates as adjusted by the CPI from time to time.

"Initial Base Fees" has the meaning described in Section 3.2(f).

"Initial Hourly Rates" has the meaning described in Annex 4.

"Insurance Policy" means any life insurance policy.

Annex 1

"Insured" means a natural person who is named as an insured on an Insurance Policy.

"Insurer" means, with respect to an Insurance Policy, the insurance company that is obligated to pay the death benefit upon the death of the related Insured (or upon the death of a second Insured thereunder, in the case of a joint Insurance Policy) pursuant to the terms of such Insurance Policy.

"Law" means any law, statute, rule, regulation, ordinance, treaty and other pronouncement having the effect of law of any Governmental Authority.

"Loss" means any loss, liability, claim, cost, damage, tax, penalty, interest or fine, whether or not arising out of a third party claim, including reasonable attorneys' fees and other out-of-pocket costs and expenses.

"Monthly Servicing Fee" has the meaning given to such term in Section 3.2(b) or (c), respectively, hereof.

"Monthly Settlement Service Fee" has the meaning given to such term in Section 3.2(d) hereof.

"Monthly Death Benefit Processing Fee" has the meaning given to such term in Section 3.2(e) hereof.

"Order" means any writ, judgment, decree (including any consent decree), injunction or similar order issued, promulgated or entered by or with any Governmental Authority (in each such case whether preliminary or final).

"Out-of-Pocket Expense" means an actual out-of-pocket cost or expense incurred by the Servicer, other than any cost or expense incurred by the Servicer in the ordinary course of performing the Services and operating its business. Without limiting the immediately preceding sentence, it is expressly agreed that Out-of-Pocket Expenses may include (i) the salary and/or overtime wages of Servicer's employees, at the rates identified on Annex 4 hereof, to the extent relating to the performance of a Service which is beyond routine monitoring and ordinary administration of the Portfolio or which is the result of a specific request by Owner hereunder; (ii) costs or expenses of the Servicer including those owed to any of its Affiliates, provided that such costs and expenses are consistent with those charged by unrelated third parties; and (iii) the costs or expenses of the Servicer engaging any unrelated third party to provide life expectancy reports or other services beyond those identified herein on a subcontract basis, if and as requested by Owner.

"Owner" has the meaning given to such term in the preamble hereto.

"Permit" means each license, permit, certificate of authority, authorization, approval, registration, franchise and similar consent granted or issued by any Governmental Authority.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, proprietorship, business or statutory trust, trust, union, association, instrumentality, Governmental Authority or other entity, enterprise, authority, unincorporated organization or business organization.

"Policy Information" has the meaning given to such term in paragraph 5(a) of Annex 2 hereto.

"Portfolio Policy" means an Insurance Policy that is owned directly or indirectly by Owner (including, but not limited to, by a securities intermediary on behalf of Owner) and as to which Owner has provided the Servicer with written notice during the Servicing Term that such Insurance Policy constitutes a Portfolio Policy; provided, however, a Settlement Policy shall automatically become a Portfolio Policy, without Owner having to deliver such a notice, upon the earlier of (i) Servicer receiving confirmation from the applicable Insurer that the Person designated as the new owner of such Settlement Policy in the change of ownership form submitted to such Insurer pursuant to paragraph 1(b) of Annex 2 hereto has been recorded by such Insurer as the new owner of such Settlement Policy; or (ii) the Servicer commencing the premium tracking and Premium Payment services described in Paragraph 2 of Annex 2 with respect to such Insurance Policy; provided, further, that an Insurance Policy shall cease to be a Portfolio Policy for all purposes of this Agreement upon the date upon which the full amount of the death benefit payable pursuant to the terms of such Insurance Policy is received by Owner.

"Premium Account" has the meaning given to such term in Section 6.1(a) hereof.

"Premium Due Date" has the meaning given to such term in paragraph 2(b) of Annex 2 hereto.

"Premium Payment" has the meaning given to such term in paragraph 2(b) of Annex 2 hereto.

"Premium Payment Schedule" means, with respect to each Portfolio Policy, a schedule of premium payments to be made in respect of such Portfolio Policy (including the dates upon which such payments are due), which such schedule (i) shall be delivered to the Servicer by or on behalf of Owner upon, or promptly following, such Insurance Policy becoming a Portfolio Policy and (ii) may be updated from time to time by the delivery to the Servicer of one or more subsequent schedules by or on behalf of Owner.

"Servicer" has the meaning given to such term in the preamble hereto.

"Services" has the meaning given to such term in Section 2.1 hereof.

"Servicing Policy" means any Insurance Policy that constitutes a Portfolio Policy; provided, however, an Insurance Policy shall not constitute a Servicing Policy (even if it constitutes a Portfolio Policy) from and after the date upon which the Servicer obtains knowledge (either from Owner or a third-party) of the death of the Insured under such Insurance

Policy (or of the death of the second Insured under such Insurance Policy, if such Insurance Policy is a joint Insurance Policy).

"Servicing Standard" has the meaning given to such term in Section 2.2 hereof.

"Servicing Term" means the period beginning on the date of this Agreement and ending upon the termination of this Agreement as provided in Article IX.

"Set-Up Fee" has the meaning given to such term in Section 3.2(a) hereof.

"Settlement Package" has the meaning given to such term in paragraph 1 of Annex 2 hereto.

"Settlement Policy" has the meaning given to such term in paragraph 1 of Annex 2 hereto.

"Settlement Services" means, collectively, the Services described under paragraph 1 of Annex 2 hereto.

"Tracking Services" means, collectively, the Services described in paragraph 3 of Annex 2 hereto.

**ANNEX 2**
**SERVICES**

The Servicer shall, as an independent contractor on behalf of Owner, provide the Settlement Services with respect to each Settlement Policy and manage, service and administer each Portfolio Policy by providing the following other Services, in all cases subject to the Servicing Standard:

1.   <u>Settlement Services</u>. The Servicer shall facilitate Owner's acquisition and disposition of Insurance Policies from time to time as reasonably directed by or on behalf of Owner. With respect to any Insurance Policy which Owner proposes to acquire (directly or indirectly) from time to time (each such Insurance Policy, a "<u>Settlement Policy</u>"), the Servicer shall promptly, after the Servicer's receipt of the transaction documents relating to a Settlement Policy and a document checklist in form and substance reasonably satisfactory to Servicer (collectively, the "Settlement Package"), review such transaction documents and complete the applicable document checklist, and return the same to Owner.

2.   <u>Premium Tracking and Premium Payment</u>.

   (a)   The Servicer shall (i) monitor insurance premium and other invoices and notices received by Servicer from the Insurers with respect to the Portfolio Policies and (ii) promptly notify Owner if any such invoice or notice from any such Insurer states that a Portfolio Policy has lapsed or will lapse or is in a state of default or grace.

   (b)   On or before the twentieth (20th) day of each calendar month occurring after the date of this Agreement, the Servicer shall provide Owner with a statement which, based on each applicable Premium Payment Schedule, (i) identifies each Portfolio Policy (other than a Portfolio Policy with respect to which a death benefit claim has been properly submitted to the applicable Insurer) for which a premium payment is due during the next succeeding calendar month and (ii) indicates the date upon which each such premium payment is due (each, a "<u>Premium Due Date</u>") and the amount of such premium payment (the "<u>Premium Payment</u>") required to be paid on such Premium Due Date.

   (c)   If there is a Premium Due Date (based on the applicable Premium Payment Schedule) with respect to an Insurance Policy occurring during the period beginning on the date such Insurance Policy becomes a Portfolio Policy and ending on the last day of the calendar month immediately following the calendar month in which such Insurance Policy becomes a Portfolio Policy, the Servicer shall, promptly following such Insurance Policy becoming a Portfolio Policy (and in any event prior to such Premium Due Date), provide Owner with a statement in respect of such Insurance Policy which includes the information described in clauses (i) and (ii) of paragraph 2(b) above.

   (d)   Provided that there are sufficient funds available in the Premium Account, the Servicer shall, unless otherwise instructed in writing by Owner, remit to the applicable Insurer the Premium Payment due on each Premium Due Date with

respect to a Portfolio Policy (other than a Portfolio Policy with respect to which a death benefit claim has been properly submitted to the applicable Insurer). Such remittance shall be made to the respective Insurer in immediately available funds or by check. In the event there are insufficient funds available in the Premium Account to so pay the Premium Payment due on a Premium Due Date, the Servicer shall promptly notify Owner.

(e)     For each Premium Due Date with respect to a Portfolio Policy (other than a Portfolio Policy with respect to which a death benefit claim has been properly submitted to the applicable Insurer), (i) if the respective Premium Payment was remitted to the applicable Insurer by check, the Servicer shall confirm that such check was cashed and if it is determined that such check was not so cashed, the Servicer will take the reasonably necessary acts to confirm with such Insurer that (A) such Premium Payment is credited to the correct Portfolio Policy account and (B) after giving effect to such Premium Payment, such Portfolio Policy has not lapsed or is in any state of grace or default, or will lapse or enter into any state of grace or default prior to the next scheduled Premium Due Date (based upon the Premium Payment Schedule) and (ii) if the respective Premium Payment was remitted to the applicable Insurer in immediately available funds, the Servicer shall confirm with such Insurer that (A) such Premium Payment was received by such Insurer and credited to the correct Portfolio Policy account and (B) after giving effect to such Premium Payment, such Portfolio Policy has not lapsed or is in any state of grace or default, or will enter into any state of grace or default prior to the next scheduled Premium Payment Date (based upon the Premium Payment Schedule).

3.     Insured Tracking. The Servicer shall make or attempt to make contact with each Insured under a Servicing Policy on an annual basis in order to determine whether such Insured is alive. Contact method options include, but are not limited to, telephone, facsimile transmission, email or other electronic communication, written communication via mail service and/or any available database with or about an Insured, an Insured's physician(s) and/or a designated contact.

4.     Death Benefit Processing.

(a)     The Servicer shall, following its verification of the death of an Insured under a Portfolio Policy, take all reasonable action (consistent with the Servicing Standard) to obtain a death certificate with respect to such Insured, which death certificate shall include, if available, the cause of death. The Servicer shall provide Owner with written notice of the death of each Insured under a Portfolio Policy within five (5) Business Days of the Servicer receiving a verified notification of death with respect to such Insured.

(b)     The Servicer shall, following its verification of the death of an Insured under a Portfolio Policy (or of the second Insured under a Portfolio Policy that is a joint Insurance Policy), take all reasonable action (consistent with the Servicing Standard) to obtain and complete all necessary death benefit forms with respect to such Portfolio Policy and to obtain, on behalf of Owner, the death benefit payable under such Portfolio Policy, including, without limitation, by using reasonable

efforts (consistent with the Servicing Standard) to resolve any contestability issue; provided, however that the Owner shall agree in writing to pay to the Servicer such additional fees and Out-of-Pocket Costs as reasonably determined by the parties as a condition precedent to the Servicer's efforts relating to the resolution of any contestability issues. The Servicer shall notify Owner of the denial of any claim for a death benefit within three (3) Business Days of the Servicer's receipt of a notice thereof. If the Servicer, through the exercise of reasonable efforts (consistent with the Servicing Standard), cannot collect the full death benefit with respect to any Portfolio Policy, the Servicer shall so inform Owner and describe the efforts taken to collect such death benefit.

(c)     If the Servicer shall receive any check or other similar instrument as payment for such death benefits or other proceeds, the Servicer shall endorse such check or other similar instrument and shall deposit the proceeds thereof into the Premium Account, and in furtherance of the foregoing, Owner hereby grants to the Servicer a revocable power of attorney to take in the name of Owner all lawful steps necessary or otherwise advisable to endorse or otherwise realize upon any such check or other similar instrument for the purposes of depositing the proceeds thereof into the Premium Account. Notwithstanding the foregoing, if the Servicer is not permitted or otherwise able to so endorse any such check or other instrument, the Servicer shall promptly forward it to Owner. The Servicer shall notify Owner within two (2) Business Days of its receipt of any death benefit or other proceeds in respect of any Portfolio Policy.

(d)     Owner acknowledges that the Servicer does not guarantee any specific time period for the receipt of a death certificate from a Governmental Authority, or for the receipt of proceeds in respect of a Portfolio Policy from the applicable Insurer, as Governmental Authorities and Insurers vary in their response times and requirements.

5.     Administrative Services.     The Servicer shall perform the following administrative Services in respect of the Portfolio Policies:

(a)     maintain a database relating to all of the Portfolio Policies which contains all material data, identified in each Settlement Package (the "Policy Information") as provided to the Servicer by Owner and/or other respective parties, necessary for the Servicer's performance of the Services, which will include: (i) the policy number; (ii) the Insurer; (iii) current contact information and social security numbers of each Insured under a Portfolio Policy; (iv) current contact information of each contact person for each Insured under a Portfolio Policy; (v) name and current contact information of the primary care physician of each Insured under a Portfolio Policy; (vi) the current life status of each Insured under a Portfolio Policy; and (vii) the Premium Payment Schedule, including a record of each Premium Payment that has been paid (and the date upon which such payment was made) to the relevant Insurer;

(b)     obtain an updated policy illustration for each Servicing Policy on an annual basis (or more frequently as directed by Owner; provided that Owner shall agree in writing to pay to Servicer such additional fees and Out-of-Pocket Costs as

reasonably determined by the parties as a condition precedent to the Servicer's obtaining additional updated policy illustrations) within thirty (30) days after each anniversary of the issue date of such Servicing Policy; provided, that, to the extent the obtainment of any such policy illustration requires Owner to execute any document, the Servicer shall be excused from obtaining such policy illustration if Owner does not execute such document following a written request of the Servicer;

(c) without limiting paragraph 6 below, provide Owner with one or more standardized monthly reports, setting forth the items described on <u>Annex 3</u> hereto, by no later than the fifteenth (15th) Business Day of every calendar month;

(d) promptly provide Owner and its designees, upon the reasonable request of Owner made with at least five (5) Business Days prior written notice from time to time but not more frequently than twice (2) annually and for durations not in excess of three (3) consecutive Business Days each, access to the Policy Information and to any other records and information maintained by the Servicer pursuant to this Agreement (other than the identity and resources applicable to the methods in which the Servicer provides the tracking services identified in Section 3 of Annex 2; which is considered Servicer's proprietary information) with respect to any Portfolio Policy, or any Insured thereunder or Insurer thereof, and shall, contingent upon Owner paying to Servicer such additional fees and Out-of-Pocket Costs as reasonably requested by Servicer, deliver to Owner such reports with respect thereto as Owner reasonably requests, and shall permit Owner and its designees to reasonably monitor and audit the Servicer's performance of the Services at no cost (other than Out-of-Pocket Costs approved and paid by Owner) or disruption to Servicer; and

(e) respond to inquiries from, and communicate as necessary or otherwise appropriate with, the Insurers relating to the Portfolio Policies and Owner.

6. <u>Notices With Respect to Certain Matters</u>. Without limiting paragraph 5(c) above:

(a) The Servicer shall deliver to Owner, within five (5) Business Days after receipt, a copy of each material written notice or other letter or document received by the Servicer (other than invoices and other information which is not material to the status of a Portfolio Policy) in connection with a Portfolio Policy, the Services or the other transactions contemplated by this Agreement from any Insurer, Insured, Governmental Authority or arbitrator.

(b) The Servicer shall deliver to Owner, within five (5) Business Days after the transmission thereof by the Servicer, a copy of each material written notice or other letter or document (other than premium payments) given by the Servicer in connection with a Portfolio Policy, the Services or the other transactions contemplated hereby to any Insurer, Insured, Governmental Authority or arbitrator.

(c) The Servicer shall deliver to Owner, promptly upon (and in any event within five (5) Business Days after) receiving written notice of any threatened or pending Action by or before any Governmental Authority or arbitrator which (i) involves

<u>Annex 2</u>

or affects any Portfolio Policy or this Agreement or the transactions contemplated hereby, (ii) in any manner challenges the validity or enforceability of any Portfolio Policy or this Agreement or (iii) in any manner challenges or seeks to restrain or prohibit the transactions contemplated by this Agreement, in each case, a notice setting forth the details thereof and any action the Servicer is taking or proposes to take with respect thereto.

(d)    The Servicer shall deliver to Owner, within five (5) Business Days after receiving written notice of any material adverse change, or of any fact, event or circumstance that would reasonably be expected to result in a material adverse change, in the ability of the Servicer to perform any Service or to otherwise comply with any of its obligations under this Agreement, a notice setting forth the details thereof and the action the Servicer is taking or proposes to take with respect thereto.

## ANNEX 3
## CONTENTS OF MONTHLY REPORT

1.    A list of all of the Portfolio Policies, identifying with respect to each Portfolio Policy (i) the name of each Insured thereunder, (ii) the Insurer thereof, (iii) the policy number thereof, (iv) the face amount thereof and (v) the date of issuance thereof.

2.    A list specifying the amount of all premiums which were paid with respect to each Portfolio Policy since the previous report (or the date of this Agreement, in the case of the first report), and each date upon which such payment was made.

3.    A list of any death benefits applied for since the previous report (or the date of this Agreement, in the case of the first report).

Any reports requested by Owner (other than described above) are subject to the reasonable discretion of Servicer in accordance with the Servicing Standard and the payment of such additional fees and Out-of-Pocket Costs as reasonably agreed by the parties.

**ANNEX 4**
**OUT-OF-POCKET COSTS**
**and**
**CPI Adjustments**

I.      For the period through December 31, 2010, the hourly rate of ASG's employees shall be $55.00 per hour, except as hereafter designated:

| | |
|---|---|
| Accounting/IT rates | $ 95.00 |
| Kim Hinkle, General Counsel | $150.00 |
| Sheri Townsend, COO | $150.00 |
| CFO/Controller | $150.00 |
| H. Thomas Moran, II, CEO | $195.00 (such hourly rates are collectively, the "Initial Hourly Rates") |

Commencing January 1, 2011, the Initial Hourly Rates for all such employees and other personnel of ASG shall be adjusted based on the cost of living as hereafter described.

II.      CPI Adjustments.  The Initial Base Fees and the Initial Hourly Rates shall each  be adjusted annually effective on January 1, 2011 and thereafter on each January 1 throughout the Servicing Term and such adjustment shall be determined with reference to the Consumer Price Index, United States, All Urban Consumers, All Items (1967-100) ("CPI"), as published by the United States Department of Labor, Bureau of Labor Statistics (the "Index").  The Initial Base Fees and the Initial Hourly Rates, as adjusted by the CPI from time to time are the "Base Fees" and "Hourly Rates", respectively.  In determining each annual January 1 CPI adjustment, the "Beginning Index" shall be the Index published as of November, 2009 and the "Adjustment Index" shall be the Index published as of November, for each succeeding year during the Servicing Term of the Agreement.  The Base Fees, and Hourly Rates for each twelve (12) month period commencing with each January 1 adjustment date shall equal the product of (i) such initial rates; times (ii) a fraction, the numerator of which is the Adjustment Index for the next preceding November and the denominator of which is the Beginning Index.  In no case, however, should the Base Fees and Hourly Rates determined with respect to any adjustment date be less than the applicable rate or fee determined with respect to any prior adjustment date.  If the Index is hereafter revised or discontinued, the parties shall agree on a similar index to be used thereafter